## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AKEBIA THERAPEUTICS, INC.,
245 First Street
Cambridge, MA 02142

        Plaintiff,

     v.

ALEX M. AZAR II, in his official capacity
as Secretary of Health and Human Services,
200 Independence Ave., SW
Washington, DC 20201

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Ave., SW
Washington, DC 20201

SEEMA VERMA, in her official capacity as
Administrator of the CENTERS FOR
MEDICARE & MEDICAID SERVICES,
7500 Security Blvd.
Baltimore, MD 21244

CENTERS FOR MEDICARE &
MEDICAID SERVICES,
7500 Security Blvd.
Baltimore, MD 21244,

        Defendants.

Civil Action No. 19-12132

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Akebia Therapeutics, Inc. ("Akebia") brings this action under the Administrative Procedure Act ("APA") to challenge a decision by the Centers for Medicare & Medicaid Services ("CMS") eliminating coverage under Medicare Part D for an innovative drug Akebia

developed to treat patients with chronic kidney disease ("CKD").  Plaintiff Akebia alleges as follows:

## PRELIMINARY STATEMENT

1.     CKD is a progressive disease that gradually impairs the function of the kidneys. The disease often advances to end-stage renal disease ("ESRD") in which a patient's kidneys fail and renal replacement therapy such as dialysis or kidney transplantation is required to sustain the patient's life.  Approximately 37 million Americans have CKD, and more than 700,000 have advanced to ESRD.  Patients with CKD and ESRD suffer from a number of complications and illnesses, which may themselves speed deterioration of the kidneys and progression of the disease.  Recognizing the dire challenges confronting CKD and ESRD patients, the President recently issued Executive Order 13879, which declares that "the state of care for patients with chronic kidney disease and end-stage renal disease (ESRD) is unacceptable" and that it is the policy of the United States to "prevent kidney failure whenever possible through better diagnosis, treatment, and incentives for preventive care."  Advancing American Kidney Health, 84 Fed. Reg. 33817 § 2(a) (July 10, 2019).

2.     During the past 14 years, Akebia and its wholly owned subsidiary, Keryx Biopharmaceuticals, Inc., have invested over $270 million in the development and approval of a prescription drug product called Auryxia® for patients with CKD.  Auryxia's active ingredient is a unique, chemically synthesized molecule with a dual mechanism of action that treats two different disease conditions associated with CKD.  In September 2014, the U.S. Food and Drug Administration ("FDA") approved Auryxia for the treatment of hyperphosphatemia (elevated levels of phosphate in the blood) in CKD patients on dialysis.  In November 2017, following additional clinical trials, FDA approved Auryxia as the first orally administered drug for the

treatment of CKD patients with iron deficiency anemia ("IDA") who are not on dialysis.  That

approval marked a significant breakthrough for CKD patients since the only other FDA-

approved drugs for IDA were intravenous medications that carry additional risks and burdens.

3.      Following FDA approval of Auryxia for each of these indications, CMS treated

Auryxia as a "covered Part D drug" under the Medicare Part D Prescription Drug Program ("Part

D"), which provides affordable prescription drug coverage through private prescription drug

plans to those who are age 65 and older and to people under age 65 who are living with certain

disabilities or ESRD.  42 U.S.C. § 1395c.  In September 2018, however, CMS abruptly reversed

course.  CMS revoked Part D coverage for the IDA indication for Auryxia and advised Part D

plan sponsors to require patients to obtain prior authorization ("PA") from the plan before

Auryxia can be dispensed and reimbursed for the treatment of hyperphosphatemia.  *See* Exhibit 1

(hereafter "CMS Decision").  In support of this unexpected reversal, CMS merely asserted in an

email to the Part D plans that its new conclusion that Auryxia is not a covered Part D drug—

despite its approval by FDA to treat disease—was "[c]onsistent with" CMS's treatment of "other

iron products."  *Id.*  Since that time, and despite the Executive Order issued by the President to

advance kidney health in the United States, CMS has declined to rescind this determination.

CMS reached this determination despite its sister agency within the Department of Health and

Human Services, FDA, having approved Auryxia as a drug product to treat a particular disease

and having concluded that Auryxia is distinct from naturally occurring iron supplements.

4.      In denying full Part D coverage for Auryxia, CMS violated Section 1860D-2(e) of

the Social Security Act ("SSA"), 42 U.S.C. § 1395w-102(e).  That provision specifies that FDA-

approved drugs are covered Part D drugs unless they fall within certain statutory exclusions.

Although CMS provided almost no explanation for its decision, CMS appears to have concluded

that Auryxia falls within the exclusion for "mineral products."  That conclusion is contrary to the plain meaning of the statute.  Auryxia is a patented drug product consisting of a complex synthetic compound, not a naturally occurring mineral product.  Moreover, the CMS Decision is arbitrary and capricious action, in violation of the APA.  5 U.S.C. § 706(2)(A).  The CMS Decision is flatly inconsistent with earlier decisions of CMS to provide full Part D coverage to other similarly situated drug products.  The CMS Decision is also internally inconsistent:  CMS considers Auryxia to be a covered Part D drug for one indication but not another, even though the active ingredient and dosage form of the drug is exactly the same when used to treat either condition.

5.     The CMS Decision has caused—and continues to cause—severe harm to Akebia.  Auryxia is currently Akebia's only commercially marketed product.  As a result of CMS's actions, Akebia is suffering significant economic harm, forfeiting opportunities to engage in further research and development that would further benefit CKD patients, and enduring substantial reputational harm.  The actions of CMS have also subjected numerous CKD patients to additional risks and burdens associated with treatment of their disease.  Because standard oral iron supplements are ineffective for CKD patients with IDA, these patients now have little choice but to undergo intravenous-administered treatment, which carries risks of adverse reactions and damage to veins that can interfere with dialysis in the future.  At the same time, the imposition of a PA requirement for hyperphosphatemia patients has led to delays and burdens as patients struggle to obtain Auryxia.

6.     These harms to both Akebia and patients suffering from CKD are ongoing and will increase in the coming months absent relief from the Court, as patients being treated for hyperphosphatemia are required to renew their PAs.  Patients typically must renew PAs one year

after obtaining them, which for most patients will be at the beginning of next year.  The adverse impact on patients caused by the CMS Decision has led over 175 leading nephrologists and several patient organizations, including the American Kidney Fund, National Kidney Foundation, and Dialysis Patient Citizens, to urge CMS to rescind the CMS Decision.

7.      Accordingly, the Court should hold unlawful and set aside the CMS Decision under the APA, restore full Part D coverage for Auryxia, and award other appropriate relief as set forth below, including preliminary injunctive relief.

## PARTIES

8.      Plaintiff Akebia Therapeutics, Inc.'s purpose is to better the lives of people impacted by kidney disease.  Akebia manufactures and markets the drug product Auryxia for the treatment of hyperphosphatemia in CKD patients on dialysis and IDA in CKD patients who are not on dialysis.  Akebia was founded in 2007 and employs about 350 people.  Akebia maintains its principal place of business at 245 First Street, Cambridge, Massachusetts 02142.  Akebia is incorporated in Delaware.  In December 2018, Akebia acquired Boston-based Keryx Biopharmaceuticals, Inc. ("Keryx"), which is incorporated in Delaware and is now a wholly owned subsidiary of Akebia.

9.      Defendant Alex M. Azar II is the Secretary of Health and Human Services and is named only in his official capacity.  Secretary Azar administers the Medicare Part D program through the Centers for Medicare & Medicaid Services.

10.      Defendant United States Department of Health and Human Services administers the Medicare Part D program through the Centers for Medicare & Medicaid Services.

11.     Defendant Seema Verma is the Administrator of the Centers for Medicare & Medicaid Services and is named only in her official capacity.  Administrator Verma administers the Medicare Part D program.

12.     Defendant Centers for Medicare & Medicaid Services is an agency of the United States Department of Health and Human Services and is responsible for administering the Medicare Part D program.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

14.     Venue is proper under 28 U.S.C. § 1391(e).

## GENERAL ALLEGATIONS

### I.     DEVELOPMENT AND APPROVAL OF NEW DRUG PRODUCTS IN THE UNITED STATES

15.     It takes many years and often hundreds of millions of dollars to develop a new drug product.  A company must conduct an extensive array of tests and studies to demonstrate that the drug is safe and effective for its proposed use.  Such studies include preclinical testing such as laboratory tests, animal studies, and formulation studies before the investigational product may be introduced in humans.  If the drug candidate satisfactorily completes this step, the company must next conduct extensive human clinical trials to evaluate the safety and efficacy of the proposed drug product.  Those trials are typically conducted in three sequential phases, which are referred to as phase 1, 2 and 3 clinical trials.  In addition, and among various other requirements, a company developing a new drug must also demonstrate that it manufactures the drug product according to precise specifications and in compliance with good manufacturing practices that assure the product's identity, strength, quality, and purity.

16.     On the bases of these studies, the applicant must next submit a new drug application ("NDA") to FDA.  Under the Food, Drug and Cosmetic Act ("FDCA"), a new drug product may not be distributed in the United States unless and until FDA has approved the NDA. 21 U.S.C. §§ 331, 355.  The NDA includes data available from preclinical and clinical trials, together with detailed information relating to the product's chemistry, manufacturing, controls, and proposed labeling, among other things.  To support marketing approval, the data and studies submitted in the NDA must be sufficient in quality and quantity to establish the safety and efficacy of the drug product for its proposed use.  Indeed, FDA may approve an NDA only if it finds that the new drug product is safe and effective for its indication and other conditions of use. *Id.* § 355(d).

17.     To gain approval of a new indication for a previously approved drug, a sponsor must conduct additional clinical studies and other tests demonstrating that the drug product is also safe and effective for that purpose.  This information is submitted to FDA in a supplemental NDA ("sNDA").  As with the original NDA, FDA may not approve an sNDA for an additional indication unless and until it finds that data from clinical studies provides substantial evidence of the safety and efficacy of the drug for the new use.  Thus, the approval requirements for an sNDA are the same as those for an NDA as set forth in 21 C.F.R. §§ 314.1, 314.71(b):  The proposed drug must be shown to be safe and effective for the treatment of a disease.

18.     Under the FDCA, FDA also maintains separate authority to regulate dietary supplements.  Unlike drug products, which are approved by FDA to treat a particular disease, a dietary supplement may not be marketed for the purposes of treating, diagnosing, preventing, or curing a disease.  21 U.S.C. §§ 321(g)(1)(B).  In fact, dietary supplements must be labeled with a disclaimer that specifically states that the claims made for the product have not been evaluated

by FDA and the products are not intended to diagnose, treat, cure, or prevent any disease.  *Id.* § 343(r)(6)(C).  The FDCA defines a dietary supplement as a "product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients: a vitamin, a mineral . . . or a concentrate, metabolite, constituent, extract or combination of any [such] ingredient . . . ."  *Id.* § 321(ff)(1).  Except in very limited circumstances, a product that has been approved by FDA as a drug through an NDA is, by definition and operation of the FDCA, not a dietary supplement.  *Id.* § 321(ff)(3).

## II.   MEDICARE PART D PROGRAM

19.    Medicare is a federal program that provides healthcare coverage for (1) people age 65 and older, (2) people under age 65 with certain disabilities, and (3) people under age 65 with ESRD.[1]  42 U.S.C. § 1395c.  Enacted in 2003 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), Part D of the Medicare statute (42 U.S.C. § 1395w-101 *et seq.*) makes outpatient prescription drug coverage available at low cost to Medicare beneficiaries.  Congress characterized Part D as a "critical modernization" of Medicare intended to remedy the fact that, prior to its enactment, "[w]hile seniors [we]re taking more drugs than any other demographic group, they [we]re often paying the highest prices because about twenty-five percent of seniors ha[d] no prescription drug coverage."  H.R. Rep. No. 108-391, at 427 (2003) (Conf. Rep.).  Especially hard hit were low-income seniors, who were forced to "make unacceptable choices between life-saving medicines and other essentials."  *Id.*

---

[1] For information regarding Medicare's coverage of patients with ESRD, *see Medicare Coverage of Kidney Dialysis & Kidney Transplant Services*, Centers for Medicare & Medicaid Services (rev. Sept. 2018), https://www.medicare.gov/Pubs/pdf/10128-Medicare-Coverage-ESRD.pdf.

20.     Under Medicare Part D, CMS contracts with health insurance providers known as "sponsors" to administer prescription drug plans.  *See generally* 42 U.S.C. § 1395w-112.  To become a plan sponsor, an entity must submit a bid, which CMS reviews to ensure, among other requirements, that the plan will provide "qualified prescription drug coverage" and is not designed in a manner that will discourage enrollment.  *Id.* § 1395w-111(e).  CMS pays Part D plan sponsors on a monthly basis via (i) a direct subsidy equal to the Part D plan's bid, and (ii) a reinsurance subsidy for patients' covered prescription drug costs that exceed a plan's out-of-pocket maximum.  42 C.F.R. §§ 423.315(b), (c), 423.329(a); *see also, e.g.*, *id.* § 423.336 (risk corridors payments).  CMS also pays plan sponsors premium and cost-sharing subsidies for statutorily-eligible low-income Part D beneficiaries.  *Id.* § 423.329(d).

21.     To receive the Part D benefit, a Medicare beneficiary must enroll in either a stand-alone "Prescription Drug Plan" or a "Medicare Advantage" (Part C) health plan with integrated prescription drug coverage.  42 U.S.C. § 1395w-101(a)(1).  Part D requires that plan sponsors provide beneficiaries access to either "standard prescription drug coverage" or "alternative prescription drug coverage with at least actuarially equivalent benefits."  *Id.* § 1395w-102(a); 42 C.F.R. § 423.104(c), (d).  In either case, plans must provide beneficiaries access to "covered part D drugs."  42 U.S.C. § 1395w-102(a)(1), (b); *id.* § 1395w-111(e)(2)(A).

22.     Congress intended the definition of "covered part D drug" to broadly encompass "any use of a covered outpatient drug for a medically accepted indication."  H.R. Rep. No. 108-391 at 436.  To that end, the Medicare statute sets forth particular criteria to be used to determine what constitutes a "covered part D drug," which it defines with reference to Medicaid's outpatient prescription drug provision.  In relevant part, the statute provides that a "covered part D drug" means "a drug that may be dispensed only upon a prescription and that is described in

subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r-8(k)(2) of this title." 42 U.S.C. § 1395w-102(e)(1)(A). Section 1396r-8(k)(2)(A)(i), in turn, defines a "covered outpatient drug" to mean a drug "which is approved for safety and effectiveness as a prescription drug under section 505 . . . of the Federal Food Drug and Cosmetic Act" ("FDCA"). *Id.* § 1396r-8(k)(2)(A)(i).

23.     After defining a covered Part D drug, the Medicare statute excludes from that term's ambit "drugs or classes of drugs, or their medical uses, which may be excluded from coverage or otherwise restricted under section 1396r-8(d)(2)," a provision of the Medicaid statute. 42 U.S.C. § 1395w-102(e)(2). That Medicaid provision in turn permits states to restrict or exclude coverage for several categories of uses of drugs and for specific drug products, including in pertinent part "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations." *Id.* § 1396r-8(d)(2)(E).

24.     Part D plan sponsors generally list covered drugs on a formulary. *See* 42 U.S.C. § 1395w-104(b)(3). Sponsors must include on their formulary drugs within each therapeutic category and class of covered Part D drugs, *id.* § 1395w-104(b)(3)(C)(i), and must make a "list of drugs included on the plan's formulary" available to the public, 42 C.F.R. § 423.128(b)(4)(i). If a covered Part D drug is not included on a particular sponsor's formulary, the sponsor must grant an exception and cover the drug if it determines the drug is "medically necessary." *Id.* § 423.578(b). CMS maintains a Formulary Reference File ("FRF") that lists all of the drugs that CMS considers to be Part D covered drugs. CMS will not reimburse plan sponsors for coverage of drugs not listed on the FRF.

III.     THE DEVELOPMENT, PATENTING, AND FDA APPROVAL OF AURYXIA

25.     Pursuant to the legal framework governing FDA approval of new drug products, Akebia (including its subsidiary Keryx) has for more than a decade invested substantial

resources in the development and approval of Auryxia for CKD patients.  As noted above, Akebia has spent over $270 million on research and development of Auryxia.

26.     The active ingredient in Auryxia is a unique, chemically synthesized metal-ion compound called a "coordination complex."  This compound is not a naturally occurring material and is not found in conventional iron products.  Instead, it is a novel form of an organic compound that is chemically distinct from naturally occurring iron. [2]  The synthetic compound is synthesized by first adding an alkaline metal hydroxide to a water-soluble ferric iron salt.[3]  The alkaline metal hydroxide is added at a specific rate and temperature to form a uniform polyiron colloidal suspension, which is washed, and an organic acid is added at a specific temperature to form the ferric organic compound in solution.[4]  The novel forms of the ferric-based coordination compounds are precipitated out of the solution using an organic solvent.[5]

27.     In connection with its review of Auryxia, FDA evaluated the active ingredient of the product and concluded that Auryxia is not the structural or functional equivalent of conventional mineral-based iron.  This critical distinction was expressly recognized by FDA reviewers during the drug approval process for Auryxia.   FDA reviewers noted that "[f]erric citrate has been approved in the United States (US) as a food supplement and is listed in 21 Code of Federal Regulations (CFR) 184.1298 as generally recognized as safe (GRAS).  Ferric citrate

---

[2] *See* FDA Label, Auryxia® (ferric citrate) tablets, at 6 (issued Nov. 2017), https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/205874s013lbl.pdf (describing Auryxia as "a phosphate binder and iron replacement product, . . . known chemically as iron (+3), x (1, 2, 3-propanetricarboxylic acid, 2-hydroxy-), y (H2O), where the ratio of citrate (x) to water (y) is as follows:  x=0.70 - 0.87 and y = 1.9 - 3.3).

[3] *See, e.g.,* U.S. Patent No. 9,328,133, Summary of the Invention, p. 2 (2016).

[4] *Id.*

[5] *Id.*

(KRX-0502, a coordination complex) [referring to the active ingredient in Auryxia] as submitted by the Sponsor differs from the GRAS ferric citrate . . . ."[6]  Subsequently, FDA reaffirmed this conclusion, stating that "Auryxia is not a naturally derived mixture; it is instead a synthetic product which is derived via chemical reaction(s) initiated and controlled by Keryx."[7]

28.      Unlike a conventional mineral-based product, Auryxia is covered by a number of patents.  Akebia is the sub-licensee of U.S. Patent No. 5,753,706, claiming therapeutic compositions including the active ingredient in Auryxia and methods of using the same for controlling phosphate retention.  Akebia is also the owner or licensee of at least fourteen patents that describe the novel and unique form of the active ingredient in Auryxia and tablet formulations thereof.  *See* U.S. Patent Nos. 7,767,851; 8,093,423; 8,299,298; 8,338,642; 8,609,896; 8,754,257; 8,754,258; 8,846,976; 8,901,349; 9,050,316; 9,328,133; 9,757,416; 9,387,191; and 10,300,039.  These patents include compound claims directed to the active ingredient in Auryxia having specific novel properties (the '851, '642, and '133 patents); pharmaceutical composition claims including the same (the '642, '896, '133, '257, '258, and '298 patents); method of treatment claims using the same (the '642, '349, '133, '976, '423, '416, and '316 patents); and tablet formulation claims including high loading of the active ingredient in Auryxia and methods of treating hyperphosphatemia or controlling serum phosphorus levels using the same (the '191 and '039 patents).

29.      Auryxia is a complex pharmaceutical compound to manufacture, and it takes six months on average to yield finished drug product from sourced raw materials.  Creating

---

[6] FDA Approval Package, NDA 205874, Pharmacology Review, at 7 (Aug. 15, 2013), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/205874Orig1s000PharmR.pdf.

[7] *See* Letter from Janet Woodcock, FDA, to John F. Neylan, Keryx Biopharmaceuticals, Inc., at 15 (Jan. 19, 2019).

Auryxia's drug substance—only the first step in manufacturing the finished drug product—requires the use of highly specialized filters and dryers in order to yield an active pharmaceutical product with Auryxia's high bioavailability.  Akebia utilizes a proprietary manufacturing process designed to yield the precise structure of the coordination complex that is the active ingredient in the drug product.  It is this manufacturing process that creates the novel synthetic compound that is effective in treating IDA and hyperphosphatemia in patients with CKD.  Akebia's manufacturing process maintains the critical physical characteristics that are key to achieving Auryxia's approved therapeutic effect while ensuring that the drug substance can be formed into oral tablets in a stable and reproducible manner.  Akebia holds a patent on the process of manufacturing Auryxia.  *See* U.S. Patent No. No. 6,903,235.  Finished Auryxia drug product is subjected to 20 different chemical and visual specifications to ensure the quality, performance, and stability of the drug.  Using three separate manufacturers at six active facilities across three countries, Auryxia requires a supply chain robust enough to ensure a secure supply of drug product for its patient population.  Akebia's supply chain is designed to adhere to the highest industry standards of good manufacturing processes for pharmaceutical drug products, a process mandated, validated, and monitored for safety and efficacy by FDA.

30.     The complex active ingredient in Auryxia has a dual mechanism of action.  Based on the ability of Auryxia to bind excess phosphate in the body, Akebia initially developed Auryxia for the treatment of hyperphosphatemia.  That disease commonly afflicts CKD patients and results in abnormally high levels of serum phosphate in a patient's blood.  Elevated levels of phosphate in the blood can cause bone and muscle problems and increase the risk of heart attacks and strokes.  On the basis of extensive preclinical and clinical studies conducted by Akebia, FDA

approved Auryxia on September 5, 2014, for the control of serum phosphorus levels in adult patients with CKD on dialysis.[8]

31.     Akebia next conducted additional clinical studies to develop Auryxia as the first oral drug product for the treatment of IDA in adult patients with CKD.  In total, Akebia spent over $50 million to complete these additional studies.  Obtaining approval for treatment of CKD patients with IDA was especially important since the only other commercially available FDA-approved treatments for this disease are intravenous medications, which subject CKD patients to additional risks and burdens.  On November 6, 2017, FDA approved an sNDA for Auryxia authorizing its use for the treatment of IDA in adult patients with CKD not on dialysis.[9]  This approval was based on FDA's careful and detailed review of Auryxia's unique active ingredient and Akebia's robust clinical studies demonstrating that the drug product is safe and effective for the treatment of IDA in CKD.

32.     The clinical studies that were required by FDA to approve Auryxia for IDA established that the product was approved to treat the disease of renal anemia associated with iron deficiency, and not as a mere iron supplement.  That is because Auryxia does not merely replace missing iron; it also causes the body to produce more hemoglobin.  Patients who do not have CKD can have IDA.  In those instances, IDA can often be treated with changes in the diet or mineral products that are nutritional supplements.  On the other hand, IDA in CKD patients has been demonstrated to be poorly responsive to nutritional supplements.

---

[8] *See* Letter from Norman Stockbridge, FDA, to Keryx Biopharmaceuticals, Inc. (Sept. 5, 2014), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/205874Orig1s000ltr.pdf; *see also* Drugs@FDA: FDA Approved Drug Products, FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=205874 (last visited Oct. 6, 2019).

[9] *See* Letter from Edvardas Kaminskas, FDA, to Keryx Biopharmaceuticals, Inc. (Nov. 6, 2017), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/205874Orig1s013ltr.pdf.

33.     Accordingly, FDA's approval of the IDA indication for Auryxia was based on clinical studies demonstrating the drug product's efficacy in raising hemoglobin in adult patients with CKD—not iron repletion.  In fact, FDA-approved labeling for Auryxia expressly states that, for the pivotal registration trial for Auryxia in IDA, patients could be included in the study only if they were intolerant of or had an unsatisfactory response to conventional oral iron.[10]  By demonstrating safety and efficacy in improving IDA as measured by effect on hemoglobin in the narrower and more difficult to treat CKD population, Auryxia cleared a much higher and different clinical bar than mere iron supplementation.

## IV.     CMS'S DECISION NOT TO COVER AURYXIA FULLY UNDER PART D

34.     Following FDA approval of Auryxia for hyperphosphatemia, Auryxia was included on the CMS FRF and virtually all Medicare Part D sponsors covered the product without any restrictions or a requirement that patients obtain PA.  Similarly, after FDA approved the sNDA authorizing marketing of Auryxia for IDA in patients with CKD, Auryxia continued to be included on the CMS FRF and Part D plans covered the product for the IDA indication without any restrictions.

35.     In a two-paragraph email to plan sponsors on September 14, 2018, however, CMS abruptly changed course and notified Part D sponsors that Auryxia is not a covered Part D drug when used to treat IDA in CKD patients.  CMS indicated that it was aware that FDA had approved Auryxia for the treatment of IDA in adult patients with CKD not on dialysis.  Ex. 1. But CMS then stated that, "[c]onsistent with other iron products," Auryxia was removed from

---

[10] *See* Auryxia® Professional Labeling, Clinical Studies 14.2 (updated 11/2017) ("Patients . . . who were intolerant of or have had an inadequate therapeutic response to oral iron supplements . . . were enrolled.").

the August CY 2018 FRF—the file that lists the drugs that CMS considers to be Part D covered drugs.  *See id.*

36.     At the same time, CMS recognized that Auryxia is also indicated for the control of serum phosphorus levels in adult patients with CKD on dialysis and stated that "CMS does not consider it to be excluded from Part D for this use."  Ex. 1.  CMS stated that Auryxia therefore would be added back to the September 2018 FRF and maintained on the 2019 FRF.  The agency stated, however, that "[s]ince Auryxia may or not meet the definition of a Part D drug depending on its use, we expect that Part D sponsors will utilize a prior authorization (PA) edit, or other process, to ensure that it is being used for a Part D covered indication."  *Id.*

37.     Shortly following the CMS Decision, Part D sponsors terminated coverage of Auryxia for the treatment of IDA and imposed PA restrictions on the use of Auryxia for the treatment of hyperphosphatemia.

## V.     AKEBIA'S OUTREACH TO CMS AND HHS FOLLOWING THE CMS DECISION

38.     In light of the CMS Decision and its impacts on both Akebia and CKD patients, Akebia promptly and repeatedly contacted CMS to request that it reconsider and rescind this decision.  There is no administrative mechanism for a drug manufacturer to challenge a CMS decision that a drug is not a covered Part D drug.  Akebia therefore was able to engage in only informal outreach to potentially relevant decision makers.

39.     Akebia's outreach commenced shortly after the CMS Decision and increased in frequency following Akebia's merger with Keryx in December 2018.  Akebia made multiple efforts in early 2019 to address the severe disruption caused by the CMS Decision, including the newly imposed PA requirement that delayed or prevented patients from filling prescriptions for Auryxia.  Akebia's outreach efforts included, among other meetings, a teleconference on October 16, 2018 with Dr. Jeffrey Kelman, Chief Medical Officer of CMS; a March 21, 2019

meeting with Demetrios Kouzoukas, Principal Deputy Administrator of CMS; a May 13, 2019
meeting with Kristina Harder, Deputy Chief of Staff, Office of the Assistant Secretary for Health
Operations, HHS; and a May 28, 2019 meeting with Amy Larrick, Director of Part D and B
Group Drug Benefit, CMS.  Akebia's Chief Executive Officer, John P. Butler, participated
directly in these efforts, and Akebia provided extensive information regarding the benefits of
Auryxia for patients.  During the course of these outreach efforts, CMS never rejected Akebia's
request that it rescind or modify the CMS Decision.  Instead, CMS officials acknowledged the
importance of this issue and indicated that they would look into the matter.  After months of
discussions, however, CMS failed to rescind the CMS Decision.

40.     In the absence of any such action, on August 23, 2019, Akebia submitted a legal
memorandum to the General Counsel of HHS and the Deputy General Counsel and Chief Legal
Officer of CMS outlining Akebia's position that the CMS Decision is unlawful under both the
SSA and the APA.  In that memorandum, Akebia explained that Auryxia is a covered Part D
drug because it is a prescription drug approved by FDA for safety and effectiveness and does not
fall within any exclusion to coverage.  In particular, Akebia explained that neither the Medicare
statute nor the Medicaid statute defines the phrase "mineral products" and that Auryxia is not a
"mineral product" under any ordinary understanding of the term.  The plain meaning of
"mineral" is "[a] solid, *naturally occurring*, usually inorganic substance with a definite chemical
composition and characteristic physical structure and properties (such as crystalline form)."
*Mineral*, Oxford English Dictionary (3d ed. 2002) (emphasis added).[11]  Thus, a synthetic,

---

[11] *See also Mineral*, Merriam-Webster Dictionary (online ed. 2019) (defining "mineral"
as "a solid homogeneous crystalline chemical element or compound that results from the
inorganic processes of nature" or "a synthetic substance having the chemical composition and
crystalline form and properties of a naturally occurring mineral").

manufactured substance with different properties than a naturally occurring substance cannot be a mineral product.  Under the plain meaning of the term, Auryxia is not a "mineral product." Auryxia is not found in nature nor is it manufactured to have the composition, form, and properties of naturally occurring iron.  Instead, Auryxia is a synthetic, highly processed compound with a unique structure and novel pharmacologic properties.

41.     The memorandum further noted that when Auryxia is used to treat IDA in patients with CKD, it does not function merely as an iron supplement.  CKD patients with IDA often respond poorly to oral iron supplements.  Auryxia, by contrast, has been shown in clinical trials to improve hemoglobin levels in CKD patients.  Akebia noted that for the pivotal registration trial for use of Auryxia to treat IDA, a study inclusion criterion required that subjects in the study were intolerant to or had unsatisfactory response to conventional oral iron.

42.     Akebia's August 23, 2019 memorandum also explained that CMS's decision to stop covering Auryxia violated the APA because it was inconsistent with other cases in which CMS had covered similarly situated drug products under Part D.

43.     First, CMS provides Part D coverage to Vitamin D analogs such as Zemplar® (paricalcitol) and Hectorol® (doxercalciferol) that are approved by FDA to treat secondary hyperparathyroidism due to Vitamin D deficiency in CKD patients, the same population treated by Auryxia.[12]  Like Auryxia, Vitamin D analogs are chemically synthesized organic drug

---

[12] CMS, CY 2019 August Formulary Reference File ("CY 2019 FRF") (RXCUI 606854, 606859, 406503, 858262, 310023), https://www.cms.gov/Medicare/Prescription-Drug-Coverage/ PrescriptionDrugCovContra/Downloads/CY-2019-August-Formulary-Reference-File.zip (last visited Oct. 6, 2019).

substances, not naturally occurring vitamins or minerals.[13]  Similar to Auryxia when used to treat CKD patients with IDA, Vitamin D analogs have been shown to be effective in CKD patients not responding to oral supplementation of native Vitamin D.  Like Auryxia, Vitamin D analogs have been approved by FDA to treat a disease condition associated with a critical deficiency that cannot be adequately addressed through dietary sources or nutritional supplements; native Vitamin D products are ineffective in treating secondary hyperparathyroidism caused by Vitamin D deficiency in patients with CKD because the activation of this natural form must occur in the kidney.  But unlike Auryxia, Vitamin D analogs, such as doxercalciferol and paricalcitol, are in fact covered by CMS under Part D.[14]

44.     Second, CMS has determined that certain potassium chloride-based products intended for the treatment of conditions associated with a mineral deficiency do not fall within Part D's statutory exclusion.  For example, Klor-Con® and K-Tab® (potassium chloride) are oral drug products that contain the mineral ingredient potassium for the treatment and prevention of potassium deficiency (hypokalemia).[15]  The labeling for these mineral-based products describes them interchangeably as both as "electrolyte replenisher[s]" and "potassium supplements."[16]  But CMS covers these products under Part D.

---

[13] FDA Label, Zemplar® (paricalcitol) Capsules (May 5, 2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021606s004lbl.pdf; FDA Label, Hectorol® (doxercalciferol) capsule, liquid filled, https://www.accessdata.fda.gov/ drugsatfda_docs/label/2008/020862s023lbl.pdf (last visited Oct. 6, 2019).

[14] Medicare Prescription Drug Benefit Manual, Ch. 6, § 20.1, Appendix B.

[15] CY 2019 FRF (RXCUI 628953, 670031).

[16] FDA Label, Klor-Con® Potassium Chloride Extended-release Tablets, USP at 1 (June 2006), https://www.accessdata.fda.gov/drugsatfda_docs/label/2007/019123s027lbl.pdf; FDA Label, K-Tab® (potassium chloride extended-release tablets, USP) (2013), https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/018279s034lbl.pdf.

45.     Finally, CMS has determined that the vitamin-based drug product Niaspan®
(niacin) oral tablets does not fall within Part D's statutory exclusion.[17]  Niaspan is indicated for
the treatment of abnormal levels of blood lipids (dyslipidemia).[18]  While the active ingredient in
Niaspan, nicotinic acid, is a common form of Vitamin B3, CMS has explained that the drug
should be covered under Part D because the disease being treated is not a vitamin deficiency
disease, but rather a disease of abnormal lipid levels, and the doses administered are in excess of
what would be needed for nutritional supplementation.[19]

46.     On October 1, 2019, Akebia met with Kelly Cleary, HHS Deputy General
Counsel and Chief Legal Officer of CMS, to further discuss this matter and to once again request
that the agency rescind the CMS Decision.  On October 4, 2019, Akebia was advised by Ms.
Cleary that CMS would not do so.  This was the first time that CMS had directly denied
Akebia's requests.

## VI.    THE HARM TO PATIENTS AND AKEBIA CAUSED BY THE CMS DECISION

47.     IDA is a common but serious disease in CKD patients associated with more rapid
kidney disease progression, higher prevalence of major cardiovascular events, increased
mortality, and reduced quality of life.  There are significant consequences for Medicare
beneficiaries with CKD who are denied access to a safe and effective oral drug to treat their IDA.
Other than Auryxia, the only option for CKD patients with IDA is intravenous (IV) iron

---

[17] Medicare Prescription Drug Benefit Manual, Ch. 6, § 20.1, Appendix B; *see also* CY
2019 FRF (RXCUI 1098135).

[18] FDA Label, Niaspan® (niacin extended-release tablets) (2005),
https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/020381s023lbl.pdf.

[19] CMS, CMS Clarification of Coverage of Prescription Niacin Under Part D,
https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/
Downloads/PrescriptionNiacinClarification_041106.pdf (last visited Oct. 6, 2019).

delivered at an infusion facility.  But IV iron imposes burdens on, and poses health risks to, CKD

patients.  Those patients face the inconvenience and cost associated with travel to an infusion

facility for treatment.  They also face increased health risks because IV administration can

produce anaphylaxis, infection, and scarring of veins that may later be needed for vascular access

placement for dialysis.  These burdens and risks can cause some CKD patients with IDA to go

untreated.  Untreated IDA can significantly diminish patients' quality of life and place their

health at risk.  CMS's decision to exclude Auryxia from the list of covered Part D drugs has thus

subjected CKD patients to these additional risks and burdens.

48.     On June 5, 2019, Dialysis Patient Citizens, a national, patient-led organization

dedicated to quality health care for people with kidney disease, wrote to CMS urging the agency

to reverse its removal of Auryxia as a covered Part D drug when used for IDA.  The group

explained that CMS' decision "negatively affects Medicare beneficiaries with kidney disease and

denies them access to a drug that has the potential to delay progression to dialysis," which will

"lead to worse health outcomes."  The letter explained that "[i]f patients are denied access to

[Auryxia for IDA], the only FDA-approved alternatives are IV iron products," which "are more

costly, have significant safety concerns[,] create potential damage to veins needed to create

fistulas to receive hemodialysis," and require "travel to hospital outpatient departments or

infusion centers, time away from jobs or families, and higher coinsurance due to drug

administration fees associated with IV infusions."  Indeed, the letter added that such travel is so

costly that "many minority and low-income Medicare beneficiaries not on dialysis . . . simply

can't maintain these ongoing infusions of iron due to the burden and cost of therapy, and go

untreated."  Given that many CKD patients develop IDA, which if left untreated can result in

exhaustion, weakness, and cognitive impairment, the group urged CMS to restore Part D coverage for Auryxia.

49.     Likewise, the National Kidney Foundation, the American Kidney Fund, and leading nephrologists wrote to CMS expressing serious concerns about the CMS Decision.  In March 2019, over 175 nephrologists from around the country wrote a letter to Secretary Azar warning that CMS's actions would harm "one of the most vulnerable and costly patient populations in the Medicare program" by making it more difficult for them to access drugs to treat "a significant comorbidity of CKD that is associated with serious clinical consequences." Since the letter was sent, additional nephrologists have signed onto the letter, bringing the total to more than 200 nephrologists.  Further, in a letter sent April 23, 2019, the chiefs of the Nephrology Divisions at the Stanford University School of Medicine and Duke University School of Medicine informed CMS that they had "seen Auryxia® make an enormous difference in the lives of many of our patients" and asked CMS to ensure "that the current generation and future generations of Medicare beneficiaries have access to this innovative therapeutic agent." The National Kidney Foundation cautioned in a letter in May 2019 that "CMS is limiting patients' options to receive the medication they and their physician feel best meets their clinical and quality of life needs."  Similarly, in May 2019, the American Kidney Fund wrote to CMS to "urge CMS to reestablish Medicare Part D coverage for Auryxia for the treatment of anemia in non-dialysis CKD patients" in light of its significant benefits over intravenous iron.

50.     Finally, in addition to the impact to CKD patients who suffer from IDA, the imposition of a PA requirement for Auryxia's indication to treat hyperphosphatemia is also harming patients with CKD on dialysis.  Although that indication remains covered under Part D, dialysis patients have faced delays in obtaining Auryxia for its covered use since CMS imposed

the PA requirement.  This harm will soon increase further because patients being treated for

hyperphosphatemia will be required to renew their PAs.  Patients typically must renew PAs one

year after obtaining them, which for most patients will be at the beginning of next year.  In many

cases, confusion based on the CMS non-coverage decision for IDA and the burden of obtaining

the PA for hyperphosphatemia have made nephrologists reluctant to prescribe Auryxia at all for

their Part D patients.

51.     Akebia has been—and will continue to be—severely harmed by the CMS

Decision in numerous respects.  Auryxia is currently Akebia's only commercially marketed

product.  Among other things, Akebia is incurring significant economic harm, losing

opportunities to engage in further research and development, and suffering substantial

reputational harm because of the CMS Decision.  Prior to the issuance of the CMS Decision,

Auryxia had been experiencing rapid growth and generating revenues that exceeded the

company's forecasts throughout 2018.  The CMS Decision and its related administrative burdens

reduced the number of prescriptions for Auryxia, thereby reducing sales and revenues.  Since

CMS issued the CMS Decision, an increasing number of nephrologists report that reimbursement

issues are the number one barrier to Auryxia use.  Total Auryxia revenues for 2019 are expected

to be significantly below company forecasts from prior to the CMS Decision.  Moreover, unless

the CMS Decision is rescinded, Akebia will lose additional revenues in 2020 and beyond as the

losses compound each other.

52.     Akebia intended to use the Auryxia revenue at issue for research and development

and will now be forced to forfeit or substantially curtail some of those additional research and

development opportunities, which could both increase revenues for Akebia and advance care for

CKD patients.  Moreover, the decline in revenue since the issuance of the CMS Decision has

made it difficult for Akebia to provide specific guidance to investors regarding future sales of Auryxia.  In response to the announcements of lower-than-expected revenues and absence of guidance that the revenues will improve, many market analysts have lowered revenue expectations for Auryxia, in turn lowering Akebia's stock price and harming its reputation.  Finally, the CMS Decision has required Akebia to spend significant amounts of money assisting patients denied access to Auryxia because of the CMS Decision.  These costs will increase again in the coming months as patients are required to renew their PAs.

## COUNT ONE

### THE CMS DECISION IS CONTRARY TO LAW

### (Administrative Procedure Act, 5 U.S.C. § 706)

53. Akebia repeats and re-alleges the allegations contained in Paragraphs 1 to 52 above as though they are fully set forth herein.

54. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

55. The APA further provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.

56. Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

57. Akebia is adversely affected by the CMS Decision.  As a result of the CMS Decision, Akebia has (among other things) suffered significant monetary harm, lost opportunities to engage in further research and development, and suffered significant reputational harm.

58.     The CMS Decision constitutes final agency action.

59.     The CMS Decision is not in accordance with law.  Specifically, the CMS Decision conflicts with 42 U.S.C. § 1395w-102(e).

60.     Auryxia is a "drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i) . . . of section 1396r-8(k)(2) of this title."  42 U.S.C. § 1395w-102(e)(1)(A).  Subparagraph (A)(i) of section 1396r-8(k)(2) describes drugs that are "approved for safety and effectiveness as a prescription drug under section 505 [21 U.S.C. 355] . . . of the Federal Food, Drug, and Cosmetic Act," and Auryxia was approved by FDA for safety and effectiveness under section 505 of the FDCA.  Auryxia is therefore a "covered part D drug." 42 U.S.C. § 1395w-102(e)(1).

61.     Auryxia does not fall within an exclusion under 42 U.S.C. § 1395w-102(e)(2).  It is not a drug that "may be excluded from coverage or otherwise restricted under section 1396r-8(d)(2)."  42 U.S.C. § 1395w-102(e)(2)(A).  In particular, it does not fall within the exclusion for "mineral products."  *Id.* § 1396r-8(d)(2)(E).  As explained above, Auryxia is not a naturally occurring element or a synthetic compound with the characteristics of a naturally occurring element.  It is a synthetic, highly processed compound with a unique structure and novel pharmacologic properties.  Auryxia is also not used in a manner consistent with classifying it as a mineral product.  It is used to treat a disease (IDA) in a class of patients not responsive to naturally occurring oral iron supplements.  Section 1396r-8(d)(2) provides that certain uses of drugs are excluded, but CMS did not identify any applicable use exclusion and none applies.

## COUNT TWO

### THE CMS DECISION IS ARBITRARY AND CAPRICIOUS

### (Administrative Procedure Act, 5 U.S.C. § 706)

62.     Akebia repeats and re-alleges the allegations contained in Paragraphs 1 to 52 above as though they are fully set forth herein.

63.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

64.     The APA further provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.

65.     Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

66.     Akebia is adversely affected by the CMS Decision.  As a result of the CMS Decision, Akebia has (among other things) suffered significant monetary harm, lost opportunities to engage in further research and development, and suffered significant reputational harm.

67.     The CMS Decision constitutes final agency action.

68.     The CMS Decision is arbitrary and capricious in numerous respects.

69.     The CMS Decision conflicts with prior CMS decisions finding that Vitamin D analogs, certain potassium chloride products, and prescription niacin products are covered Part D drugs.

70.     The CMS Decision is internally inconsistent.  CMS has determined that Auryxia is a covered Part D drug—and therefore not a "mineral product"—for purposes of treating

hyperphosphatemia.  But CMS has excluded Auryxia from Part D coverage for purposes of treating IDA even though the active ingredient is precisely the same for both uses.  In excluding Auryxia from Part D coverage when used to treat IDA, CMS appears to have focused on the use of the product.  But CMS did not identify any use excluded by the statute, and none of the use exclusions in the statute is applicable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a)      Preliminarily enjoin the CMS Decision and order Defendants to notify Part D Sponsors that (1) the CMS Decision has been rescinded, (2) Auryxia is a covered Part D drug for both its hyperphosphatemia and IDA indications, and (3) a PA or any other edit is no longer required for the use of Auryxia in the hyperphosphatemia indication;

b)      Hold unlawful and set aside the CMS Decision;

c)      Award Plaintiff the costs of bringing this action; and

d)      Afford such other and further relief as the Court deems just and proper.

Dated:  October 15, 2019                    Respectfully submitted,

                                            /s/ Lindsey B. Silver

Nicole R. Hadas* (#638031)                     Lindsey B. Silver (#685731)
AKEBIA THERAPEUTICS, INC.                      WILMER CUTLER PICKERING HALE
245 First Street                                  AND DORR LLP
Cambridge, MA 02142                            60 State Street
Tel: (617) 871-2091                            Boston, MA 02109
nhadas@akebia.com                              Tel.: (617) 526-6772
                                               Fax: (617) 526-5000
*Of Counsel*                                   lindsey.silver@wilmerhale.com

                                               Bruce S. Manheim*
                                               Brian M. Boynton*
                                               Leon T. Kenworthy*
                                               WILMER CUTLER PICKERING HALE
                                                  AND DORR LLP
                                               1875 Pennsylvania Avenue, NW
                                               Washington, DC 20006
                                               Tel.: (202) 663-6781
                                               Fax: (202) 663-6363
                                               bruce.manheim@wilmerhale.com

                                               *Counsel for Plaintiff*

                                               *\* pro hac vice application forthcoming*