**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AKEBIA THERAPEUTICS, INC.,
                Plaintiff,

     v.

ALEX M. AZAR II, in his official capacity as
Secretary of Health and Human Services, et al.,

        Defendants.

No. 1:19-cv-12132-ADB

**<u>ORAL ARGUMENT REQUESTED</u>**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY**
**<u>INJUNCTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................2

     A.    MEDICARE PART D...........................................................................2

     B.    AKEBIA'S FDA APPROVED DRUG PRODUCT AURYXIA .........................2

     C.    THE CMS DECISION AND AKEBIA'S OUTREACH TO CMS.......................4

ARGUMENT ....................................................................................................................5

I.     AKEBIA IS LIKELY TO SUCCEED ON THE MERITS.......................................6

     A.    The CMS Decision Is Contrary To The Medicare Statute, Which Requires CMS To Fully Cover Auryxia Under Medicare Part D............................................6

          1.    Auryxia is a Covered Part D Drug For Both of its FDA-Approved Indications.................................................................................6

          2.    CMS's Vague and Conclusory Decision is Not Entitled To Deference ....11

     B.    The CMS Decision Was Arbitrary and Capricious.................................................12

          1.    Inconsistent Prior Treatment of Other Products .......................................13

          2.    Inconsistent Treatment of Auryxia's Two Indications ..............................16

II.     AKEBIA FACES IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF .............17

III.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST .......................18

IV.     IN THE ALTERNATIVE, THE COURT CAN GRANT SUMMARY JUDGMENT .....20

CONCLUSION..................................................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001).....................................20

*Arizona v. Shalala*, 121 F. Supp. 2d 40 (D.D.C. 2000) ...................................................6

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................6

*Bruns v. Mayhew*, 750 F.3d 61 (1st Cir. 2014) .........................................................5

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ...........................17

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ......................11, 12

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d
    284 (1st Cir. 1995) ................................................................................15

*Cty. of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) ....................................13

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................13, 16

*Grosso v. Surface Transp. Bd.*, 804 F.3d 110 (1st Cir. 2015) ...................................12, 16

*Harrington v. Chao*, 280 F.3d 50 (1st Cir. 2002) ......................................................13

*Heineman v. Terra Enters., LLC*, 817 F. Supp. 2d 1049 (E.D. Tenn. 2011) ..............................7

*Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167 (1st Cir. 2011) .......................7

*Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, No. 3:17-CV-30037-
    MGM, 2018 WL 4537205 (D. Mass. Aug. 6, 2018) ..................................................8

*Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039 (9th Cir. 2015) ......................................17

*Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) ..............................16

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...........................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
    U.S. 29 (1983)................................................................................12, 16

*Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001)...................................................11

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir.
    2013) ...........................................................................................17

*Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) ...................11

*Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654 (D.C. Cir. 2003) ..............................................................................................................................11

*Ramirez v. Medtronic Inc.*, 961 F. Supp. 2d 977 (D. Ariz. 2013)..............................................10

*Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131 (D.C. Cir. 2010)..................................................6

*Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)....................................17

*SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ......................................................................12

*Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005) ...............................................................................................................................11

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .........................................................................12

*Stauffer v. IRS*, 285 F. Supp. 3d 474 (D. Mass. 2017)...............................................................16

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ..........................................................................7

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ............................................6

*United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Novartis Pharm. Corp.*, No. 15-CV-12732, 2017 WL 2837002 (D. Mass. June 30, 2017) (Burroughs, J.), *aff'd*, 902 F.3d 1 (1st Cir. 2018) ................................8

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ............................................................11, 12

*Varsity Wireless, LLC v. Boxford Zoning Bd. of Appeals*, No. CV 15-11833-MLW, 2017 WL 4220575 (D. Mass. Sept. 22, 2017) ........................................................20

## STATUTES, RULES, AND REGULATIONS

21 C.F.R. § 184.1298 ..................................................................................................................9

38 Fed. Reg. 20,730 (1973) ........................................................................................................9

84 Fed. Reg. 33817 (July 10, 2019)............................................................................................3

5 U.S.C. § 704 ............................................................................................................................6

5 U.S.C. § 706 .......................................................................................................................6, 12

21 U.S.C. § 321 ..........................................................................................................................9

21 U.S.C. § 343 ..........................................................................................................................9

21 U.S.C. § 350 ..........................................................................................................9

21 U.S.C. § 355 ..........................................................................................................9

21 U.S.C. § 505 .......................................................................................................2, 7

42 U.S.C. § 1395c .......................................................................................................2

42 U.S.C. § 1395w-102 .........................................................................................2, 6, 7

42 U.S.C. § 1395w-111 .............................................................................................2

42 U.S.C. § 1395w-112 .............................................................................................2

42 U.S.C. § 1396r-8 .................................................................................2, 6, 7, 10, 16

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.
    L. No. 108-173, 117 Stat. 2066 (2003) .................................................................2

Fed. R. Civ. P. 56(a) .................................................................................................20

Fed. R. Civ. P. 65(a)(2) .............................................................................................20

Pub. L. No. 102-571, 106 Stat. 4502 (1992) .............................................................9

## OTHER AUTHORITIES

H.R. Rep. No. 108-391 (2003) ..................................................................................11

*Mineral*, Oxford Dictionary of Biochemistry and Molecular Biology (2d ed. 2006) .....................7

U.S. Patent No. 6,576,665 (June 10, 2003) ..............................................................15

U.S. Patent No. 6,903,235 (June 7, 2005) .............................................................8, 9

U.S. Patent No. 7,767,851 (Aug. 3, 2010) .............................................................3, 9

U.S. Patent No. 8,093,423 (Jan. 10, 2012) ................................................................8

*Webster's Third New International Dictionary* 1437 (1993) .........................................7

**INTRODUCTION**

In this action, Akebia Therapeutics ("Akebia") challenges a decision by the Centers for Medicare & Medicaid Services ("CMS") to eliminate coverage under Medicare Part D for the drug product Auryxia® when used to treat iron deficiency anemia ("IDA") in patients with chronic kidney disease ("CKD"). Auryxia is a novel and chemically synthesized drug product covered by fifteen patents and approved by the Food and Drug Administration ("FDA") to treat both IDA and hyperphosphatemia. Following these approvals, CMS fully covered Auryxia under Part D. In September 2018, however, CMS abruptly withdrew coverage for the IDA indication. CMS appears to have concluded that Auryxia, when used to treat IDA, should be excluded from Part D coverage because it is a mineral product. That decision violates the Medicare statute and constitutes arbitrary and capricious action in violation of the Administrative Procedure Act ("APA").

Absent relief from the Court, Akebia will suffer significant irreparable harm from the CMS decision. The company will forego millions of dollars in revenues, incur millions of dollars in additional costs, and face significant reputational harm and lost opportunities. The uncertainty about Auryxia sales has also led to a major drop in the company's stock price and caused Akebia to curtail research and development opportunities for Auryxia that would further benefit CKD patients. Moreover, as reflected in declarations submitted by a preeminent nephrologist and three of the nation's leading kidney patient organizations, absent relief, CKD patients will continue to suffer from CMS's denial of Part D coverage of Auryxia. Instead of being able to take Auryxia tablets to treat their disease, CKD patients will have to receive iron infusions intravenously, risking vein damage, anaphylaxis, and other complications.

Accordingly, Akebia now moves the Court for a preliminary injunction. For the reasons explained below, Akebia satisfies the requirements for such relief, and the Court should order

CMS to restore full coverage under Medicare Part D to Auryxia.

## BACKGROUND

### A.    MEDICARE PART D

Medicare is a federal program that provides healthcare coverage for (i) people age 65 and older, (ii) people under age 65 with end-stage renal disease ("ESRD"), and (iii) people under age 65 with certain disabilities. 42 U.S.C. § 1395c. Established by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), Medicare Part D provides low-cost prescription drug coverage to Medicare beneficiaries.

Under Part D, CMS contracts with health insurance providers known as "sponsors" to administer prescription drug plans. *See* 42 U.S.C. § 1395w-112. Part D requires that plan sponsors provide beneficiaries access to "covered part D drugs." *Id.* § 1395w-102(a)(1), (b); *id.* § 1395w-111(e)(2)(A). A "covered part D drug" is "a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r-8(k)(2) of this title." *Id.* § 1395w-102(e)(1)(A). The cross-referenced provision, relating to Medicaid outpatient drug coverage, defines a "[c]overed outpatient drug" to mean a drug "which is approved [by FDA] for safety and effectiveness as a prescription drug under section 505" of the Federal Food, Drug and Cosmetic Act ("FDCA"). *Id.* § 1396r-8(k)(2)(A)(i).

Congress excluded from the definition of "covered part D drug" only "drugs or classes of drugs, or their medical uses, which may be excluded from coverage or otherwise restricted under section 1396r-8(d)(2)." 42 U.S.C. § 1395w-102(e)(2). Section 1396r-8(d)(2), in turn, provides for the exclusion of several categories of uses of drugs, as well as classes of drugs, including in pertinent part here "[p]rescription vitamin[s] and mineral products." *Id.* § 1396r-8(d)(2)(E).

### B.    AKEBIA'S FDA APPROVED DRUG PRODUCT AURYXIA

CKD is a progressive disease that gradually impairs the function of the kidneys. The

disease often advances to ESRD, in which a patient's kidneys fail and renal replacement therapy such as dialysis or kidney transplantation is required to sustain the patient's life. About 37 million Americans suffer from CKD. *See* Advancing American Kidney Health, 84 Fed. Reg. 33817 § 2(a) (July 10, 2019). Among the many complications of CKD, one of the most common is IDA, which can impact these patients' quality of life and lead to potentially fatal complications. Another complication is hyperphosphatemia—a condition in which abnormally high levels of serum phosphate in a CKD patient's blood can cause bone and muscle problems and increase the risk of heart attacks and strokes.

Akebia and its subsidiary Keryx have spent over $270 million researching and developing Auryxia during the past fourteen years. Compl. ¶¶ 2, 25; Butler Decl. ¶ 4. Auryxia is a unique, chemically synthesized organic compound called a ferric citrate "coordination complex" and is distinct from the active ingredient in iron nutritional supplements. *See* FDA Approval Package, NDA 205874, Pharmacology Review, at 7, 11 (Aug. 15, 2013) (Ex. A).[1] In recognition of Auryxia's status as a "novel form of ferric citrate," U.S. Patent No. 7,767,851 cols. 2, 8 (Aug. 3, 2010) (Ex. B), Akebia has obtained or is a licensee or sub-licensee of at least 15 patents covering Auryxia or methods of using the drug. *See* Compl. ¶ 28 (listing patents).

In September 2014, FDA approved Auryxia for the treatment of hyperphosphatemia in CKD patients on dialysis. *See* Letter from Norman Stockbridge, FDA, to Keryx Biopharmaceuticals, Inc. (Sept. 5, 2014) (Ex. C). In November 2017, following additional clinical trials, FDA approved Auryxia as the first orally administered drug for the treatment of CKD patients with IDA who are not on dialysis. *See* Letter from Edvardas Kaminskas, FDA, to

---

[1] All exhibits cited are exhibits to the Declaration of Brian M. Boynton, filed herewith, unless specifically designated as attached to a different declaration.

Keryx Biopharmaceuticals, Inc. (Nov. 6, 2017), at 1 (Ex. D).  Auryxia's second indication is

based on clinical studies demonstrating the drug product's efficacy in raising hemoglobin in

adult patients with CKD.  *See* FDA Label, Auryxia® (ferric citrate) tablets, at 6–7, 9 (issued Nov.

2017) (Ex. E).  Significantly, patients without CKD who have IDA can often be treated with

dietary changes or iron supplements.  But IDA in CKD patients has been demonstrated to be

poorly responsive to nutritional supplements.  Auryxia treats those patients because it does not

merely replace missing iron; it also causes the body to transport ferric iron into the blood, where

it "can be incorporated into hemoglobin."  *Id.* at 6; *see also* Decl. of Dr. Glenn M. Chertow ¶ 6.

## C.    THE CMS DECISION AND AKEBIA'S OUTREACH TO CMS

CMS maintains a Formulary Reference File ("FRF") that lists all of the drugs that CMS

considers Part D covered drugs.  Following FDA approval of Auryxia for hyperphosphatemia

and IDA, CMS treated Auryxia as a fully "covered Part D drug" for each indication.  Butler

Decl. ¶ 6.  Auryxia was included on the CMS FRF beginning in 2014.  *See id.*  Similarly,

Auryxia continued to be included on the CMS FRF following FDA's approval of the IDA

indication in 2017.  *Id.*  As of September 2018, virtually all Medicare Part D sponsors covered

the product without any restrictions.  *Id.*

On September 14, 2018, however, in a notice to Part D plan sponsors, CMS abruptly

reversed itself and stated that Auryxia is not a covered Part D drug when used to treat IDA in

CKD patients.  Butler Decl., Ex. 1 ("CMS Decision").  CMS stated that it was aware that FDA

had approved Auryxia for the treatment of IDA in adult patients with CKD not on dialysis, but

wrote that, "[c]onsistent with other iron products," Auryxia was removed from the August CY

2018 FRF.  *Id.*  CMS recognized Auryxia was also approved to treat hyperphosphatemia and

explained that, because "CMS does not consider it to be excluded from Part D for this use,"

Auryxia would be added back to the September 2018 FRF and maintained on the 2019 FRF.  *Id.*

The agency stated, however, that "[s]ince Auryxia may or may not meet the definition of a Part D drug depending on its use, we expect that Part D sponsors will utilize a prior authorization ("PA") edit, or other process, to ensure that it is being used for a Part D covered indication." *Id.* CMS's decision did not explain why Auryxia was no longer a covered drug for the IDA indication, nor did it explain why the agency departed from its prior determinations that similar drugs were covered Part D drugs. *See infra* p. 13–15. After the CMS Decision, Part D sponsors terminated coverage of Auryxia for the treatment of IDA and imposed PA restrictions on the use of Auryxia for the treatment of hyperphosphatemia. Butler Decl. ¶ 8.

Akebia engaged in extensive outreach to Defendants seeking to persuade them to reverse the CMS Decision. Compl. ¶¶ 38-39; Butler Decl. ¶¶ 9–13. As part of those efforts, Akebia met with numerous officials including (among others) the Principal Deputy Administrator of CMS. Butler Decl. ¶ 10. With no decision from CMS, on August 23, 2019, Akebia submitted a legal memorandum to the General Counsel of the Department of Health and Human Services ("HHS") and the HHS Deputy General Counsel and CMS Chief Legal Officer outlining Akebia's position that the CMS Decision is unlawful under both the Medicare statute and the APA. *See* Compl. ¶¶ 40-45; Butler Decl. ¶ 12. On October 4, 2019, a year after CMS notified the Part D plans that it would no longer cover Auryxia for its IDA indication, CMS confirmed that it would not revisit or rescind its Part D coverage decision regarding Auryxia. Compl. ¶ 46; Butler Decl. ¶ 13.

## ARGUMENT

A preliminary injunction is warranted when the plaintiff demonstrates "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (internal quotation marks omitted).

## I.    AKEBIA IS LIKELY TO SUCCEED ON THE MERITS

Akebia is likely to succeed on the merits of its APA challenge to the CMS Decision,

which is "not in accordance with law" and arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).[2]

### A.    The CMS Decision Is Contrary To The Medicare Statute, Which Requires CMS To Fully Cover Auryxia Under Medicare Part D

The CMS Decision is contrary to the Medicare statute governing Part D drug coverage.

*See* 42 U.S.C. § 1395w-102(e).  Under the plain terms of the statute, Auryxia is a "covered part

D drug" because it is dispensed only with a prescription and is approved by FDA, and it does not

fall within any statutory exclusion from coverage, including the exclusion for "prescription …

mineral products."  *Id.* § 1396r-8(d)(2)(E).

#### 1.    Auryxia Is a Covered Part D Drug For Both of Its FDA-Approved Indications

Auryxia fulfills both of the statutory requirements for a drug to be a "covered part D

drug":  Auryxia (i) can only be obtained with a prescription, and (ii) was approved by FDA for

the treatment of hyperphosphatemia in adult patients with CKD on dialysis in 2014 and for the

---

[2] The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  The CMS Decision is "final agency action" subject to review under the second prong of section 704 because it (1) "marks the consummation of the agency's decisionmaking process" and (2) is one "from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 156 (1997) (internal citations and quotation marks omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).  *First*, the decision represents CMS's final determination about whether Auryxia is a covered Part D drug when prescribed for IDA, as the agency has reiterated in recent discussions with Akebia.  *See Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010) (action is final where there is "no indication that [it is] subject to further agency consideration or possible modification"); *supra* p. 5.  *Second*, the decision has, as a practical matter, already led Part D plan sponsors to cease coverage of Auryxia for IDA and require a PA for Auryxia when prescribed for hyperphosphatemia.  *See, e.g., Arizona v. Shalala*, 121 F. Supp. 2d 40, 48-49 (D.D.C. 2000) (HHS's change to block grant program via informal "action transmittal," which suggested that non-complying plans would not be approved, was final agency action).

treatment of IDA in adult patients with CKD not on dialysis in 2017, both pursuant to Section 505 of the FDCA. 42 U.S.C. § 1395w-102(e)(1); *see supra* p. 3–4. Auryxia therefore *must* be covered under Part D unless it is one of the "drugs or classes of drugs, or their medical uses" that are "excluded from coverage or otherwise restricted" under 42 U.S.C. § 1396r-8(d)(2). 42 U.S.C. § 1395w-102(e)(2)(A). Although CMS did not even mention a specific statutory provision when it excluded Auryxia, CMS's assertion that it was denying coverage "[c]onsistent with other iron products," Butler Decl. Ex. 1, suggests that CMS relied on the exclusion applicable to "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations." 42 U.S.C. § 1396r-8(d)(2)(E).

Auryxia does not fall within that exclusion, as the statute's plain meaning, context, and congressional purpose demonstrate. *See Succar v. Ashcroft*, 394 F.3d 8, 22–23 (1st Cir. 2005). Where, as here, Congress does not define a statutory term, courts may consult a dictionary to divine its ordinary meaning. *See Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 171 (1st Cir. 2011). The dictionary definition of "mineral" is "a solid homogeneous crystalline chemical element or compound (as diamond or quartz) that *results from the inorganic processes of nature* and that has a characteristic crystal structure and chemical composition or range of compositions." *Heineman v. Terra Enters., LLC*, 817 F. Supp. 2d 1049, 1058 (E.D. Tenn. 2011) (quoting *Webster's Third New International Dictionary* 1437 (1993)) (emphasis added); *see also Mineral,* Oxford English Dictionary (3d ed. 2002) (Ex. F) (defining "mineral" as "[a] solid, *naturally occurring*, usually inorganic substance with a definite chemical composition and characteristic physical structure and properties (such as crystalline form)" (emphasis added)); *Mineral*, *Merriam-Webster Dictionary* (Ex. G) ("an inorganic substance") (2nd def.); *Mineral*, Oxford Dictionary of Biochemistry and Molecular Biology (2d ed. 2006)

(Rabinowitz Decl. Ex. A) ("any naturally occurring inorganic substance of a type often obtained by mining").[3]

Auryxia is neither naturally occurring nor inorganic. Instead, as FDA, CMS's sister agency within HHS, has recognized, Auryxia is a novel, synthesized compound that is chemically distinct from naturally occurring iron. Decl. of Michael Rabinowitz ¶¶ 5-6; Letter from Janet Woodcock, FDA, to John F. Neylan, Keryx Biopharmaceuticals, Inc., at 15 (Jan. 19, 2019) (Ex. H) ("Auryxia is not a naturally derived mixture; it is instead a synthetic product which is derived via chemical reaction(s)."); FDA Approval Package at 7 (Ex. A) (explaining that the "coordination complex" that is the active ingredient in Auryxia differs from the form of ferric citrate that is marketed as a mineral product to maintain nutritional iron levels); Chertow Decl. ¶ 6. Auryxia is not found in nature; it was developed through years of research and can only be manufactured through a patented and complex process. *See* U.S. Patent No. 8,093,423 (Jan. 10, 2012) (Ex. I) (describing the manufacturing and quality control process); U.S. Patent No. 6,903,235 col. 2 (June 7, 2005) (Ex. J) (same).[4] In other words, Auryxia was invented in a lab, not dug out of the earth.

In recognition of Auryxia's status as a "novel form of ferric citrate," Auryxia is covered

---

[3] *See also* U.S. Geological Survey, *What is the difference between a rock and a mineral?* (defining a "mineral" as "a naturally occurring inorganic element or compound having an orderly internal structure and characteristic chemical composition, crystal form, and physical properties"), https://www.usgs.gov/faqs/what-difference-between-a-rock-and-a-mineral?qt-news_science_products=0#qt-news_science_products (last visited Oct. 23, 2019) (Rabinowitz Decl. Ex. B).

[4] The Court should take judicial notice of statements in the official U.S. Patent and Trademark Office records cited herein. *See Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, No. 3:17-CV-30037-MGM, 2018 WL 4537205, at *1 (D. Mass. Aug. 6, 2018); *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Novartis Pharm. Corp.*, No. 15-CV-12732, 2017 WL 2837002, at *3 n.5 (D. Mass. June 30, 2017) (Burroughs, J.) (taking judicial notice of patent prosecution documents as public record), *aff'd*, 902 F.3d 1 (1st Cir. 2018).

by at least 15 patents that describe the ferric citrate coordination complex in Auryxia as distinct from commercially available ferric citrate in both physical characteristics and solubility. *E.g.*, '851 Patent cols. 2, 8 (Ex. B); *see also* FDA Approval Package at 7 (Ex. A) (explaining that while ferric citrate has been approved as a dietary supplement and listed at 21 C.F.R. § 184.1298 as "generally recognized as safe" ("GRAS"), Auryxia's active ingredient "differs from the GRAS ferric citrate"). Auryxia is also an organic compound, not an inorganic mineral. Specifically, ferric citrate is an organic derivative of citric acid, which is an organic compound that has the chemical formula $C_6H_8O_7$. *See* '235 Patent col. 2 (Ex. J); Rabinowitz Decl. ¶ 5.

Auryxia's approved indication to treat a disease that does not respond to traditional iron supplements further supports the conclusion that it is not a mere mineral product that provides nutritional supplementation.[5] Oral iron supplements—including those dispensed only on prescription—merely supply iron for nutritional supplementation purposes. *E.g.*, Label, Niferex™ Tablets (July 2019) (Ex. K) ("Niferex™ is a multivitamin/multimineral dietary

---

[5] The FDCA draws a distinction between "drugs," 21 U.S.C. § 321 (g)(1)—which undergo a rigorous, expensive, and time-consuming approval process to ensure they are safe and effective to treat a specific disease, *see* 21 U.S.C. § 355; Compl. ¶¶ 15-17—and "mineral" based supplements and other "dietary supplements," which are "intended to supplement the diet," 21 U.S.C. § 321(ff)(1)(B). Only a drug is intended "for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," *id.* § 321(g)(1)(B); it is unlawful misbranding for a vitamin or mineral dietary supplement to claim to treat a specific disease or class of diseases, *id.* § 343(r)(6). The statutory and regulatory scheme make clear that vitamins and minerals are products used for nutritional supplementation. In addition to 21 U.S.C. § 321(ff), which defines vitamins and minerals as among the "dietary ingredients" included in "product[s] intended to supplement the diet," the FDCA's misbranding provision refers to the labeling of "any vitamin, mineral, *or other nutrient*," 21 U.S.C. § 343(q)(1)(E) (emphasis added), and limits FDA's rulemaking jurisdiction regarding vitamins and minerals to "a vitamin, mineral, or other ingredient for use by man *to supplement his diet*," *id.* § 350(3)(B) (emphasis added); *see also* Pub. L. No. 102-571, 106 Stat. 4502 (1992) (requiring HHS to study FDA activities "related to dietary supplements of vitamins, minerals, herbs, or other similar nutritional substances."); 38 Fed. Reg. 20,730, 20,732 (1973) (FDA Commissioner explanation that "vitamins and minerals are intended … to be taken to supplement the diet … and are not intended for medicinal or therapeutic purposes").

supplement indicated for use in improving the nutritional status of patients with iron deficiency"). In contrast, FDA approved Auryxia to treat a disease—IDA. As the clinical studies upon which FDA's approval of Auryxia for IDA make clear, unlike iron dietary supplements, it is Auryxia's unique chemical properties that allow it to effectively treat IDA in patients with CKD, causing their bodies to produce more hemoglobin. FDA's approved label for Auryxia states that, for the pivotal registration trial for Auryxia's IDA indication, only patients "who were intolerant or ha[d] had an inadequate therapeutic response to oral iron supplements" could participate. *See* FDA Label, Auryxia® (ferric citrate) tablets, at 9 (Ex. E).[6] In other words, it is precisely *because* Auryxia is not merely an iron supplement that it is able to treat IDA in patients with CKD who do not respond to iron supplements. *See id.* at 6; Chertow Decl. ¶¶ 5-6.

In its decision, CMS states that "Auryxia® may or may not meet the definition of a Part D drug *depending on its use*." Butler Decl. Ex. 1 (emphasis added). But none of the statutory exclusions from Part D coverage based on *use* is applicable here. *See* 42 U.S.C. § 1396r-8(d)(2). Auryxia is not used for "anorexia, weight loss, or weight gain," to "promote fertility," for "cosmetic purposes or hair growth," for "relief of cough and colds," or for "sexual or erectile dysfunction." *Id.* Moreover, the *use* of Auryxia cannot make it a "mineral product." Where the physical characteristics of a product demonstrate that it is not a mineral product—*i.e.*, it is not a naturally occurring inorganic substance—CMS cannot classify that product as a mineral based merely on its use. It can exclude a product from coverage based on its use only if the use falls within one of the statutorily excluded uses set forth above, which Auryxia's use for the treatment of IDA does not.

---

[6] The Court can take judicial notice of statements in an FDA-approved label, which "is a matter of public record and there is no dispute … about its authenticity." *Ramirez v. Medtronic Inc.*, 961 F. Supp. 2d 977, 984 (D. Ariz. 2013).

Finally, reading the term "mineral product" not to encompass a novel synthetic drug like Auryxia accords with Congress's purpose in enacting Part D—to broadly cover "any use of a covered outpatient drug for a medically accepted indication." H.R. Rep. No. 108-391, at 442 (2003) (Conf. Rep.). "Agency action must be found to be consistent with the congressional purposes underlying the authorizing statute," *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983), and CMS's expansive and unjustified reading of "mineral product" to include even a synthetic organic compound approved by FDA to treat diseases suffered by vulnerable CKD patients undermines Congress's goals in enacting Part D. *See also Shays v. FEC*, 337 F. Supp. 2d 28, 70 (D.D.C. 2004) (considering statutory purpose), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005).

### 2. CMS's Vague and Conclusory Decision Is Not Entitled To Deference

CMS's cryptic email to Plan D sponsors is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the email does not even mention the "mineral product" exclusion, much less purport to interpret it, and thus "contains no interpretation of [the statutory provision at issue] to which [the Court] might defer." *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 661 (D.C. Cir. 2003). Second, there is no indication that Congress intended to grant deference to such an informal agency decision. Deference is appropriate only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see Navarro v. Pfizer Corp.*, 261 F.3d 90, 99 (1st Cir. 2001). Here, CMS did not exercise rulemaking authority, and nothing in the Medicare statute gives any "indication that Congress meant to delegate authority" to make binding interpretations in informal emails to plan sponsors. *Mead*, 533 U.S. at 231. Indeed, CMS's

11

email is far more conclusory than the headquarters-level U.S. Customs Service decisions "set[ting] out [the agency's] rationale in some detail" denied deference in *Mead*. *See id.* at 224.

Nor is the CMS Decision entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Where *Chevron* deference is inapplicable, the weight due an agency's interpretation "'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Mead*, 533 U.S. at 219 (quoting *Skidmore*, 323 U.S. at 140). In other words, the Court should only "defer to [CMS] in so far as [it] find[s] the [agency]'s interpretations persuasive." *Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 117 (1st Cir. 2015). The CMS Decision has *no* persuasive value. It simply instructs Plan D sponsors to remove Auryxia from their formularies when prescribed for IDA, without any meaningful explanation or even an identification of the statutory provision that serves as the basis for CMS's determination. The CMS Decision offers no analysis of the meaning of "covered part D drug" or whether Auryxia is a covered Part D drug when used to treat IDA.[7]

### B.    The CMS Decision Was Arbitrary and Capricious

The CMS Decision also must be set aside under the APA because it is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and must base its decision "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

---

[7] In any event, no deference is owed because the term "mineral product" unambiguously does not include a synthetic, organic compound like Auryxia. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (Courts "owe an agency's interpretation of the law no deference unless, after employing traditional tools of statutory construction, [they] find [them]selves unable to discern Congress's meaning." (internal quotation marks omitted)).

(internal quotation marks omitted)).  "A long line of precedent has established that an agency

action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations

differently."  *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (internal

quotation marks omitted).

### 1.    Inconsistent Prior Treatment of Other Products

CMS's refusal to cover Auryxia as a Part D drug when prescribed for IDA was arbitrary

and capricious because it departed from the agency's prior treatment of similarly or less

favorably situated drug products.  Agencies are not free to ignore their own precedent; they must

"address or adequately distinguish" similar prior cases with different outcomes.  *Harrington v.*

*Chao*, 280 F.3d 50, 57–59 (1st Cir. 2002); *see also Encino Motorcars, LLC v. Navarro*, 136 S.

Ct. 2117, 2126 (2016).  Here, the CMS Decision regarding coverage of Auryxia cannot be

squared with CMS's prior determinations regarding other drug products.

*First*, CMS has consistently covered products that include a synthetically derived mineral

component combined with citric acid.  For instance, the FRF lists lithium citrate oral solution,

CY 2019 FRF (Ex. L) (RXCUI 756059), which is an organic substance consisting of citric acid

mixed with a salt of the mineral lithium that is approved by FDA as a mood stabilizer to treat

bipolar disorder.  *See* FDA Label, Lithium oral solution and Lithium Carbonate capsules (Sept.

2018) (Ex. M) ("Lithium Oral Solution is a palatable oral dosage form of lithium ion.  It is

prepared in solution from lithium hydroxide and citric acid in a ratio approximately di-lithium

citrate.").  Likewise, CMS covers potassium citrate, CY 2019 FRF (Ex. L) (RXCUI 199381,

603281, 898490, 898517, 199376, 603282), which is a "citrate salt of potassium," FDA Label,

Urocit®-K, at 1 (Jan. 1990) (Ex. N).

*Second*, CMS announced in its January 2016 revisions to the Medicare Prescription Drug

Benefit Manual ("Manual") that Vitamin D analogs such as Zemplar® (paricalcitol) and

Hectorol® (doxercalciferol) "are not excluded" from Part D coverage "because CMS interprets the exclusion of prescription vitamin D products as being limited to products consisting of ergocalciferol (vitamin D2) and/or cholecalciferol (vitamin D3)." Manual, Ch. 6, § 20.1 (revised Jan. 15, 2016) (Ex. O). Like Auryxia, Vitamin D analogs are chemically synthesized organic drug substances, not naturally occurring vitamins or minerals. *See* FDA Label, Zemplar® (paricalcitol) Capsules (2014) (Ex. P); FDA Label, Hectorol® (doxercalciferol) capsule, liquid filled (Ex. Q). And, like Auryxia, the Vitamin D analogs are approved by FDA to treat a disease associated with a critical deficiency that cannot be adequately addressed through dietary sources or nutritional supplements. Just as Auryxia treats IDA stemming from iron deficiency in CKD patients who cannot benefit from natural iron supplements, Vitamin D analogs treat secondary hyperparathyroidism due to Vitamin D deficiency in CKD patients who cannot take natural Vitamin D supplements because the activation of natural Vitamin D (like iron) must occur in the kidney. FDA Label, Zemplar® § 12.1 (Ex. P); FDA Label, Hectorol®, at 1 (Ex. Q).

*Third*, CMS determined in 2006 that the niacin-based drug products Niaspan and Niacor do not fall within the statutory exclusion under Part D for vitamins and minerals—a decision it reaffirmed in the Part D Manual in 2016. *See* CMS, CMS Clarification of Coverage of Prescription Niacin Under Part D, at 1 (Apr. 11, 2006) (Ex. R); CMS, Part D Drugs/Part D Excluded Drugs, at 3 (Apr. 19, 2006) (Ex. S); Manual, Ch. 6, § 20.1 (Ex. O). Unlike Auryxia, which is synthetically produced, the active ingredient in those drugs, nicotinic acid, is a common, naturally occurring form of Vitamin B3. CMS's primary rationale for covering niacin tablets— that they "are approved by the [FDA] as safe and effective drugs, are used therapeutically for the treatment of dyslipidemia, and do not serve as nutritional supplements or address a vitamin deficiency," CMS Clarification of Coverage at 1 (Ex. R)—applies with equal force to Auryxia,

which is approved to treat IDA, not a mineral deficiency.

*Finally,* CMS has also consistently covered a number of drugs consisting of inorganic mineral salts.  For instance, the 2019 FRF lists several calcium-based mineral salts, including calcium acetate, a "naturally occurring solid."  U.S. Patent No. 6,576,665 (June 10, 2003) (Ex. T); *see* CY 2019 FRF (Ex. L) (RXCUI 1099808, 359296, 197433).  CMS's 2019 FRF also includes seven forms of lithium carbonate.  *See* CY 2019 FRF (RXCUI 311355, 197891, 197889, 197890, 206786, 197892, 197893) (active ingredient is lithium carbonate); FDA Label, Lithium oral solution and Lithium Carbonate capsules (Ex. M) ("[l]ithium is an element of the alkali-metal group"); FDA Approval Package, Lithium Carbonate Capsules USP, 300 mg, NDA 76-121, Chemist's Review No. 2, at 2 (Aug. 13, 2001) (Ex. U) (lithium carbonate consists of "[c]arbonic acid [and] dilithium salt").  Many of those mineral-based products are, unlike Auryxia, intended for the treatment of conditions associated with a mineral deficiency.  For example, Klor-Con and K-Tab (potassium chloride) are oral drug products that contain the mineral ingredient potassium for the treatment and prevention of potassium deficiency.  *See, e.g.*, CY 2019 FRF (Ex. L) (RXCUI 628953, 670031) (listing Klor-Con® and K-Tab® potassium chloride tablets).  In fact, the FDA-approved labeling for these mineral-based products describes them as "[p]otassium supplement[s]."  FDA Label, Klor-Con® Potassium Chloride Extended-release Tablets, USP, at 1 (June 2006) (Ex. V); *see also* Manual, Ch. 6, App'x B (Ex. O) (listing potassium, sodium, calcium, and magnesium-based drug products as covered Part D drugs).

CMS's interpretation of the statutory exclusion for mineral products in this case and its decision to deny coverage for Auryxia's IDA indication cannot be reconciled with its treatment of the products described above.  CMS did not "set forth any new facts, fresh information, or changed circumstances which would counsel" in favor of shifting its position.  *Citizens*

*Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 291 (1st Cir. 1995).

Indeed, CMS failed even to *acknowledge* its departure from its prior narrower interpretations of

"[p]rescription vitamin[s] and mineral products."  42 U.S.C. § 1396r-8(d)(2)(E).  That alone

renders the decision arbitrary and capricious.  *Encino Motorcars, LLC*, 136 S. Ct. at 2125-26.

### 2.    Inconsistent Treatment of Auryxia's Two Indications

The CMS Decision is also arbitrary and capricious because it treats Auryxia differently

for its two FDA-approved indications.  CMS has concluded that Auryxia is covered for

hyperphosphatemia and not covered for IDA.  *See* Butler Decl. Ex. 1.  It is "the very meaning of

the arbitrary and capricious standard" that "[t]he treatment of cases A and B, where the two cases

are functionally indistinguishable, must be consistent."  *Indep. Petroleum Ass'n of Am. v.

Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).  Auryxia cannot be a "mineral product" when

prescribed to treat IDA and not a mineral product when prescribed to treat hyperphosphatemia.

The drug's chemical properties, dosage form (tablets), and strength per tablet are unchanged

regardless of which disease it treats.

In its decision, CMS states that "Auryxia® may or may not meet the definition of a Part D

drug *depending on its use*."  Butler Decl. Ex. 1 (emphasis added).  But as noted above, none of

the exclusions from coverage based on *use* is applicable here, and CMS cannot classify Auryxia

as a mineral based on its use.  *See supra* p. 10.[8]  In the instant case, CMS failed to "provide[] any

explanation for its decision, let alone a 'rational connection between the facts found and the

choice made.'"  *Stauffer v. IRS*, 285 F. Supp. 3d 474, 485 (D. Mass. 2017) (quoting *State Farm*,

463 U.S. at 43).

---

[8] *See State Farm*, 463 U.S. at 43 (holding that when an "agency has relied on factors which Congress has not intended it to consider," its action is arbitrary and capricious); *Grosso*, 804 F.3d at 120 (vacating agency interpretation that looked to irrelevant considerations).

**II.    AKEBIA FACES IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF**

Akebia readily satisfies the second preliminary injunction requirement:  Absent relief, it will suffer irreparable harm during the pendency of this litigation.

To establish irreparable harm, Akebia "need not demonstrate that the denial of injunctive relief will be fatal to its business."  *Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996).  It need only show that its legal remedies are inadequate.  *Id*.  Although purely economic harm is generally not "irreparable," *id.* at 19, Akebia cannot obtain compensation for its losses because sovereign immunity bars recovery of damages from Defendants.  It is well settled that significant economic injuries like those Akebia will suffer are irreparable when damages are unavailable because the wrongdoer is protected by sovereign immunity.  *See, e.g.*, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (economic harm irreparable where sovereign immunity would bar damages); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (noting that "numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable"); *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

Auryxia is currently Akebia's only commercially marketed product, and the Medicare Part D program accounts for approximately 60% of the IDA market for the product.  *See* Butler Decl. ¶ 15.  Absent injunctive relief, the Company stands to forego millions of dollars in revenues in 2020 alone during the course of this litigation.  *Id.* ¶ 20.  Moreover, even if full coverage for Auryxia is restored effective January 1, 2021 following a decision on the merits of Akebia's claim, the CMS Decision will have lasting impacts on revenue going forward, since future growth will be based on decreased 2020 revenues.  *Id.* ¶ 21.

In addition, Akebia has already incurred millions of dollars in costs related to addressing the PA requirement.  Butler Decl. ¶ 23.  In 2020, Akebia will incur millions of dollars of

additional costs, absent relief from the Court, as patients being treated for hyperphosphatemia will be required to renew their PAs in January 2020. *Id*. ¶ 24. Akebia also faces significant additional costs related to excess inventory resulting from the CMS Decision. *See id.* ¶ 25.

Akebia also will continue to suffer significant reputational harm without injunctive relief. *See* Butler Decl. ¶¶ 27–32. As Akebia attempted to work with CMS during the course of 2019 to reverse the agency's decision, Akebia's reputation suffered in light of uncertainty in the financial markets about Auryxia sales, including in particular the long-term outlook for the IDA indication. *Id.* ¶¶ 27–28, 30. As a result of concerns about revenue growth, Akebia's stock price has dropped 60% since December 2018 and is unlikely to recover its value if the CMS Decision is not reversed. *Id*. ¶ 29. The CMS Decision has also resulted in significant harm to Akebia in the form of lost opportunities, including opportunities for further R&D aimed at providing additional benefits to CKD patients and opportunities to inform more nephrologists about the benefits of Auryxia. *See id.* ¶¶ 33–34. When CMS for the first time advised Akebia on October 4, 2019 that the agency would not rescind or modify the CMS Decision, Akebia had no option but to seek injunctive relief to avoid suffering further harm.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST

The balance of the equities weighs heavily in favor of Akebia. Unlike Akebia, Defendants will suffer no cognizable harm if a preliminary injunction is granted. There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted). Because Akebia has shown a likelihood of success on the merits, Defendants have no recognizable interest in persisting to deny coverage for Auryxia's IDA indication.

In any event, the cost to the government of covering Auryxia for IDA treatment is modest

and is insignificant to the program as a whole.  *See* Butler Decl. ¶ 36 (providing annual cost per

patient); *id.* ¶ 38 (total Part D program spending greater than $80 billion).  The cost to the

government of covering Auryxia for IDA is also less than the harm to Akebia from non-coverage

of IDA and the related PA requirement for hyperphosphatemia, both in absolute terms and (most

obviously) in relative terms.  *See id.* ¶ 37.[9]  Finally, any increase in cost from covering Auryxia

for IDA would be offset by reductions in the cost of treating complications from the use of

intravenous ("IV") iron and caring for untreated IDA patients.  *See id.* ¶ 39.

Additionally, the public interest strongly weighs in favor of granting a preliminary

injunction—as a preeminent nephrologist and the nation's leading kidney disease patient groups

all have attested.  *See* Chertow Decl. ¶¶ 4–8; Decl. of LaVarne A. Burton ¶¶ 4–6; Decl. of Hrant

Jamgochian ¶¶ 4–9 (attaching letter to CMS); Decl. of Kerry Willis ¶ 4 (same).  The CMS

Decision harms IDA patients with CKD because Auryxia is the only FDA-approved orally

administered drug that treats that condition.  *See* Burton Decl. ¶¶ 4–5; Jamgochian Decl. ¶ 5.

Absent Part D coverage of Auryxia for IDA in patients with CKD, the only other commercially

available FDA-approved treatment options are IV iron products, which must be administered by

a provider at an infusion center.  Chertow Decl. ¶¶ 7–8; Burton Decl. ¶ 5.  That requires patients

to travel to such infusion centers to receive IV iron, "which can be a significant burden for

beneficiaries who face transportation barriers or live in rural areas."  *Id.*  Intravenous

administration presents particular risks to patients, including anaphylaxis, infection, and potential

damage to veins that will be needed for vascular access for hemodialysis (if the CKD patient

---

[9] Because CMS does not dispute that Auryxia is a covered Part D drug for its
hyperphosphatemia indication, the additional cost to cover those patients is not cognizable harm
to the government.  *Compare id.* ¶ 20 (dividing lost revenues to Akebia between IDA and
hyperphosphatemia due to the PA).

later advances to dialysis).  Chertow Decl. ¶¶ 7–8; Burton Decl. ¶ 5.

In addition, CMS's imposition of a PA requirement for Auryxia when prescribed to treat hyperphosphatemia burdens patients with CKD on dialysis.  The PA requirement has caused delays for patients to obtain the drug and has led to confusion among some doctors about Auryxia's coverage status—a harm that will only increase in the coming months as those patients must renew their annual PAs.  Burton Decl. ¶ 6; Butler Decl. ¶ 24.

## IV.    IN THE ALTERNATIVE, THE COURT CAN GRANT SUMMARY JUDGMENT

Akebia also moves for summary judgment on its APA claims.  Summary judgment is merited when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In an APA case, on a motion for summary judgment the "'entire case' on review is a question of law."  *Varsity Wireless, LLC v. Boxford Zoning Bd. of Appeals*, No. CV 15-11833-MLW, 2017 WL 4220575, at *10 (D. Mass. Sept. 22, 2017) (citation omitted); *see also American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001).  Therefore, "whether or not [Akebia] has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy."  *American Bioscience*, 269 F.3d at 1084.  For the same reasons Akebia is likely to succeed on the merits, it is entitled to summary judgment on its claims.  Accordingly, although the Court can and should grant Akebia's motion for a preliminary injunction, it may also decide this case now on the merits if it elects to do so.  *See* Fed. R. Civ. P. 65(a)(2).

## CONCLUSION

Accordingly, the Court should grant Akebia's motion and the relief sought therein.

Dated:  October 29, 2019

Respectfully submitted,

/s/ Lindsey B. Silver

Nicole R. Hadas (#638031)*
AKEBIA THERAPEUTICS, INC.
245 First Street
Cambridge, MA 02142
Tel: (617) 871-2091
nhadas@akebia.com

*Of Counsel*

Lindsey B. Silver (#685731)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6772
Fax: (617) 526-5000
lindsey.silver@wilmerhale.com

Bruce S. Manheim*
Brian M. Boynton*
Leon T. Kenworthy*
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6781
Fax: (202) 663-6363
bruce.manheim@wilmerhale.com

*Counsel for Plaintiff*

*  Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2019, I served a true and correct copy of the attached

document upon counsel listed below by electronic mail and Federal Express (overnight):

Mary Murrane
Rayford Farquhar
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210
Mary.Murrane@usdoj.gov
Rayford.Farquhar@usdoj.gov

/s/ *Lindsey B. Silver* _____
LINDSEY B. SILVER