**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AKEBIA THERAPEUTICS, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>ALEX M. AZAR II, in his official capacity<br>as Secretary of Health and Human Services;<br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES;<br>SEEMA VERMA, in her official capacity as<br>Administrator of the CENTERS FOR<br>MEDICARE & MEDICAID SERVICES;<br>CENTERS FOR MEDICARE &<br>MEDICAID SERVICES,<br><br>        Defendants. | No. <u>19-cv-12132-ADB</u><br><br>(Leave to file granted on 11/18/19) |

**AMICUS BRIEF**
**OF THE MASSACHUSETTS BIOTECHNOLOGY COUNCIL**
**IN SUPPORT OF PLAINTIFF AKEBIA THERAPEUTICS, INC.**

**INTEREST OF THE AMICUS**

Founded in 1985, Massachusetts Biotechnology Council ("MassBio") is a nonprofit association of more than 1,200 biotechnology companies, academic institutions, disease foundations, and other organizations involved in life sciences and healthcare, principally based or active in the Commonwealth of Massachusetts.  With a commitment to advancing Massachusetts' leadership in the life sciences by growing the industry, adding value to the healthcare system, and improving patient lives, MassBio has spent the last three decades advancing policies and providing educational services to achieve those goals.

Of the more than 700 MassBio members that are life sciences companies, more than 88% have fewer than 250 employees worldwide, and 74% have fewer than 50.  These small and midsize

biotechnology companies depend on consistent application of CMS reimbursement policies to maintain their ability to research, develop, and commercialize breakthrough medicines, and to ensure that patients around the world have affordable access to those new treatments. Because of the already numerous challenges faced by small and midsize biotechnology companies and the heavy reliance of these innovators on federal healthcare programs, MassBio is particularly concerned with the uncertainty caused by CMS's unexplained decision with regard to Auryxia. As an advocate for innovation and improved patient outcomes, MassBio can provide insight on the consequences of the CMS Decision for patients, manufacturers, providers, and federal healthcare programs.

A core consideration in the decision to grant a preliminary injunction is the public and private interests that will be affected by the challenged decision. *See* ECF 15 ("Akebia Motion") at 3–4; ECF 16 ("Akebia Mem.") at 18–20. MassBio's role as a leader in state and national educational efforts around the biotechnology industry makes it uniquely well positioned to assist the Court in understanding the effects of the CMS Decision on the public interest. In this case, the public interest, including the CMS Decision's effects on patients, providers, federal healthcare programs, and manufacturers, further tilts the balance in Akebia's favor. Accordingly, MassBio respectfully submits this *amicus* to aid in the Court's inquiry.

## ARGUMENT

Over the past decade and a half, Plaintiff Akebia Therapeutics, Inc. ("Akebia") has spent more than $270 million developing, testing, and securing regulatory approval for Auryxia® (ferric citrate) ("Auryxia"). That effort resulted in the development of a product that has secured U.S. Patent and Trademark Office ("USPTO") approval for fifteen patents and U.S. Food and Drug Administration ("FDA") approval for two indications that hold promise to improve the health and

lives of thousands of patients.  Akebia's considerable investment in developing Auryxia is illustrative of similar, and even greater, investments across the biotechnology industry.  In the six years leading up to Auryxia's 2014 FDA approval, the Government Accountability Office estimates that research and development ("R&D") spending by U.S.-owned pharmaceutical companies and U.S.-based R&D by foreign companies exceeded $89 billion per year, reflecting an eight percent increase in annual spending over that period.  *See* GAO, *Drug Industry Profits, Research and Development Spending, and Merger and Acquisition Deals*, at 29 (Nov. 2017) (link). That investment yielded transformative improvement in Americans' health care.  Over the same time, novel drugs – innovative products that serve previously unmet medical need or help advance patient care – accounted for about thirteen percent of all FDA approvals and increased from just twenty in 2005 to forty-five a decade later. *Id.* at 41.

For market participants, federal healthcare spending represents the single greatest variable when evaluating investment decisions; Medicare alone accounts for fifteen percent of *all* federal spending.  *See* Juliette Cubanski et al., *The Facts on Medicare Spending and Financing*, at 2 (Aug. 20, 2019) (link).  Further, federal healthcare spending represents twenty percent of all healthcare spending in the United States.  CMS, *National Health Expenditure Fact Sheet* (link).  Precisely because of this outsized role, exclusion from reimbursement eligibility under federal healthcare programs has been recognized as a virtual "financial death sentence" for drug or medical device manufacturers.  HHS-OIG, *A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse*, at 9, 14 (link).  Exclusion of a particular product from CMS coverage has a similarly devastating effect on its financial prospects, especially when the target population is predominantly older, and thus more likely to be covered by Medicare.  The impact on patients is

just as dire.  If a drug is excluded from the Medicare coverage, beneficiaries of that program are effectively cut off from access to the medication.

Because manufacturers must make investment decisions years before a reimbursement decision, they are required to "anticipate questions of value in the clinical development pipeline," based on established reimbursement principles at the time of the investment decision, "not simply at or near the point of launch."  Brian Bruen et al., *The Impact of Reimbursement Policies and Practices on Healthcare Technology Innovation*, at 24 (Feb. 2016) (link).  Where the company in question is a smaller, or single-product, innovator, the ability to rely on consistency and regularity in the reimbursement regime is all the more essential, as a non-reimbursement decision for that product would be fatal to the company.

CMS itself recognizes the role that its reimbursement decisions play in fostering future innovation.  It publishes guides like the *Innovators' Guide to Navigating Medicare*, which acknowledges that "[w]ith a Medicare budget of approximately $500 billion and serving 54 million beneficiaries, [CMS] plays a key role in the overall direction of the health care system."  CMS, *Innovators' Guide to Navigating Medicare*, at 3 (2015) (link).  Because payers – particularly large payers like the Medicare Part D program overseen by CMS – play such a crucial role, HHS-funded research has identified ways to increase predictability in reimbursement decisions in order to encourage innovation:  "The discernible impact on incentives to innovate can be substantially affected by the manner in which different reimbursement decision-making processes (by different payers) are ***transparent, evidence-based, consistent, and timely***."  Bruen *supra*, at 25 (emphasis added).

The decision to deem Auryxia ineligible for reimbursement when used to treat iron deficiency anemia and to require prior authorization when used to treat hyperphosphatemia (the

"CMS Decision"), fails on all of these important standards.  It was not transparent; after more than a year of discussions Akebia is still left to guess about the reason for the decision.  Akebia Mem. at 7 (assuming, without confirmation, that Auryxia was designated as ineligible for reimbursement based on the exception for mineral products).  Nor does it seem to have been evidence-based; at least CMS has not disclosed what that evidence might be.  And CMS's decision-making was certainly not timely; CMS made its about face *after* Auryxia had already been placed on formulary, and without any forewarning.

From the standpoint of innovation, however, the most problematic aspect of the CMS Decision – and the focus of *amicus*'s submission – is the way in which it departs, without explanation, from past practice.  The CMS Decision is inconsistent with (1) the treatment of other products by CMS under Medicare Part D; (2) the treatment of Auryxia both by the USPTO and by CMS's sister organization under the HHS umbrella, the FDA; and (3) the treatment of Auryxia's multiple uses within CMS.  Each of these inconsistencies introduces uncertainty into the decision-making of manufacturers that will diminish innovation to the detriment of patients, providers, and federal healthcare programs.

## I.  CMS's Treatment of Auryxia is Inconsistent with Its Treatment of Similar Products.

When companies first consider whether to invest in the development of a new product – or, in Akebia's case, whether to start up a new *company* to develop a new product – the first and most important reference point is CMS's treatment of similar products.  While there is a certain degree of inherent unpredictability at the time of initial investment about what the state of affairs will be fifteen or more years later when the product is ready to enter the market, companies are nonetheless justified in relying on agencies' past practice as an indicator of their future behavior.  As Akebia observes, agencies are not free to ignore their own precedent and must "address or

adequately distinguish" similar prior cases with different outcomes.  Akebia Mem. at 13 (quoting *Harrington v. Chao*, 280 F.3d 50, 57–59 (1st Cir. 2002)).  Companies make investments in new products long before they know whether they will actually be able to create an innovative, safe, and effective product, long before they seek patent protection from the USPTO, and long before they seek regulatory approval from FDA.  *If* they manage to achieve all of those things, however, the expectation is that CMS will not abruptly reverse course by changing its approach to evaluating products for inclusion on its formulary.  If manufacturers cannot rely on a consistent application of existing principles to similarly situated new products, the resulting uncertainty would risk stifling innovation.

Under Medicare Part D, plan sponsors – who administer prescription drug plans – are only required to provide beneficiaries with access to "covered part D drugs."  *See* 42 U.S.C. §§ 1395w-112; 102(a)(1), (b); 111(e)(2)(A).  "Covered part D drugs" are broadly defined to include any drug "which is approved [by the FDA] for safety and effectiveness as a prescription drug," *except for* a finite and explicit list of products.  *Id.* § 1396r-8(k)(2)(A)(i).  As relevant here, that list of exceptions includes "[p]rescription . . . mineral products." 42 U.S.C. § 1396r-8(d)(2)(E).  Notably, Congress did not define the meaning of the term "mineral products" and, therefore, innovators like Akebia may struggle to discern, years in advance of a finished product, whether their new drug will fall within that exception.  Beyond consulting a dictionary, *see* Akebia Mem. at 7, the logical starting point of such an inquiry is CMS's treatment of similar products.

As Akebia notes, there are numerous products that are identically or similarly situated to Auryxia and have received favorable CMS reimbursement decisions, including: (1) synthetically derived mineral components combined with citric acid; (2) Vitamin D analogs; (3) niacin-based products; and (4) inorganic mineral salts.  Akebia Mem. at 13–15.  For an innovator at the outset

of product development, there are no grounds on which to differentiate between the treatment of those products and that of Auryxia.  For instance, CMS has approved reimbursement of other products with  active ingredients that are chemically synthesized organic drug substances, such as Vitamin D analogs.  Akebia Mem. at 14.  Indeed, CMS has even approved for reimbursement products in which the active ingredient is a common, *naturally occurring* form of Vitamin B3. *Id.*

Nor has CMS's historical treatment of products turned on, as it now suggests, whether the product is "used for treatment of vitamin or mineral deficiencies or conditions caused by vitamin or mineral deficiencies." ECF 29 at 2.  Indeed, many of Auryxia's comparison products are approved to treat precisely those conditions and have nonetheless received favorable determinations from CMS.  *See, e.g.*, FDA Label, Klor-Con® Potassium Chloride Extended-release Tablets, USP, at 1 (June 2006) (ECF 25-22 at 1) (stating that Klor-Con is "indicated for the treatment and prophylaxis of hypokalemia," which is a potassium deficiency in the bloodstream).  Here, moreover, Auryxia was approved based on studies done in patients selected precisely because traditional mineral supplements had been *ineffective*, *see* ECF 25-5 at 9, confirming that Auryxia is not simply treating a mineral deficiency with a mineral supplement.  In short, neither the source of the product's active ingredient nor the nature of the treatment would have suggested to Akebia that reimbursement would be denied for Auryxia.

None of that is to say that CMS can never make changes to reimbursement criteria or decisions.  Where CMS makes transparent decisions, provides timely notice of the fact that they are considering those changes, and relies on evidence-based information (with input from the industry), such decisions can actually enhance companies' willingness to engage in R&D by building trust that the agency's decisions will be well-informed and transparent.  But when CMS does none of those, yet reverses its longstanding practice, such inconsistency not only frustrates

the legitimate expectations underlying past investments, it deters future investment for fear of other, similar arbitrary decision-making.

## II.   CMS's Treatment of Auryxia is Inconsistent with Other Governmental Agencies'.

Innovators will also be deterred from making investments in developing new treatments if they perceive a risk that different regulatory bodies with overlapping authorities will reach inconsistent conclusions regarding the same underlying issue.  New biotechnological innovations often must pass through several checkpoints on their way to market.  Prior to CMS's coverage decisions, Auryxia obtained both patent protection from USPTO and approval from FDA to be marketed as a drug.  USPTO approved fifteen separate patents covering Auryxia, and FDA approved two separate indications.  The actions by those sister regulatory bodies confirm that Auryxia is not merely a mineral product, but instead qualifies as the type of medical innovation that federal law, including the Medicare formulary, are meant to incentivize.  The CMS Decision cannot be squared with those other decisions.

As an initial matter, Auryxia was not treated as a mineral by the USPTO.  Both the USPTO and the Supreme Court have consistently held that naturally occurring products, *specifically including minerals*, are not proper subject matter eligible for patent protection.  *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) ("[A] new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter.").  As a result, the USPTO has promulgated guidance that it will not approve patents for any "non-naturally occurring products that lack markedly different characteristics from any naturally occurring counterpart."  *See* USPTO, *Manual of Patent Examining Procedure*, § 2106 – Patent Subject Matter Eligibility (link).  Indeed, "neither naturally occurring compositions of matter, *nor synthetically created compositions that are structurally identical to the naturally occurring compositions*, are patent eligible."  *In re BRCA1– and BRCA2–Based Hereditary Cancer Test Patent Litigation*, 774 F.3d 755, 760 (Fed. Cir. 2014)

(emphasis added).  Thus, the fact that the USPTO granted patents for Auryxia means that the USPTO regards it as being – at a minimum – "markedly different" than any naturally occurring material, including minerals.

FDA – CMS's sister organization within HHS – provided further confirmation that Auryxia is not a mineral.  As Akebia has noted, Congress intended Medicare Part D to provide coverage for "any use of a covered outpatient drug for a medically accepted indication."  ECF 1 ("Compl.") ¶ 22 (citing H.R. Rep. No. 108-391 at 436).  While Congress excluded from coverage FDA approved prescription minerals or vitamins, *see* 42 U.S.C. § 1396r-8(d)(2)(E), here, FDA was unambiguous in finding that "Auryxia is not a naturally derived mixture; it is instead a synthetic product which is derived via chemical reaction(s) . . . ."  ECF 25-8 at 15.

Indeed, Auryxia's advancements, based on the clinical investigations Akebia funded, led FDA to grant Akebia a three-year period of exclusivity on the product.  *See id.* at 19.  This statutory exclusivity period recognizes the importance of medical advances made through clinical studies – both in terms of current innovation and laying the groundwork for future research – that would be put at risk by reduced innovation.  And, as previously noted, Auryxia's pivotal trial for its second indication was specifically limited to patients "who were intolerant of or have had an inadequate therapeutic response to oral iron supplements."  ECF 25-5 at 9.  This further confirms that Auryxia is not a mineral, since patients responded positively to it after not responding to iron supplements.  Only through further innovation and research, including costly patient trials, was Akebia able to develop a new medical treatment for a serious health condition.  This is not simply a case of FDA granting an indication for a mineral supplement.

In short, both the USPTO and FDA have recognized that Auryxia is not simply a naturally occurring mineral put to a new use, but rather represents a significant scientific innovation,

permitting an improvement in the treatment of hyperphosphatemia and iron deficiency anemia. CMS's contradiction of USPTO and FDA on this point is especially problematic given the nature of the inquiry.  In Section 1396r-8(d)(2)(E), Congress used a term – "mineral" – that is a scientific term with implications for a number of pharmaceutical regulators.  Of the three agencies that looked at this issue, it is USPTO and FDA that have greater scientific expertise regarding what constitutes a "mineral."  Yet, CMS gave no explanation why it did not treat those agencies' scientific determinations as decisive of the issue.  Where reimbursement coverage turns on questions of a scientific character, innovators need to know that these scientific determinations will be made on the basis of sound science.  If reimbursement can be denied based on CMS's unexplained reversal of prior determinations made by two agencies with scientific expertise, investors will lack confidence that they need in order to undertake costly scientific investigations.

**III.    CMS's Use-Dependent Treatment of Auryxia is Inconsistent with Statutory Requirements.**

Even apart from the above inconsistencies, CMS's own treatment of Auryxia introduces sufficient inconsistency in the market to undermine future investment in life-saving innovations. As Akebia has explained, CMS's decision to draw a distinction between the different uses of Auryxia for purposes of reimbursement is inconsistent with the statutory text.  Akebia Memo. at 10.  If Auryxia is not a mineral product when used to treat hyperphosphatemia, it is not a mineral product when used to treat iron deficiency anemia.

The consequences of CMS's inconsistent treatment will be significant both for manufacturers and patients.  As is often the case, after making a considerable initial investment to develop and secure approval for an initial indication for Auryxia, Akebia spent a further $50 million to perform additional studies that were necessary to secure approval of its second indication.  Compl. ¶ 31.  But the CMS Decision would create clear disincentives to developing

such additional life-saving uses.  Whereas Akebia had an existing, FDA-approved, CMS-reimbursable product on the market, it was punished for further investing in that life-changing innovation to obtain a second indication when CMS determined not only that Auryxia's second indication was not reimbursable, but that the product's original indication would require prior authorization.  Now, manufacturers have to consider not only whether a second (or third or fourth) indication will be approved by FDA and CMS, they have to consider whether seeking that approval will rebound back and frustrate their ability to recoup expenses and serve patients under their existing indications.  As a result, manufacturers have a significantly diminished incentive to pursue supplemental New Drug Applications for "add-on" indications.

Moreover, the CMS Decision is detrimental to patients for existing uses, who are now at risk of losing funding for treatment options *they are already using*.  Patients and providers must now go through the onerous prior approval process as required by the CMS Decision and state-level payers may very well deny reimbursement for Auryxia as a result.  This would leave patients already taking Auryxia for hyperphosphatemia fighting through previously nonexistent red tape and potentially losing all governmental support for the product that they and their providers have decided on as a course of treatment.  Every manufacturer who considers seeking a second indication will now faces a critical decision whether to risk serving existing patients in order to potentially improve the lives of additional patients.

Nothing in the statutory text suggests that Congress intended the reimbursement of a FDA approved product to be put at risk by FDA's approval of a further indication for the product, especially where, as here, FDA has expressly concluded that the product is not merely a form of a naturally occurring mineral, but instead a synthetic material derived from a chemical process.

<u>**CONCLUSION**</u>

The USPTO says that Auryxia is not a mineral.  FDA says that Auryxia is not a mineral.  CMS says that other, similar products are not minerals.  And CMS says that Auryxia is not a mineral when used for other indications.  Akebia has amply demonstrated that this line of decision-making is inconsistent with the APA.  As explained above, moreover, these inconsistencies, if allowed to stand, will undermine the confidence that is necessary to incentivize future investment in new medical treatments.  The industry, patients, and the government itself will all suffer as a consequence.  For these reasons, *amicus* MassBio respectfully urges the Court to grant Akebia's motion.


Dated: November 18, 2019                    Respectfully submitted,


                                            /s/ Douglas Hallward-Driemeier
                                            Douglas Hallward-Driemeier (BBO # 627643)
                                            Douglas.Hallward-Driemeier@ropesgray.com
                                            ROPES & GRAY LLP
                                            2099 Pennsylvania Avenue NW
                                            Washington, DC 20006
                                            (202) 508-4600 (voice)
                                            (202) 508-4650 (fax)

                                            *Attorney for Massachusetts Biotechnology Council*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, November 18, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

/s/ Douglas Hallward-Driemeier
Douglas Hallward-Driemeier (BBO # 627643)
Douglas.Hallward-Driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC 20006
(202) 508-4600 (voice)
(202) 508-4650 (fax)

*Attorney for Massachusetts Biotechnology Council*