# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AKEBIA THERAPEUTICS, INC., | |
| Plaintiff, | Civil Action No. 19-12132-ADB |
| v. | |
| ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SEEMA VERMA in her official capacity as Administrator of the CENTERS FOR MEDICARE & MEDICAID SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**INTRODUCTION**

This Court should deny the motion of plaintiff Akebia Therapeutics, Inc. ("Akebia") for a preliminary injunction. Akebia has not met its burden to demonstrate it is entitled to the extraordinary relief of a status quo-altering preliminary injunction ordering the government to notify Part D sponsors that, effective immediately, Auryxia is a covered Part D drug for both its hyperphosphatemia and iron deficiency anemia indications. Dkt. 15 at 4-5.

First, Akebia cannot show it is likely to succeed on the merits. As set forth in Defendants' Motion to Dismiss, this Court lacks subject matter jurisdiction over Akebia's claims because they have not been administratively exhausted, and Akebia failed to state a cognizable claim for relief because there is no final agency action subject to review under the Administrative Procedure Act ("APA"). Nor does Akebia fare any better on the substance of its claims: Akebia cannot demonstrate that the sub-regulatory guidance it challenges violates the Medicare statute, nor can Akebia demonstrate that CMS guidance was inconsistently applied, much less arbitrary and capricious.

Second, Akebia has failed to make the required showing of imminent irreparable harm. After waiting more than one year to bring its challenge to CMS's sub-regulatory guidance, all of the harms it alleges either have already occurred or are too speculative to support its request for injunctive relief.

Finally, the balance of the hardships weighs in favor of the government, and the public interest would not be not served by a status quo-altering injunction that would short-circuit the regulatory process and interfere with the proper functioning of the Medicare program as administered by CMS. Because Akebia cannot satisfy any of the elements of the preliminary injunction test, this Court should deny its motion.

1

# BACKGROUND[1]

## I.    Statutory Background: Part D Coverage

Under Medicare Part D, the government does not directly reimburse beneficiaries for their prescription drug expenses.  Instead, CMS, which administers Part D, contracts with private insurers ("sponsors") to provide prescription drug coverage to Medicare beneficiaries who elect to enroll in a Part D plan.  *See* 42 U.S.C. §§ 1395w-111 and 1395w-112.

Most prescription-only drugs that are approved by the Food and Drug Administration ("FDA") are "covered Part D drug[s]."  42 U.S.C. § 1395w-102(e)(1)(A).  But the statutory definition of "covered Part D drug" excludes "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations."  42 U.S.C. §§ 1395w-102(e)(2) and 1396r-8(d)(2)(E).  There are thousands of FDA-approved, prescription-only drugs in the United States, and CMS typically addresses the applicability of the statutory exceptions to Part D coverage on a case-by-case basis via sub-regulatory guidance and informal communications like the one at issue in this case.[2]

## II.    Factual and Procedural Background

In December 2018, Akebia purchased Keryx Biopharmaceuticals ("Keryx").  *See* Dkt. 18, Declaration of John P. Butler ("Butler Decl."), ¶ 4.  Keryx had developed a drug called Auryxia (ferric citrate), which is an iron salt.  In September 2014, the FDA approved Auryxia to

---

[1] For a full discussion of the statutory and factual background, the government respectfully refers the Court to the background section of Defendants' Motion to Dismiss.

[2] For example, the Medicare Prescription Drug Benefit Manual ("PDBM") includes a non-exhaustive chart containing "coverage clarifications for specific products/drugs/drug categories in accordance with statutory and regulatory requirements for Part D drugs."  Ex. A, App'x B (Chapter 6 of PDBM).  Unless otherwise specified, citations to "Ex. __" refer to the exhibits to the Declaration of Alexander R. White, filed concurrently.

treat hyperphosphatemia in patients with chronic kidney disease on dialysis. *See id.*, ¶ 5. The FDA label states that, for this indication, "Auryxia is a phosphate binder indicated for the control of serum phosphorus levels in adult patients with chronic kidney disease on dialysis." Dkt. 25-5, Ex. E at 1.[3] In November 2017, the FDA approved Auryxia to treat iron deficiency anemia in patients with chronic kidney disease who are not on dialysis. *See* Butler Decl., ¶ 5. For this indication, the FDA describes Auryxia as "an iron replacement product indicated for the treatment of iron deficiency anemia in adult patients with chronic kidney disease not on dialysis." Dkt. 25-5, Ex. E at 1.

In September 2018, after the FDA had approved Auryxia as an "iron replacement product" for the treatment of iron deficiency anemia, CMS sent Part D plan sponsors an email (the "CMS Email") regarding Part D coverage for Auryxia. CMS explained that, "[s]ince Auryxia may or may not meet the definition of a Part D drug depending on its use, we expect that Part D sponsors will utilize a prior authorization edit, or other process, to ensure that it is being used for a Part D covered indication." Dkt. 1, Ex. 1.

More than a year later, on October 15, 2019, Akebia filed its Complaint challenging the guidance in the CMS Email about the use of a "prior authorization edit, or other process" to ensure that sponsors paid for Auryxia only when it was used for a Part D covered indication and not as an iron replacement product for which Congress has prohibited Part D coverage. Dkt. 1. Akebia sought a preliminary injunction on October 29, 2019. Dkts. 15 & 16.

---

[3] The government agrees with Akebia that statements in an FDA-approved label are proper subjects for judicial notice under Federal Rule of Evidence 201. *See* Dkt. 16 at 15 n.6.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary injunction only when the movant demonstrates that: (1) plaintiff is likely to succeed on the merits; (2) it is likely plaintiff will be irreparably injured if a preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction will further the public interest.[4] *Id.* at 20; *see also McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996); *SimpliVity Corp. v. Bondranko,* 204 F. Supp. 3d 340, 346 (D. Mass. 2016); *Banks v. Harrison*, 864 F. Supp. 2d 142, 145 (D.D.C. 2012).

The standard for a preliminary injunction is heightened when, as here, the injunction would "disturb rather than preserve the status quo." *Lewis v. General Elec. Co.*, 37 F. Supp. 2d 55, 62 (D. Mass. 1999). Thus, "the First Circuit has cautioned that mandatory preliminary injunctions . . . should be granted only in those circumstances when the exigencies of the situation demand such relief." *Id.* (citing *Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)) (internal quotations omitted); *see also Braintree Labs, Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010).

---

[4] In the First Circuit, the "four factors are not entitled to equal weight in the decisional calculus." *SimpliVity*, 204 F. Supp. 3d at 346 (internal quotations omitted). The movant's likelihood of success on the merits is the core requirement for a preliminary injunction. *Id.* "If the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *Id.* (internal quotations omitted).

## ARGUMENT

**I.**    **Akebia is Unlikely to Succeed on the Merits of Its Claim.**

Akebia is not likely to succeed on the merits because the CMS Email is non-binding and accords with the congressional directive that Part D plans not provide coverage for "mineral products."  This Court should reject Akebia's invitation to render a binding interpretation of this statutory provision in the first instance and should defer judgment on the reasonableness of CMS's interpretation until the agency renders a final action subject to judicial review.[5]  *See* Mem. in Supp. of Mot. to Dismiss at 7-15.

### A.  Akebia is not likely to overcome the substantial defects identified in Defendants' Motion to Dismiss.

For the reasons set forth in Defendants' Motion to Dismiss, and fully incorporated herein, Akebia has failed to establish that this Court has jurisdiction over its claims or to state a claim for relief that can be granted.  There has been no presentment and exhaustion of administrative remedies as required by the Medicare statute.  42 U.S.C. § 405(h); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000).  Moreover, because the CMS Email is not a final agency action, Akebia cannot state a claim for relief under the APA.  5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  For these reasons alone, Akebia is not likely to succeed on the merits.

---

[5] Akebia challenges an Email from CMS staff and complains that it is "cryptic" and unpersuasive.  Dkt. 16 at 16.  The government does not seek any deference for the CMS Email. *See* Dkt. 16 at 16-17.  As set forth in Defendants' Motion to Dismiss, the CMS Email is not a "final agency action" and is therefore unreviewable.  *See* Mem. in Supp. of Mot. to Dismiss at 11-15.  An administrative challenge by a beneficiary to a coverage determination would, consistent with congressional purpose in enacting 42 U.S.C. § 405(h), permit the agency to consider the issues presented and interpret the statute in a manner consistent with application of *Chevron* deference.  *See generally id.* at 3-6, 10.

**B. The CMS Email is consistent with the statutory exclusion of "mineral products" from Part D coverage.**

Even if the Court were to reach the substance of Akebia's claims, Akebia is not likely to prevail because the CMS Email is not contrary to the plain language of the statute. *See* 5 U.S.C. § 706(2)(A). The CMS Email reflects CMS guidance that the statutory exclusion of Part D coverage for "mineral products" applies to a drug when prescribed as an "iron replacement product indicated for the treatment of iron deficiency anemia." Dkt. 25-5, Ex. E. Interpreting "mineral product" to encompass manufactured products prescribed for conditions arising from a mineral deficiency is consistent with relevant dictionary definitions and gives effect to all the statutory text.

    1. *Interpreting "mineral products" to include manufactured products is reasonable and does not violate the Medicare statute.*

CMS's understanding of the statutory phrase "mineral products," which Congress did not define, reasonably includes manufactured items containing a mineral as an active ingredient, even where the product is a "synthetic, organic compound like Auryxia." Dkt. 16 at 17 n.7. Akebia relies primarily on four dictionary definitions of the word "mineral," as well as a United States Geological Survey FAQ explaining the difference between a rock and a mineral. *Id.* at 12-13. But the Supreme Court has cautioned that the word "mineral" as used in statutes is not a proper subject for elucidation by dictionary: "[T]he word minerals is used in so many senses, dependent on the context, that the ordinary definitions of the dictionary throw but little light upon its signification in any case." *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 42-43 (1983) (quotation omitted).

Even if relying on dictionary definitions of "mineral" were not disfavored, the statutory language at issue is not the word "mineral" but the phrase "mineral products." 42 U.S.C.

§ 1396r-8(d)(2)(E); *see Hornsby v. Lufthansa German Airlines*, 593 F. Supp. 2d 1132, 1137 (C.D. Cal. 2009) ("[T]he question is what the *phrase* 'principal and permanent residence' means, not simply the word 'residence.'  Defendant's position is contingent on the implicit argument that no phrase containing the word 'residence' could ever mean anything other than the word 'residence' itself.") (emphasis in original).  The word "product"—and therefore any understanding of the phrase "mineral product" that gives full effect to its language—does not unambiguously refer only to something naturally occurring.  In the Oxford English Dictionary, for example, only one of the several definitions of the word "product" mentions a form of the word "nature." *See* Ex. B (OED definition of "product") ("A thing generated or produced by, or as if by, nature or a natural process.").  Other definitions in the same dictionary imply that a "product" results from manufacturing or work: "An object produced by a particular action or process; the result of mental or physical work or effort" and "[a]n article or substance that is manufactured or refined for sale." *Id.*  The dictionary—Akebia's principal tool for narrowing the meaning of the statute—highlights the breadth of the statutory phrase at issue and supports the reasonableness of the government's interpretation.

Moreover, a narrow definition of "mineral product" that restricts the term to naturally occurring substances would be irreconcilable with the full language of the statutory provision, which excludes "[p]rescription vitamins and mineral products, except prenatal vitamins *and fluoride preparations*." 42 U.S.C. § 1396r-8(d)(2)(E) (emphasis added).  "Fluoride is a mineral that occurs naturally." Ex. C (Centers for Disease Control, "About Fluoride").  If the scope of "mineral products" were limited to naturally occurring substances, then there would be no need for Congress to include an exception for "fluoride preparations," which (as the name implies) are manufactured or prepared substances. Ex. D (OED definition of "preparation") ("A specially

prepared or made up substance, as a medicine, cosmetic, foodstuff, etc.").  Here, defining "mineral product" to require that the substance in question be natural, not manufactured or prepared, would render superfluous another part *of the same sentence*.  *See Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").  The surplusage is avoidable; understanding "mineral product" more broadly to include manufactured things is consistent with dictionary definitions and gives effect to the "fluoride preparations" exception.  Under this definition, and more critically under *any* definition that gives effect to all of the statutory text, Auryxia (which is a manufactured product containing the mineral iron as an active ingredient for one indication) could qualify as a mineral product, and thus be excluded from coverage under Part D.

It is true, but irrelevant, that the *exact chemical compound* in Auryxia cannot be found in nature.  Limiting the "mineral products" exclusion to naturally occurring substances would—besides being unfaithful to the statutory text—create inconsistency with existing CMS guidance, including for other iron products.  Polysaccharide Iron Complex, for example, is a compound containing the mineral iron that does not exist in nature and must be manufactured, but it is nonetheless not covered under Part D because it is a "prescription vitamin or mineral product." *See* Ex. A, App'x B.  Nor is there any authority for the proposition that a drug covered by fifteen patents, or one that was expensive to develop, or one that is complicated to manufacture, or one that contains organic materials, cannot be a "prescription vitamin or mineral product."  *See* Dkt.

16 at 13-14. These factors are simply irrelevant to the likelihood that Akebia will succeed on its statutory claim.[6]

Because the CMS Email provides an interpretation of the mineral products exclusion that does not depart from the statutory language, Akebia is unlikely to succeed on the merits of its claims.

2. *CMS permissibly considers a product's use in determining whether it is coverable under Part D.*

CMS may properly consider Auryxia's use when determining whether it is a mineral product under Part D. The introduction to the list of drugs permissibly excluded from Medicaid coverage, and mandatorily excluded from Medicare Part D coverage, reads: "The following drugs or classes of drugs, *or their medical uses*, may be excluded from coverage or otherwise restricted." 42 U.S.C. § 1396r-8(d)(2); *see* 42 U.S.C. § 1395w-102(e). Provisions (A) through (D) of the statute mention specific non-covered uses, and the "prescription vitamins and mineral products" exclusion at paragraph (E) does not. But that does not mean that consideration of "use" is forbidden for paragraph (E). Nothing in the "or their medical uses" phrase unambiguously restricts consideration of use to only those paragraphs where a specific "use" is mentioned. Congress could have done so by, for example, saying "or the medical uses listed below," which would have indicated that use-based exclusions are appropriate for *only* those paragraphs mentioning a use. According to its FDA label, Auryxia is an "iron replacement

---

[6] Additionally, Akebia's argument regarding congressional purpose is circular: Congress intended to cover "covered outpatient drugs." Dkt. 16 at 16 (citing H.R. Rep. No. 108-391, at 442 (2003) ("any use of a covered outpatient drug for a medically accepted indication.")). Whether Auryxia is a covered Part D drug when it is prescribed for iron deficiency anemia is the very question at issue, and Congress's intent that covered drugs be paid for by Part D does not answer the question.

product" for one use and a "phosphate binder" for another.  It is not unreasonable or contrary to the statute to conclude that a single drug can be a "mineral product" for one use and not another. Therefore, Akebia has not shown it is likely to prevail on the merits of its claims, and this Court should deny its request for a preliminary injunction.

### C.  The CMS Email is consistent with prior guidance.

Akebia is also unlikely to succeed on the merits of its claims because CMS's treatment of Auryxia for iron deficiency anemia as excluded under Part D is not arbitrary and capricious, but rather is consistent with CMS's prior guidance on Part D coverage for comparable drugs.  *See* Dkt. 16 at 18-21.

#### 1.  *Mineral components combined with citric acid*

CMS guidance regarding lithium salts and potassium citrate is consistent with CMS's guidance regarding Auryxia.  Dkt. 16 at 18.  Lithium salts, much like Auryxia when used for hyperphosphatemia, are mineral solutions used to treat a disease unrelated to a mineral deficiency.  *See* Dkt. 25-13, Ex. M at 1 ("Lithium is a mood-stabilizing agent indicated as monotherapy for the treatment of bipolar I disorder.").  Lithium is not taken to remedy a lithium deficiency or a disease related to such a deficiency; it treats a psychiatric condition.  Just as lithium is a covered Part D drug when prescribed to treat bipolar I disorder, Auryxia is covered when prescribed for hyperphosphatemia, *see* Dkt. 25-5, Ex. E at 1, ("Auryxia is a phosphate binder indicated for the control of serum phosphorus levels in adult patients with chronic kidney disease on dialysis"), but not when prescribed for iron deficiency anemia, *id.* ("Auryxia is an iron replacement product indicated for the treatment of iron deficiency anemia.").  Furthermore, CMS guidance permitting coverage of potassium citrate and calcium acetate is not at odds with the CMS Email because, per CMS guidance, the substances are electrolytes, and there is no statutory

10

provision precluding coverage of electrolytes.[7]  *See* Ex. A, App'x B (listing potassium, sodium, calcium, and magnesium as "Electrolytes/Replenishers"); *cf.* Dkt. 16 at 18, 20.

### 2. Vitamin D analogs

There is no inconsistency arising from the fact that certain synthetic vitamin analogs do not qualify as "prescription vitamins" while other synthetic drugs, like Auryxia, are nonetheless "mineral products."  To be sure, Vitamin D analogs such as Zemplar and Hectorol are in some ways similar to Auryxia: they are chemically synthesized compounds that are often prescribed to chronic kidney disease patients to treat conditions arising from vitamin deficiencies.  Dkt. 16 at 19.  But CMS guidance permitting Part D coverage for Vitamin D analogs is an interpretation of the "prescription vitamins" exclusion, and CMS guidance on Auryxia for iron deficiency anemia is an interpretation of the "mineral products" exclusion.  42 U.S.C. § 1396r-8(d)(2)(E); *see also* Ex. A, § 20.1.  The statute does not require treating Auryxia similarly to a Vitamin D analog because Auryxia is not a vitamin analog, and Akebia does not suggest otherwise.  In particular, CMS's decision to treat synthetic vitamins that do not exist in nature differently from naturally occurring vitamins does not require excluding a synthetic compound containing iron from the definition of "mineral products."  That application of different statutory language leads to

---

[7] Although electrolytes are a subset of minerals, *see, e.g.*, Ex. E (Merck Manual, "Overview of Electrolytes") ("Electrolytes are minerals that carry an electric charge when they are dissolved in a liquid such as blood."), CMS guidance treats electrolytes differently from non-electrolyte minerals because electrolytes have the unique property of carrying an electric charge when dissolved.  Electrolyte products are generally not excluded from Part D coverage.  Potassium Iodide, which is a product that combines an electrolyte (potassium) and a non-electrolyte mineral (iodine), *is* excluded because it is used to replace the mineral iodine and is not used for electrolyte replenishment.  *See* Ex. A, App'x B ("Potassium Iodide products are excluded from Part D as Iodine products (minerals) because they are not used for potassium supplementation.").  Iron is not an electrolyte.  Nor is the form of iron found in Auryxia.

different results is wholly unsurprising.  *See Wisconsin Central Ltd. v. United States*, 138 S. Ct.
2067, 2071 (2018) ("We usually presume differences in language like this convey differences in
meaning.") (quotation omitted).  Nothing in the statute requires CMS to treat the exclusion of
"prescription vitamins" identically to the exclusion of "mineral products."[8]

   *3.  Niacin-based products*

   CMS guidance also properly differentiates between niacin-based products and Auryxia
prescribed for iron deficiency anemia.  *See* Dkt. 16 at 14.  Like lithium salts and Auryxia for
hyperphosphatemia, *see supra*, niacin is not prescribed to remedy a vitamin deficiency or a
disease arising therefrom, but rather is used to treat a distinct disease, dyslipidemia.  Dkt. 25-18,
Ex. R. at 1.  Akebia asserts that Auryxia "is approved to treat IDA, not a mineral deficiency."
Dkt. 16 at 20.  But IDA stands for "*iron deficiency* anemia," and Auryxia's FDA label describes
it as an "iron replacement product."  Auryxia treats a disease caused by an iron deficiency *by
replacing iron*, even if it does so in a novel way.  *Cf.* Dkt. 16 at 14.  The same is not true of niacin
products prescribed for dyslipidemia.  Because CMS's treatment of Auryxia for iron deficiency
anemia is consistent with prior guidance, Akebia is unlikely to prevail on its claim that the CMS
Email is arbitrary and capricious.[9]

---

[8] In a similar vein, the suggestion that Auryxia cannot be a mineral product because it is an FDA-
approved "drug" conflates statutory provisions with different language.  If Auryxia were not an
FDA-approved drug, it would not be eligible for coverage under Part D for any indication and
the mineral products exception would be irrelevant.  But the use of the word "mineral" in the
Food, Drug, and Cosmetic Act to refer to various non-drug "supplements" does not mean that a
drug cannot also be a "mineral product" for purposes of the Medicare statute.  *Cf.* Dkt. 16 at 14
n.5.

[9] CMS has not "shift[ed] its position" or departed from prior, narrow interpretations of the
statutory language such that both indications were considered covered.  *Cf.* Dkt. 16 at 20-21.
The FDA approved Auryxia for the treatment of iron deficiency anemia in November 2017 and
the agency's first statement about Part D coverage for that indication came via the CMS Email

## II.    Akebia Has Not Demonstrated It Is Likely to Suffer Substantial Irreparable Harm.

Even if Akebia could show a likelihood of success on the merits, it would not be entitled to a preliminary injunction because it raises only speculative and unsupported fears of economic harm.  Although purely economic harm is not generally considered irreparable, the First Circuit has held that, "[w]here a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists."  *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (citing *Ross–Simons*, 102 F.3d at 19).  The government does not dispute Akebia's assertion that, in the absence of a waiver of sovereign immunity, Akebia cannot seek money damages from the United States.  But that fact does not end the Court's inquiry.  *See Winter*, 555 U.S. at 22 (plaintiff seeking injunctive relief must make a "clear showing" that irreparable harm is "likely" in the absence of an injunction); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (the movant "bears the burden of demonstrating irreparable harm, which must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store"); *see also Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[T]he fact that economic losses may be unrecoverable does not absolve the movant from its considerable burden of proving that those losses are certain, great and actual.") (internal citations omitted). Akebia has not met its burden to establish that its fears of economic harm are substantial, irreparable, and based on more than the unsupported assertions of its CEO.[10]

---

ten months later.  Akebia does not allege that CMS has ever stated, formally or informally, that Auryxia is a covered Part D drug when prescribed for iron deficiency anemia.

[10] Courts within the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits . . . such that the strength

First, Akebia's reliance on an anticipated failure to meet projected revenue targets is simply too speculative to support a preliminary injunction. *See Charlesbank Equity Fund II*, 370 F.3d at 162 (irreparable harm "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store"). To support its assertions about revenue projections, Akebia provides only the conclusory affidavit of its CEO. Mr. Butler does not explain with any specificity how he reached these conclusions, and he does not provide any financial records, data, reports, or expert analysis to support his opinion. *See Braintree Labs., Inc.*, 622 F.3d at 42 (holding plaintiff did not establish irreparable harm where "[a]ll it has put in the record is a conclusory affidavit from its Chief Financial Officer."); *see also Nat'l Min. Ass'n*, 768 F. Supp. 2d at 52 (concluding plaintiff's declaration was insufficient to establish irreparable harm where, although it "raise[d] legitimate concerns about the current and future health of his company . . . plaintiff here is offering nothing more than a 'predict[ion]' that is 'at best, remote and speculative.'"). Evidentiary support for Mr. Butler's predictions is particularly important here, given Akebia's statements elsewhere that revenue for Auryxia increased "13 percent year-over-year to $30.0 million for the third quarter of 2019," and "[t]otal Auryxia prescriptions increased 15.5 percent year-over-year to 51,700 in the third quarter of 2019."[11] Ex. F at 1 (Akebia press release, Nov. 12, 2019). Moreover, Akebia's statements to the Securities and Exchange Commission show substantially less certainty regarding potential future harm than

---

of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs, Inc.*, 622 F.3d at 42-43.

[11] While Akebia says that Auryxia is currently its only commercially marketed product, Dkt. 16 at 17, product revenue accounted for less than one-third of the company's revenue in the most recent quarter. *See* Ex. F at 2 (announcing $30 million in product revenue and $62 million in "license, collaboration, and other revenue").

those it makes here.  *Compare* Butler Decl., ¶ 22 *with* Ex. G at 75 (Akebia 10-Q for the quarter

ended September 30, 2019) ("We cannot predict the future impact of the CMS determination or

prior authorization changes on our operations and they *could* have a material adverse effect on

our revenue and results of operations going forward.") (emphasis added).  With no support for

Akebia's projected losses other than the general statements of its CEO, neither the Court nor the

government can judge their accuracy.

Second, Akebia's claimed losses in opportunities for research and development are also

speculative.  Mr. Butler identifies one research and development project that may be impacted

and states that Akebia may limit its scope. Butler Decl., ¶ 33.  *See In re Rare Coin Galleries of*

*America, Inc.*, 862 F.2d 896, 902 (1st Cir.1988) ("Speculation or unsubstantiated fears of what

may happen in the future cannot provide the basis for a preliminary injunction.").  Mr. Butler

does not state that Akebia will forgo the larger study, and he does not explain why the projected

lost revenue for 2020 would prompt such a decision when Akebia reported total revenue of $92

million, spent $74.5 million on research and development, and reported a loss of $54.6 million in

the third quarter of 2019, due, in part, to expenses from its merger with Keryx.  Ex. F at 1-2.

Third, Akebia's contention that it will be substantially and irreparably harmed by "costs

related to addressing the PA requirement" is not supported by the evidence in the record.[12]

Butler Decl., ¶¶ 23, 34.  Again, Mr. Butler provides no basis for the costs to Akebia or why the

anticipated expenses are significantly higher than the amount spent in 2019.  And he does not

provide any basis for his knowledge of the number of PAs or explain why or how Akebia, a

---

[12] As described in Defendants' Motion to Dismiss, what Akebia refers to as the PA
"requirement" is not a requirement but rather an *expectation* that plan sponsors will "utilize a
prior authorization (PA) edit, *or other process*, to ensure that [Auryxia] is being used for a Part D
covered indication."  Dkt. 1, Ex. 1 (emphasis added)

pharmaceutical manufacturer, is spending money to address them.[13]  Prior authorization

requirements generally involve communication among the beneficiary and/or his or her

prescribing physician, and the plan sponsor.  *See generally* Ex. H (CMS, "Parts C & D Enrollee

Grievances, Organization/Coverage Determinations, and Appeals Guidance"), § 40.4 (describing

satisfaction of prior authorization or other requirements).  Pharmaceutical manufacturers do not

submit prior authorization requests.  *Cf. United States v. Babich*, No. 1:16-cr-10343-ADB,

Memorandum and Order (D. Mass. Nov. 26, 2019) at 12 (describing impermissible manufacturer

involvement in prior authorization submission process).  In any event, the First Circuit has held

that, at least in the Medicaid context, "[t]here is no evidence that the prior authorization

procedure is likely to foreclose a patient from receiving a necessary drug."  *Pharm. Research*

*and Mfrs. of America v. Concannon*, 249 F.3d 66, 78 (1st Cir. 2001).  Akebia has not explained

how a procedure that is common in government prescription drug coverage plans and need not

involve manufacturers in its operation will require it to incur millions of dollars in expenses.

Even if these harms were properly supported with evidence, expenses and lost revenue of

a few million dollars are not substantial for a company like Akebia that has hundreds of millions

of dollars in revenue each year.  *See Rosario-Urdaz*, 350 F.3d at 222 (harm must be substantial);

*ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D. D.C. 2014) ("ConverDyn's alleged loss of $10

million per year, assuming *arguendo* that this estimate is accurate, is not of sufficient magnitude

in light of ConverDyn's annual revenues of $100 million."); *LG Electronics U.S.A., Inc. v. Dep't*

*of Energy*, 679 F. Supp. 2d 18, 36 (D.D.C. 2010) (comparing financial impact to total worldwide

---

[13] The Butler Declaration describes, without elaboration, spending on "technological tools to
address the PA requirement."  Butler Decl., ¶ 23.  This nonspecific statement is insufficient to
show irreparable harm.

revenue and concluding that claimed losses were too small to constitute irreparable harm, even if the plaintiff could not recover damages from the Department of Energy).

Nor may Akebia rely on past harms or harms that are not permanent, such as past expenses, reputational harm with financial analysts, or a drop in its stock price. Butler Decl., ¶¶ 19, 23, 27-30, 32; *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 80-81 (1st Cir. 2009) ("all of the facts appellant marshals in an effort to demonstrate irreparable harm related to harm the plaintiff had already suffered, rather than to harm he would suffer if the preliminary injunction were not granted."). Akbeia does not provide any evidence that its stock price or reputation with financial markets is likely to drop further as a result of the CMS Email issued in September 2018 or, even if it did, that such "harm" would be irreparable. *See Intercept Pharm., Inc. v. Fiorucci*, No. CV 14-1313-RGA, 2016 WL 6609201, at *3 (D. Del. Jan. 28, 2016) ("Plaintiff cannot point to any case law, however, suggesting that a potential drop in stock price alone can meet the irreparable harm prong for injunctive relief. . . . I cannot conceive how the possibility that a company's stock price will drop due to an opposing litigant's public reassertion of his already-public litigation position creates a likelihood of irreparable harm justifying the 'drastic and extraordinary' remedy of injunctive relief."); *Rocket Learning, Inc. v. Rivera Sanchez*, No. CV 10-2252 (FAB), 2011 WL 13351430, at *18 (D.P.R. Feb. 12, 2011), *report and recommendation adopted*, No. CV 10-2252 (FAB), 2011 WL 13351431 (D.P.R. Mar. 24, 2011) ("The record in the case at bar, however, is devoid of any evidence to suggest that Learning Alliances' and Rocket Learning's drop in market share is or will be permanent."). Because these alleged harms have already occurred or are reparable, they do not support the issuance of a preliminary injunction.

Fundamentally, Akebia's arguments of substantial economic harm rely on its unsubstantiated attribution of the entirety of the decline in its projected revenues and sales to the CMS Email. *See, e.g.,* Butler Decl., ¶ 25 ("We expect to have to pay millions of dollars for product that we do not, in fact, need because of decreased sales expectations attributable to the CMS Decision.").[14]  Prescriptions of Auryxia for iron deficiency anemia constitute a small portion of its overall sales, Butler Decl., ¶ 37, and a majority of nephrologists surveyed in Q2 2019 did not identify reimbursement issues as the number one primary barrier to writing prescriptions from Auryxia.[15]  Butler Decl., ¶ 18.  Keryx, the prior maker of Auryxia, itself listed CMS policy as only one of fourteen factors related to the commercial success of Auryxia in the United States.  *See* Ex. I at 30 (Keryx 10-Q for quarter ending September 30, 2018).

Finally, Akebia's delay in seeking relief from this Court undercuts its claims of substantial harm.  Akebia purchased Keryx in December 2018, three months after CMS issued the CMS Email.  *See* Butler Decl., ¶ 4. Akebia, therefore, chose to complete its acquisition of Keryx and Auryxia with full knowledge of the CMS Email.  Akebia then waited more than nine months after completing the purchase before seeking emergency relief from this Court.  Akebia's failure to seek judicial relief sooner, even if it preferred to resolve the matter out of court, detracts from its claims of irreparable harm.  *See Oxford Immunotec Ltd.*, 271 F. Supp. 3d 358, 368 (D. Mass. 2017) ("Oxford had reason to know in January, 2017, that the QFT–Plus would be "rolled-out" in the second half of this year.  Its delay until late August, 2017, counsels against its claim of urgency."); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)

---

[14] Akebia does not provide any numbers to quantify this claim.

[15] Akebia does not provide the survey, the sample size, or any numbers to quantify what it contends is a significant increase from Q4 2018.

("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action . . .").

### III.     The Balance of the Equities And the Public Interest Favor the Government.

Finally, the balance of the equities and the public interest favor the government.  Part D beneficiaries are able to seek coverage of Auryxia for iron deficiency anemia through the administrative review procedure created by Congress; they do not need a preliminary injunction to protect their interests.  *See* Mem. in Supp. of Mot. to Dismiss at 3-6. Congress and the Supreme Court have already considered the impact on beneficiaries of using this process.  The Supreme Court has held that the assurance of thorough administrative review without "premature interference" from courts "comes at a price, namely, occasional individual, delay-related hardship."  *Ill. Council*, 529 U.S. at 13.  "In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations . . . paying this price may seem justified. In any event, such was the judgment of Congress."  *Id.*  A preliminary injunction allowing Akebia to bypass this scheme would damage the proper functioning of the Medicare program as administered by CMS.[16]  *See Puerto Rican Ass'n of Physical Med. and Rehab., Inc. v. United States,* 521 F.3d 46, 50 (1st Cir. 2008) ("[T]he problem of irreparable injury does not only affect one side.  It is likely that section

---

[16] Open enrollment in Part D for 2020 began on October 15 and ends December 7, 2019.  During open enrollment, beneficiaries may review plan formularies, including prior authorization requirements, in selecting a plan.  Many beneficiaries have already chosen plans for 2020 on the basis of published formularies and associated prior authorization requirements.  An injunction directing CMS to give instructions to sponsors concerning prior authorization for Auryxia during or after open enrollment could be disruptive and cause confusion for beneficiaries.

405's insistence on exhaustion owes something to the fear that the Secretary's decisions restricting payment might otherwise be promiscuously enjoined at great cost to the government.").  Doing so would not be in the public interest.

**CONCLUSION**

For the reasons stated above, the Court should deny Akebia's motion for a preliminary injunction.

Dated: December 3, 2019                              Respectfully submitted,

                                                     ANDREW E. LELLING
                                                     United States Attorney

                                        By:      */s/ Erin E. Brizius*
                                                 Gregg Shapiro (BBO #642069)
                                                 Erin E. Brizius (NY #4821161)
                                                 Assistant United States Attorneys
                                                 United States Attorney's Office
                                                 1 Courthouse Way, Suite 9200
                                                 Boston, MA 02210
                                                 (617) 748-3100
                                                 gregg.shapiro@usdoj.gov
                                                 erin.e.brizius2@usdoj.gov

Of Counsel:

ROBERT P. CHARROW
General Counsel

KELLY M. CLEARY
Deputy General Counsel

JANICE L. HOFFMAN
Associate General Counsel

SUSAN MAXSON LYONS
Deputy Associate General Counsel for Litigation

ALEXANDER R. WHITE
Attorney
U.S. Dept. of Health & Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Div.
5300 Cohen Building
330 Independence Ave., SW
Washington, D.C. 20201
(202) 619-0182
alexander.white@hhs.gov

U.S. Dept. of Health & Human Services                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

    I, Erin E. Brizius, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                      */s/ Erin E. Brizius*
                                        Erin E. Brizius
                                        Assistant U.S. Attorney

Dated: December 3, 2019