**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

AKEBIA THERAPEUTICS, INC.,

      Plaintiff,

  v.

ALEX M. AZAR II, in his official capacity as
Secretary of Health and Human Services, et al.,

      Defendants.

No. 1:19-cv-12132-ADB

---

**REPLY MEMORANDUM IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

# **TABLE OF CONTENTS**

I.      AKEBIA IS LIKELY TO SUCCEED ON THE MERITS.....................................................1

    A.      The CMS Decision Is Contrary to Statute and Arbitrary and Capricious................1

        1.      Auryxia Does Not Fall Within the Mineral Exclusion For Any Use...........1

        2.      CMS's Inconsistent Decisions Are Arbitrary and Capricious ....................6

    B.      Defendants' Jurisdictional Challenges Are Meritless.............................................7

        1.      The CMS Decision Was Final Agency Action ...........................................8

        2.      Exhaustion Was Not Required...................................................................9

II.     AKEBIA FACES IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF .............12

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST .......................15

CONCLUSION.................................................................................................................................15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Acolyte Techs. Corp. v. Jeja Int'l Corp.*,
    2011 WL 4025111 (S.D. Cal. Sept. 12, 2011)...................................................................13

*Action All. of Senior Citizens v. Leavitt*,
    483 F.3d 852 (D.C. Cir. 2007).........................................................................................10

*Alcresta Therapeutics, Inc. v. Azar*,
    755 F. App'x 1 (D.C. Cir. 2018).....................................................................................13

*Allergan, Inc. v. Burwell*,
    2016 WL 1298960 (D.D.C. Mar. 31, 2016).....................................................................8

*American Chiropractic Ass'n, Inc. v. Leavitt*,
    431 F.3d 812 (D.C. Cir. 2005).........................................................................................10

*Baxter Healthcare Corp. v. Weeks*,
    643 F. Supp. 2d 111 (D.D.C. 2009)................................................................................10

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004).........................................................................................................2

*Bennett v. Spear*,
    520 U.S. 154 (1997).........................................................................................................8

*Council for Urological Interests v. Sebelius*,
    668 F.3d 704 (D.C. Cir. 2011).........................................................................................11

*Matter of Glenn*,
    900 F.3d 187 (5th Cir. 2018) ...........................................................................................7

*National Ass'n of Home Builders v. U.S. Army Corps of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005).......................................................................................9

*Neang Chea Taing v. Napolitano*,
    567 F.3d 19 (1st Cir. 2009)..............................................................................................2

*Physician Hosps. of Am. v. Sebelius*,
    691 F.3d 649 (5th Cir. 2012) ..........................................................................................11

*Polanco v. E. Chigago Mach. Tool Corp.*,
    2012 WL 12886210 (C.D. Cal. Sept. 18, 2012) ..............................................................3

*Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United States*,
    521 F.3d 46 (1st Cir. 2008)............................................................................................11

ii

*Rosario-Urdaz v. Rivera-Hernandez*,
    350 F.3d 219 (1st Cir. 2003)............................................................12, 14

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)...................................................................14

*Shalala v. Illinois Council on Long Term Care, Inc.*,
    529 U.S. 1 (2000)............................................................................9, 11

*Snyder v. ISC Alloys, Ltd.*,
    772 F. Supp. 244 (W.D. Pa. 1991)............................................................3

*Southwest Pharmacy Sols., Inc. v. CMS*,
    718 F.3d 436 (5th Cir. 2013) ................................................................11

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)...............................................................................5

*Union of Concerned Scientists v. Wheeler*,
    377 F. Supp. 3d 34 (D. Mass. 2019) .........................................................9

*UnitedHealthcare Ins. Co. v. Price*,
    248 F. Supp. 3d 192 (D.D.C. 2017) .........................................................10

*Watt v. Western Nuclear, Inc.*,
    462 U.S. 36 (1983)...............................................................................2

## STATUTES, RULES, AND REGULATIONS

5 U.S.C. § 704.............................................................................................8

5 U.S.C. § 706.............................................................................................1

28 U.S.C. § 1331..........................................................................................9

42 U.S.C. § 405............................................................................................9

42 U.S.C. § 1395ii.........................................................................................9

42 U.S.C. § 1395w-102..............................................................................4, 8

42 U.S.C. § 1395w-104...............................................................................10

42 U.S.C. § 1395w-114.................................................................................8

42 U.S.C. § 1395w-115.................................................................................8

42 U.S.C. § 1396r-8.................................................................................4, 5, 6

42 C.F.R. § 423.566 ............................................................................................................10

42 C.F.R. § 423.2315 ...........................................................................................................8

## OTHER AUTHORITIES

Merriam-Webster's Dictionary ...............................................................................................3

Akebia Therapeutics, Inc. FY 2018 Annual Report (Form 10-K) (Mar. 26, 2019) ......................15

The government's opposition to Akebia's motion for a preliminary injunction provides no basis to deny relief. The unexplained CMS Decision is contrary to the plain terms of the Medicare statute and wholly arbitrary and capricious in its treatment of Auryxia® compared to other drugs that CMS covers under Part D. It is no surprise, therefore, that the government seeks to avoid a determination on the merits—arguing that Akebia has no recourse whatsoever to challenge the substantial and unrecoverable harm the CMS Decision is inflicting on the company. But the jurisdictional hurdles the government raises are meritless, and the harm to Akebia—which the government concedes cannot be redressed due to sovereign immunity—is well documented. Finally, the balance of equities and the public interest strongly favor entry of an injunction, which will provide significant benefits to a vulnerable patient population and support innovation while imposing no material injury on the government.

## I.    AKEBIA IS LIKELY TO SUCCEED ON THE MERITS

### A.    The CMS Decision Is Contrary to Statute and Arbitrary and Capricious

Akebia is likely to succeed on the merits of its APA claims because the CMS Decision is "not in accordance with law" and arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

#### 1.    Auryxia Does Not Fall Within the Mineral Exclusion For Any Use

The CMS Decision conflicts with the Medicare statute because Auryxia is not a "mineral product[]" under any ordinary understanding of the term.[1] In the CMS Decision, the agency offered no interpretation of the Medicare statute. Recognizing that fatal flaw, the government's brief in this litigation seeks to offer more. But it is still not clear what the government believes the statutory exemption for "prescription vitamins and mineral products" covers. The

---

[1] Although the government disclaims any reliance on deference, it repeatedly suggests that the interpretations it proffers should be upheld if "reasonable." Opp. 6, 7, 10. But because the Court owes CMS no deference, Mem. 11–12, it must choose the *best* reading of the statute.

government's position seems to be that a product is a "mineral product" if CMS says it is. *See, e.g.*, Opp. 8 (arguing the exclusion cannot be limited to naturally occurring substances because that would "create inconsistency with existing CMS guidance"). This Court should reject CMS's "we know it when we see it" approach to Part D coverage. As explained below, Auryxia does not fall within the "mineral product" exception under any plausible interpretation.

Although CMS hesitates to commit to *any* definition of the word "mineral," it does not actually dispute that a "mineral" is a naturally occurring, inorganic substance, as Akebia demonstrated. Mem. 7–8. Where a statutory term is undefined, courts routinely consult dictionary definitions to determine plain meaning, *Neang Chea Taing v. Napolitano*, 567 F.3d 19, 25 (1st Cir. 2009), and CMS does not suggest the definitions Akebia relies on are incorrect or offer any alternatives. Instead, CMS simply cites *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983). Opp. 6. But *Watt* says nothing about what Congress meant by the term "mineral" in the Medicaid statute, and unlike in that case, here there is no legislative history on the meaning of "mineral products" to point the way.[2] Although there is some variation among dictionary definitions, even the broadest meaning of "mineral" would exclude the ferric citrate complex in Auryxia. *See* Mem. 7–8. As the government concedes, Opp. 6, 8, Auryxia is a novel, synthesized organic compound that is chemically distinct from naturally occurring iron. *See* Mem. 7–9.

The government insists that the word "product" must also be considered, *see* Opp. 6, but doing so does not advance the government's position. In ordinary usage, a "product" is

---

[2] It is far from certain that the Supreme Court today would follow the approach taken in *Watt*. The Court has expressly declined to extend *Watt* to the question of whether sand and gravel are "valuable minerals." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 182–85 (2004) (plurality).

"something … that is marketed or sold as a commodity." *Product*, Merriam-Webster's

Dictionary, https://www.merriam-webster.com/dictionary/product (last visited Dec. 8, 2019).[3]

The inclusion of the word "product" simply makes clear that the phrase "mineral products"

encompasses minerals that have been finished for marketing and sale and rendered suitable for

patient use.  The government suggests that the word "product" refers to "manufactured things."

Opp. 8.  But that interpretation does not render Auryxia a "mineral product."  Not everything

"manufactured" is a "mineral product," and Auryxia is manufactured from a novel, organic ferric

citrate coordination complex, not a mineral.  While Auryxia is no doubt a *product*, it is not a

"mineral product."

    To the extent the government offers an affirmative interpretation of the exclusion, it is

one that plainly does not cover Auryxia.  The government suggests that the exclusion covers

"manufactured items containing a mineral as an active ingredient."  Opp. 6; *see also id.* at 8

(asserting that Auryxia "is a manufactured product containing the mineral iron as an active

ingredient for one indication").  That interpretation, however, does not support the CMS

Decision.  The active ingredient in Auryxia is not "the mineral iron," as CMS contends.  Opp. 8.

As the FDA itself has recognized, Auryxia's active ingredient for *both* indications is a novel

version of the organic compound ferric citrate that is not naturally occurring.  *See* Dkt. No. 25-5,

Ex. H at 2 ("Auryxia's labeling lists ferric citrate, as the drug's active ingredient."); *id.* at 15

("Auryxia is not a naturally derived mixture."); Dkt. No. 25-1, Ex. A at 7 (explaining that the

"coordination complex" that is the active ingredient in Auryxia differs from the form of ferric

---

[3] Similarly, courts have recognized that referring to things as "products" often denotes
that they are "items or goods suitable for use," *Polanco v. E. Chigago Mach. Tool Corp.*, 2012
WL 12886210, at *3 (C.D. Cal. Sept. 18, 2012), or "finished items with a tangible form," *Snyder
v. ISC Alloys, Ltd.*, 772 F. Supp. 244, 251 (W.D. Pa. 1991).

citrate that is marketed as a mineral product to maintain nutritional iron levels); *see also* Tomas Ganz, Avi Bino & Isidro B. Salusky, *Mechanism of Action and Clinical Attributes of Auryxia®* *(Ferric Citrate)*, 79 Drugs 957, 959 (May 27, 2019) (Decl. of Lindsey Silver Ex. A) ("The API [active pharmaceutical ingredient] of Auryxia is … a solid mixture of ferric citrate coordination complexes[.]").  Because the active ingredient in Auryxia is not the mineral iron, Auryxia is not a "mineral product" under the government's lead interpretation.

Perhaps recognizing this fundamental flaw in its argument, the government next suggests an alternative interpretation of the "mineral products" exclusion that turns on how the product is *used* and disregards the composition of the product.  The government claims that "[i]nterpreting 'mineral product' to encompass manufactured products prescribed for conditions arising from a mineral deficiency is consistent with the relevant dictionary definitions and gives effect to all the statutory text."  Opp. 6; *see also id.* at 9–10 (arguing that "CMS permissibly considers a product's use in determining whether it is coverable under Part D").  Under this view, any manufactured product that is used to treat a "mineral deficiency" is a "mineral product."  But this interpretation conflicts with the plain terms of the statute and does not in fact cover Auryxia.

The government offers no authority for its sweeping use-based interpretation.  The Medicare statute excludes "drugs or classes of drugs, *or* their medical uses" that are "excluded from coverage or otherwise restricted" under Medicaid's outpatient drug coverage provision.  42 U.S.C. § 1395w-102(e)(2) (emphasis added).  The cross-referenced Medicaid provision in turn contains a list of exclusions, which are either "drugs or classes of drugs" or "medical uses."  The first four exclusions and the final one are defined by the use of the product:  They remove a drug from coverage only "when" it is "used" for a certain purpose.  *See id.* § 1396r-8(d)(2)(A)-(D), (H) (excluding "[a]gents *when used for* anorexia, weight loss, or weight gain, … [a]gents *when*

used to promote fertility, [a]gents *when used for* cosmetic purposes or hair growth, [a]gents *when used for* the symptomatic relief of cough and colds," and "[a]gents *when used for* the treatment of sexual or erectile dysfunction" (emphases added)).

In contrast, the remaining items on the list are "drugs or classes of drugs," including "[n]onprescription drugs"; certain drugs that require tests or services that can be purchased only from the manufacturer; and (as relevant here) "[p]rescription vitamins and mineral products." *Id.* § 1396r-8(d)(2)(E), (F), (G). Drugs within those categories are excluded from coverage based on their characteristics, not their "use." Had Congress intended to exclude "agents when used for the treatment of conditions arising from a mineral deficiency," it surely would have followed the form of the first four exclusions and said so directly. It would not have eliminated the words "when used for," described the exclusion as being for "prescription vitamin and mineral products," and expected CMS to infer into the exclusion the very text present in the other exclusions. Reading *every* category in Medicaid's exclusory list to refer to excluded uses would also render the provision's reference to "drugs or classes of drugs" superfluous, which the Court should not do unless demanded by the text. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

In any event, Auryxia does not, in fact, merely treat a mineral deficiency when prescribed for IDA in patients with chronic kidney disease ("CKD"). *See* Supp. Decl. of Dr. Glenn M. Chertow ¶¶ 4–8. Iron deficiency anemia ("IDA") in patients with CKD is complex. It typically reflects an impaired capacity of the body to absorb, and once absorbed, to utilize, iron. *Id.* ¶ 4. In fact, many CKD patients with IDA have what is referred to as "functional" IDA, where there is adequate or more than adequate storage of iron in the body, but an inability of the body to utilize iron efficiently to make red blood cells. *See id.* ¶ 5. Auryxia has been shown to increase red blood cell counts in CKD patients with IDA, without regard to whether a particular patient's

anemia is attributable in part to low stores of iron.  *Id.* ¶¶ 6–8.  Auryxia is thus a covered Part D

drug under either of the government's interpretations.

### 2. CMS's Inconsistent Decisions Are Arbitrary and Capricious

The government is also unable to defend, much less reconcile, CMS's previous

inconsistent coverage decisions, which themselves do not support the government's

interpretations of the statute set forth in its opposition brief.

*First*, the active ingredient in lithium citrate is a synthetically derived mineral component

combined with citric acid, exactly like Auryxia, and therefore indistinguishable as to both its

"mineral" content and means of manufacture.  Mem. 13.  Tellingly, CMS does not even try to

argue that lithium citrate is materially different from Auryxia in composition (indeed, it concedes

lithium citrate is mineral based).  Opp. 10.  CMS defends its coverage solely based on its "use"

interpretation.  Opp. 10–11.  But as explained above, that is not a reasonable interpretation of the

statute and cannot be the basis for distinguishing among drugs.  *Supra* pp. 4–5.

*Second*, CMS acknowledges that Vitamin D analogs Zemplar and Hectorol, which CMS

has determined are covered Part D drugs, are also materially indistinguishable from Auryxia

because they are synthetic, not naturally occurring, and are "often prescribed to chronic kidney

disease patients to treat conditions arising from vitamin deficiencies," Opp. 11—*i.e.*, they are

*used* to remedy a deficiency of the vitamin they contain and not some other disease.  *See also*

Mem. 13–14.  CMS's sole justification for this differential treatment is a conclusory statement

that "CMS guidance permitting Part D coverage for Vitamin D analogs is an interpretation of the

'prescription vitamins' exclusion, and CMS guidance on Auryxia for iron deficiency anemia is

an interpretation of the 'mineral products' exclusion," Opp. 11—ignoring that the phrases

constitute the only two items in a list in the same statutory subsection.  The references to

"vitamins" and "mineral products" in Section 1396r-8(d)(2)(E) should not be construed

differently "when the two [phrases] can be read consistently."  *Matter of Glenn*, 900 F.3d 187,

190 (5th Cir. 2018) (internal quotation marks omitted).

*Third*, CMS's attempt to distinguish its coverage of niacin-based drugs is also premised

solely on the fact that they treat dyslipidemia, not a vitamin deficiency.  Opp. 12.  For the same

reasons set forth above, the "use" of those products is irrelevant under the statute and, in any

event, Auryxia is not used merely to treat iron deficiency.  Moreover, because the active

ingredient in the niacin products is a vitamin (Mem. 14), there is more justification for excluding

them than Auryxia, whose active ingredient is not a mineral.  *See supra* pp. 3–4.

*Finally*, and perhaps most strikingly, the government does not even try to rationalize

CMS's coverage of the numerous mineral salts of potassium, magnesium, calcium, and sodium

that it has determined are Part D drugs.  *See* Mem. 15.  It offers only the *ipse dixit* that "per CMS

guidance, the substances are electrolytes," and "[e]lectrolyte products are generally not excluded

from Part D coverage" even though "electrolytes are a subset of minerals."  Opp. 10–11 & n.7.

Not even the government's atextual use-based interpretation explains this anomaly, since the

government does not dispute that the products are used to "[r]eplenish[]" electrolytes in the

body.  Opp. 11; Mem. 15.  In CMS's view, electrolytes are somehow just different.

In sum, CMS's divergent coverage determinations for a range of other drugs render the

CMS Decision arbitrary and capricious and casts fatal doubt on the government's *post hoc*

interpretations of the mineral exclusion in the statute.

**B.  Defendants' Jurisdictional Challenges Are Meritless**

Seeking to avoid the merits of Akebia's challenge to the CMS Decision, the government

raises two jurisdictional challenges.  As Akebia will explain more fully in its forthcoming

opposition to CMS's motion to dismiss, neither has merit.  And, there is no reason for the Court

to await full briefing on that motion before entering a preliminary injunction in this case.

### 1.    The CMS Decision Was Final Agency Action

The CMS Decision was "final agency action … subject to judicial review" under the APA. 5 U.S.C. § 704. Agency action is final if it (1) "marks the consummation of the agency's decisionmaking process"; and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (internal citations and quotation marks omitted). The CMS Decision satisfies both prongs.

*First*, the CMS Decision represents the "consummation" of CMS's decisionmaking process. The Decision gave no indication its conclusion was tentative or open to reconsideration. *See Allergan, Inc. v. Burwell*, 2016 WL 1298960, at *6 (D.D.C. Mar. 31, 2016). On the contrary, CMS's chief legal officer, Kelly Cleary, has expressly affirmed that CMS will not revisit the Decision. Butler Decl. ¶¶ 12–13. The fact that the Decision could in theory be reconsidered does not render it non-final. *See* 5 U.S.C. § 704.

*Second*, legal consequences unquestionably have "flow[ed]" for both Akebia and plan sponsors. *Bennett*, 520 U.S. at 156. Whether or not a drug is a "covered part D drug" has enormous consequences for patients, plan sponsors, and the drug's manufacturer. Medicare beneficiaries can obtain access to a drug through Part D, and plan sponsors can obtain reimbursement for the cost of covering the drug, only if it is a covered Part D drug. *See* 42 U.S.C. §§ 1395w-102(a), (b), (e), 1395w-114, 1395w-115. Drug manufacturers receive the benefits of increased Medicare sales and also face the burden of being required to pay "coverage gap" discounts only if a drug is a covered Part D drug. *See id.* § 1395w-114a(b)(1)(A), (g)(2) (Medicare Coverage Gap Discount Program); 42 C.F.R. § 423.2315.

CMS's determination that Auryxia is not a Part D drug when used to treat IDA and its dictate to plan sponsors that it "expect[s]" them to "utilize a prior authorization (PA) edit," Butler Decl. Ex. 1, are binding instructions to plan sponsors from the Federal agency that

regulates their conduct and can impose penalties for non-compliance.  This Court has held such

"mandatory language" that causes a change in the party's position constitutes final agency

action.  *Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34, 42–43 (D. Mass. 2019).

If plan sponsors pay for a drug CMS has deemed not covered, they must pay for the drug out of

their own profits, because they would face legal penalties for claiming reimbursement from

CMS.  The threat of those "easily-identifiable legal consequences" for plan sponsors, *National*

*Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005),

was enough to ensure that they would stop covering Auryxia for IDA, *see* Butler Decl. ¶ 8.  The

resulting impact on both patients with CKD and Akebia is more than sufficient to show the real-

world effects of the CMS Decision and, thus, final agency action of CMS here.

### 2.    Exhaustion Was Not Required

Akebia's claims cannot be dismissed on exhaustion grounds because, as the government

concedes, "Part D does not include a mechanism for a drug manufacturer to challenge coverage

determinations administratively," Defs. Mem. 10, and Akebia did in fact present its claims to

CMS.

The government notes that the Medicare statute, through its incorporation of a Social

Security Act provision, withdraws general federal jurisdiction under 28 U.S.C. § 1331 for certain

"action[s] ... to recover on any claim arising under" the Medicare statute.  *See* 42 U.S.C.

§§ 405(h), 1395ii.  But that provision is designed to "channel" review of Medicare decisions

through available administrative review procedures, and does not apply where dismissing the

plaintiff's suit "would not lead to a channeling of review through the agency, but would mean no

review at all."  *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10, 17

(2000); *see also id.* at 19.  The D.C. Circuit has explained that, when "no statute appears to make

any affirmative grant of (channeled) jurisdiction over Medicare Part D claims of the type pressed

by [a plaintiff]," those claims may be brought under the APA in federal court.  *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 859 (D.C. Cir. 2007).   Indeed, the *Illinois Council* "exception applies not only when administrative regulations foreclose judicial review, but also when roadblocks *practically cut off* any avenue to federal court." *American Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) (emphasis added); *UnitedHealthcare Ins. Co. v. Price*, 248 F. Supp. 3d 192, 202 (D.D.C. 2017).

The exception recognized in *Illinois Council* is applicable here because the Medicare statute does not provide any mechanism for agency review of the claim at issue—Akebia's challenge to the CMS Decision.  As the government acknowledges, Defs. Mem. 10, the Medicare statute and CMS's regulations provide for administrative review and ultimately judicial review only of challenges by patients—not drug manufacturers—to certain Part D plan sponsor coverage determinations.  *See* 42 U.S.C. § 1395w-104(h)(1); 42 C.F.R. § 423.566(c).  Even patients, moreover, could not challenge the *CMS Decision* at issue because CMS's regulations permit review of only a *plan sponsor's* individualized "coverage determination" for a particular beneficiary.  42 C.F.R. § 423.566(b); *Action All. of Senior Citizens*, 483 F.3d at 860.[4]

The speculative prospect that a patient might one day pursue administrative review of a Part D plan sponsor's denial of coverage and ultimately seek judicial review does not foreclose Akebia's APA challenge to the CMS Decision.  Akebia "is not suing on behalf of anyone who could seek administrative review of its claims," and nothing in *Illinois Central* requires Akebia "to recruit [an enrollee] to act as its proxy in an administrative process." *Baxter Healthcare Corp. v. Weeks*, 643 F. Supp. 2d 111, 116 (D.D.C. 2009).  The Supreme Court in *Illinois Council*

---

[4] Moreover, because enrollees can challenge only a sponsor's "decision not to provide or pay for a Part D drug," 42 C.F.R. § 423.566(b)(1), they could not obtain review of CMS's imposition of the PA requirement.

addressed this precise issue, explaining that an association of nursing homes could not proceed

under the APA, even though it had no ability to obtain agency review itself, because it "speaks

only on behalf of its member institutions," and the members had access to administrative review.

529 U.S. at 24.  By contrast, Akebia asserts its own rights and could not obtain agency review.[5]

In any event, the government points to no patient challenges in the fourteen months since the

CMS Decision and offers no any reason to suggest that patients have the resources to pursue

expensive administrative and judicial review.  *See Council for Urological Interests v. Sebelius*,

668 F.3d 704, 712 (D.C. Cir. 2011) (failure of hospitals to challenge CMS rule showed presence

of "practical roadblock" for plaintiff that lacked right to administrative review).

Finally, to the extent Akebia was required to present its claim to CMS, it did.  Akebia

engaged in lengthy outreach to Defendants seeking to persuade them to reverse the CMS

Decision.  Compl. ¶¶ 38–39; Butler Decl. ¶¶ 9–13.  As part of that process, Akebia submitted a

legal memorandum to the General Counsel of HHS and the HHS Deputy General Counsel and

CMS Chief Legal Officer explaining why the CMS Decision was unlawful.  Compl. ¶¶ 40–45;

Butler Decl. ¶ 12.  And, that Officer flatly denied Akebia's request to reverse the CMS decision.

*Id.* ¶ 13.  Under the administrative review scheme in effect, Akebia could do no more.

---

[5] The cases on which Defendants rely in its motion to dismiss—involving challenges by associations whose members had access to administrative review procedures or members that might not encounter practical roadblocks—are simply irrelevant.  *E.g., Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United States*, 521 F.3d 46, 48 (1st Cir. 2008) (doctors' association challenge to regulation requiring physical therapists be specially trained for their services to be reimbursed under Part B); *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 658-659 (5th Cir. 2012) (plaintiff was association of hospitals that could press their own claims administratively).  *Southwest Pharmacy Sols., Inc. v. CMS*, 718 F.3d 436 (5th Cir. 2013), is also not on point.  In that case, the Court held that a pharmacy plaintiff could act as a representative of Part D enrollees and pursue administrative claims on their behalf.  *See id.* at 444.  Here, CMS does not suggest that Akebia—a drug manufacturer—could serve as a representative or assignee of a Part D beneficiary.

## II.    AKEBIA FACES IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Akebia's opening brief demonstrated that absent relief, it will suffer irreparable harm, including significant lost revenues from foregone sales of Auryxia in Part D.  The government concedes that any such harm is literally irreparable:  "Akebia cannot seek money damages from the United States."  Opp. 13.  The government also acknowledges that in *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003), the Court held that "[w]here a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists."  *Id.* at 222.

The government is thus left to argue that the harm to Akebia is "too speculative."  Opp. 14.  But to the contrary, "[i]t is nose-on-the-face plain" that Akebia will lose revenues as long as the CMS Decision remains in place.  *Rosario-Urdaz*, 350 F.3d at 222.  The government does not contest that "the Medicare Part D program accounted for approximately 60% of the IDA market" for Auryxia.  Butler Decl. ¶ 15.  Nor does the government dispute that "Medicare Part D sponsors stopped covering Auryxia for treatment of IDA" because of the CMS Decision.  *Id.* ¶ 16.  It is therefore self-evident and undisputed that Akebia will continue to lose revenue in 2020 due to the CMS Decision.

The government questions Akebia's reliance on *projected* revenue targets to quantify the *amount* of lost revenues, arguing that the projections are supported by only the "conclusory" declaration of Akebia's CEO John Butler.  Opp. 14–15.  But projections are necessarily forward-looking, and the Butler declaration is far from "conclusory."  It provides significant detail regarding the losses facing Akebia.  *See* Butler Decl. ¶¶ 14–29.  That detail includes a discussion of why both aspects of the CMS Decision negatively affect the volume of prescriptions for Auryxia filled by Part D beneficiaries.  *Id.* ¶¶ 16–18.  It references supporting data from surveys of nephrologists showing significant increases in the number of doctors indicating that Part D

coverage concerns pose a barrier to prescribing Auryxia.  *Id.* ¶ 18.  And it delineates the amount

of the projected revenue shortfalls attributable to denial of preliminary relief, carefully separating

out past harm and future harm that would be mitigated by a later vacatur of the CMS Decision

upon final resolution of the case.  *Id.* ¶¶ 19–22.

     Courts routinely grant preliminary injunctions where irreparable harm has been

demonstrated by affidavits of senior executives.  *See, e.g.*, *Alcresta Therapeutics, Inc. v. Azar*,

755 F. App'x 1, 5 (D.C. Cir. 2018) (finding irreparable harm based on Chief Commercial Officer

declaration describing estimates of past forgone sales that were expected to increase the

following year); *see also Acolyte Techs. Corp. v. Jeja Int'l Corp.*, 2011 WL 4025111, at *3 (S.D.

Cal. Sept. 12, 2011).  The Butler Declaration similarly supports a finding of harm here.

     The government points to modest increases in overall Auryxia revenues in the first three

quarters of 2019. Opp. 14–15.  But such an *overall* increase—including sales outside of

Medicare Part D and across both indications for the drug—says nothing about the impact of the

CMS Decision.  The Butler Declaration does not contend that absolute product revenues have

declined; it explains that revenues declined versus expectations.  *See* Butler Decl. ¶ 19.  In other

words, revenues would have increased much more had CMS not issued its Decision.[6]

     The government also questions the costs incurred by Akebia due to the PA requirement.

Opp. 15–16.  But the Butler Declaration explains that the costs are attributable to (1) increased

use of free samples provided by physicians, and (2) the cost of "technological tools to help

_____

[6] CMS also points to a sentence in Akebia's recent 10-Q that CMS believes indicates
"less certainty regarding potential future harm."  Opp. 14.  But that sentence appropriately
reflects the uncertainty presently facing the company as it seeks preliminary injunctive relief.
The 10-Q notes that Akebia has brought the present litigation.  *See* White Decl. Ex. G at 75.  It
also explains that "*[i]f [Akebia is] unsuccessful* in [its] efforts to obtain Part D coverage for the
IDA Indication, our ability to commercialize Auryxia for this indication *will* continue to be
adversely impacted."  *Id.* (emphasis added).

patients through the PA process."  Butler Decl.  ¶ 23.  Akebia has already incurred millions of

dollars in costs and estimates that in 2020 it will incur millions of dollars of additional costs,

absent relief, as patients being treated for hyperphosphatemia are required to renew their PAs in

January 2020.  *Id*. ¶¶ 23–24.  To the extent the government desires further detail regarding the

"technological tools" Akebia put in place, that information is set forth in the attached

Supplemental Butler Declaration.

Citing a couple of out-of-circuit district court decisions, the government argues that even

if Akebia has incurred millions of dollars in unrecoverable losses, that harm is insufficient

because the company "has hundreds of millions of dollars in revenue each year."  Opp. 16–17;

*see* White Decl. Ex. G at 7 (showing $265 million in revenues through Sept. 30, 2019, most of

which is not from product sales).[7]  The government itself observes, however, that Akebia

"reported a <u>loss</u> of $54.6 million in the third quarter of 2019" alone.  Opp. 15 (emphasis added).

Indeed, the company has reported net <u>losses</u> of approximately $185 million through the first

three quarters of 2019.  *See* White Decl. Ex. G at 7.  Given Akebia's financial circumstances,

unrecoverable losses of "millions" of dollars cannot be simply disregarded.  *See Rosario-Urdaz*,

350 F.3d at 222; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996)

(rejecting argument that since a particular product at issue "comprises less than one percent of

Ross–Simons' total annual sales, there can be no irreparable harm").[8]

---

[7] The government notes that Akebia has revenue sources other than Auryxia.  Opp. 14 n.11.  But the "license, collaboration and other revenue" that the government cites largely just (partially) offsets certain research and development costs that Akebia incurs.  *See* Annual Report (Form 10-K) of Akebia Therapeutics, Inc. for FY 2018, filed March 26, 2019 at 138 (describing collaboration agreements with Otsuka Pharmaceutical Co.).

[8] The government also questions Akebia's reliance on reputational harm, lost R&D, and stock price declines.  *See* Opp. 15, 17.  But the First Circuit has recognized the validity of reputational harm, *see Ross-Simons*, 102 F.3d at 20, and these types of losses are just portions of the overall irreparable injury Akebia has suffered, *see* Mem. 17–18; Butler Decl. ¶¶ 14–39.

Finally, Defendants' contend that Akebia's purported delay in seeking relief undercuts its showing of irreparable harm. Opp. 18. But Akebia's attempts to work with CMS in good faith during the course of 2019 to reverse the agency's decision, *see* Butler Decl. ¶¶ 6–13, provide no basis to discount the appreciable harm Akebia is suffering.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST

The government does not contest that the cost to the Part D program of covering Auryxia for IDA is modest and insignificant to the program as a whole. Mem. 18–19. Nor does it dispute that the harm to Akebia from a denial of relief, including the harm to innovation illustrated by amicus curiae MassBIO (Dkt. No. 39), exceeds the harm to the government from granting relief. Mem. 18–19. Most importantly, CMS does not dispute the ongoing harm to patients caused by the CMS Decision—harm that prompted both the Medicare Advocacy Project of Greater Boston Legal Services and the Center for Medicare Advocacy to file amicus curiae briefs highlighting the importance of relief to vulnerable patients living with CKD. *See* Dkt. Nos. 43 & 51.

The government's only argument is that the harm to patients could eventually cease if a patient were to successfully run the gauntlet of CMS's administrative review mechanisms (open to patients but not Akebia). *See* Opp. 19. But that is irrelevant to the present balancing of harms. The question here is not whether the "delay-related hardship" to patients is justified *if* the government is correct that Akebia cannot challenge the CMS Decision. That assumes a final resolution of this case in the government's favor before the matter has been litigated. The relevant question is whether the ongoing harm to Akebia and patients posed by the CMS Decision outweighs the modest impact on the government. There can be no question it does.

## CONCLUSION

For the foregoing reasons, and the reasons set for in Akebia's opening memorandum, the Court should grant Akebia's motion and the relief sought therein.

Dated:  December 9, 2019

Respectfully submitted,

/s/ *Lindsey B. Silver*

Nicole R. Hadas (#638031)*
AKEBIA THERAPEUTICS, INC.
245 First Street
Cambridge, MA 02142
Tel: (617) 871-2091
nhadas@akebia.com

*Of Counsel*

Lindsey B. Silver (#685731)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6772
Fax: (617) 526-5000
lindsey.silver@wilmerhale.com

Bruce S. Manheim*
Brian M. Boynton*
Leon T. Kenworthy*
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6781
Fax: (202) 663-6363
bruce.manheim@wilmerhale.com

*Counsel for Plaintiff*

*\* Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2019, a true and correct copy of the foregoing was filed electronically with the United States District Court for the District of Massachusetts. Notice of this filing has been sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

/s/ *Lindsey B. Silver*
LINDSEY B. SILVER