# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AKEBIA THERAPEUTICS, INC.,

       Plaintiff,

  v.

ALEX M. AZAR II, in his official capacity as
Secretary of Health and Human Services, et al.,

      Defendants.

No. 1:19-cv-12132-ADB

## **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

ARGUMENT .................................................................................................................4

I.     THE MEDICARE STATUTE DOES NOT BAR AKEBIA'S APA CHALLENGE..........4

     A.     The Jurisdiction-Channeling Provision Does Not Apply ........................5

          1.     There Is No Administrative Mechanism for a Challenge by Akebia...........6

          2.     The Possibility of a Future Challenge by Patients to a Part D Plan Sponsor Decision Does Not Foreclose Akebia's APA Challenge..............7

               a.     A Patient Cannot Challenge the CMS Decision .............................7

               b.     A Patient Challenge Would Not Protect Akebia's Interests ............7

               c.     Review by an Unrelated Third Party Is Irrelevant ..........................9

               d.     Review by a Patient Is Not a Practically Available Alternative....................................................................................11

     B.     Akebia Presented Its Claim to CMS and Further Exhaustion Is Not Required.............................................................................................12

II.     THE CMS DECISION WAS FINAL AGENCY ACTION .............................................14

     A.     The CMS Decision Was the Consummation of the Agency Process ...................14

     B.     The CMS Decisions Has Legal Consequences .....................................................16

CONCLUSION...............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Action All. of Senior Citizens v. Johnson,*
607 F. Supp. 2d 33 (D.D.C. 2009) ..........................................................................12

*Action All. of Senior Citizens v. Leavitt,*
483 F.3d 852 (D.C. Cir. 2007) ...........................................................................5, 6, 7

*Action All. of Senior Citizens v. Sebelius,*
607 F.3d 860 (D.C. Cir. 2010) ...............................................................................12

*Allergan, Inc. v. Burwell,*
No. CV 13-00264, 2016 WL 1298960 (D.D.C. Mar. 31, 2016)........................14, 16

*American Hosp. Ass'n v. Hargan,*
289 F. Supp. 3d 45 (D.D.C. 2017) ..........................................................................13

*American Chiropractic Ass'n, Inc. v. Leavitt,*
431 F.3d 812 (D.C. Cir. 2005) ..................................................................................6

*American Hosp. Ass'n v. Azar,*
895 F.3d 822 (D.C. Cir. 2018) ...........................................................................12, 13

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000)...............................................................................20

*Baxter Healthcare Corp. v. Weeks,*
643 F. Supp. 2d 111 (D.D.C. 2009) .....................................................................9, 16

*Bennett v. Spear,*
520 U.S. 154 (1997)..........................................................................................14, 16

*Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline Co.,*
851 F.3d 105 (1st Cir. 2017).....................................................................................15

*Bowen v. Michigan Acad. of Family Physicians,*
476 U.S. 667 (1986).......................................................................................4, 5, 11

*Brown v. Sec'y of Health & Human Servs.,*
46 F.3d 102 (1st Cir. 1995).....................................................................................13

*Ciba-Geigy Corp. v. EPA,*
801 F.2d 430 (D.C. Cir. 1986) ...........................................................................14, 15

*Council for Urological Interests v. Sebelius*,
    668 F.3d 704 (D.C. Cir. 2011) .................................................................................................11

*Empire Health Found. v. Burwell*,
    209 F. Supp. 3d 261 (D.D.C. 2016) .........................................................................................5

*Estabrook v. United States*,
    No. 16-cv-11772-ADB, 2018 WL 6592092 (D. Mass. Dec. 13, 2018) ....................................2

*Faith Int'l Adoptions v. Pompeo*,
    345 F. Supp. 3d 1314 (W.D. Wash. 2018) ...............................................................................16

*First Nat'l Bank of Chicago v. Comptroller of Currency of U.S.*,
    956 F.2d 1360 (7th Cir. 1992) .................................................................................................16

*General Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) .................................................................................................20

*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) .................................................................................................16

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .................................................................................................18

*Ipsen Biopharms., Inc. v. Azar*,
    ___ F.3d ___, 2019 WL 6482392 (D.C. Cir. Dec. 3, 2019) .............................................17, 18

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .................................................................................................................12

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) ...............................................................................................18

*National Ass'n of Psychiatric Health Sys. v. Shalala*,
    120 F. Supp. 2d 33 (D.D.C. 2000) ............................................................................................6

*New York v. HHS*,
    No. 07 Civ. 8621 (PAC), 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) ................................19

*Pena Martinez v. Azar*,
    376 F. Supp. 3d 191 (D.P.R. 2019) .........................................................................................13

*Physician Hosps. of Am. v. Sebelius*,
    691 F.3d 649 (5th Cir. 2012) ...................................................................................................10

*Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United States*,
    521 F.3d 46 (1st Cir. 2008) ......................................................................................................10

*Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007)........................................................................................2

*Sackett v. EPA*,
   566 U.S. 120 (2012)................................................................................................4

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016)........................................................................15, 19

*Shalala v. Illinois Council on Long Term Care, Inc.*,
   529 U.S. 1 (2000)............................................................................................ *passim*

*Southwest Pharmacy Sols., Inc. v. CMS*,
   718 F.3d 436 (5th Cir. 2013) ...............................................................................10

*Tataranowicz v. Sullivan*,
   959 F.2d 268 (D.C. Cir. 1992)..............................................................................14

*Union of Concerned Scientists v. Wheeler*,
   377 F. Supp. 3d 34 (D. Mass. 2019) .....................................................................19

*United States v. Mendoza*,
   464 U.S. 154 (1984)................................................................................................8

*United States Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   136 S. Ct. 1807 (2016) .....................................................................................15, 19

*Weinberger v. Salfi*,
   422 U.S. 749 (1975)..............................................................................................13

## STATUTES, RULES, AND REGULATIONS

5 U.S.C. § 702...........................................................................................................4

5 U.S.C. § 704.....................................................................................................14, 15

28 U.S.C. § 1331.......................................................................................................5

42 U.S.C. § 405.........................................................................................................5

42 U.S.C. § 1395ii....................................................................................................5

42 U.S.C. § 1395w-22..............................................................................................6

42 U.S.C. § 1395w-102......................................................................................2, 17

42 U.S.C. § 1395w-104......................................................................................6, 11

42 U.S.C. § 1395w-114......................................................................................2, 17

42 U.S.C. § 1395w-115 ........................................................................................... 2, 17

42 C.F.R. § 423.100 ........................................................................................... 2, 17, 18

42 C.F.R. § 423.258 ........................................................................................... 2, 18

42 C.F.R. § 423.308 ........................................................................................... 2, 18

42 C.F.R. § 423.329 ........................................................................................... 2, 18

42 C.F.R. § 423.336 ........................................................................................... 2, 18

42 C.F.R. § 423.564 ........................................................................................... 9

42 C.F.R. § 423.566 ........................................................................................... 6, 7, 9

42 C.F.R. § 423.578 ........................................................................................... 9

42 C.F.R. § 423.580 ........................................................................................... 9

42 C.F.R. § 423.600 ........................................................................................... 9

42 C.F.R. § 423.782 ........................................................................................... 2, 18

42 C.F.R. § 423.2002 ........................................................................................... 9

42 C.F.R. § 423.2062 ........................................................................................... 8, 15

42 C.F.R. § 423.2100 ........................................................................................... 9

42 C.F.R. § 423.2136 ........................................................................................... 9

42 C.F.R. § 423.2315 ........................................................................................... 17

**INTRODUCTION**

The government's motion to dismiss the Administrative Procedure Act ("APA")
complaint filed by Akebia Therapeutics, Inc. ("Akebia") should be denied.  Akebia challenges a
decision by Defendant Centers for Medicare & Medicaid Services ("CMS") determining that
Akebia's drug product, Auryxia®, is not a "covered" drug under the Medicare Part D program
when used for one of the two indications for which it has been approved by the Food and Drug
Administration ("FDA").  That decision also instructed Part D "plan sponsors" (the private
insurers that provide coverage under Part D) to require patients to obtain prior authorization
("PA") from the plans before they can use Auryxia for its other FDA-approved indication.

The CMS decision has had enormous consequences for Akebia, patients, and plan
sponsors.  It precludes plan sponsors from receiving payment from CMS for covering Auryxia
for its iron deficiency anemia ("IDA") indication, and it resulted in all Part D plan sponsors
terminating such coverage.  It also caused the plan sponsors to implement the PA requirement
CMS mandated for Auryxia's hyperphosphatemia indication, impeding patient access to the drug
for that use.  All of this had a significant negative and irreparable impact on Akebia's revenues,
as explained in Akebia's pending motion for a preliminary injunction.  *See* Dkt. Nos. 15, 16, 57.

The government, however, has taken the position that Akebia simply has no remedy in
court, even if it is correct that the CMS decision is contrary to the plain terms of the Medicare
statute and arbitrary and capricious.  In the government's view, Akebia's claim cannot proceed
because the company failed to pursue administrative remedies that the government concedes
were not available to it.  The government further contends that the CMS decision is not "final
agency action" that can be challenged under the APA despite the significant legal consequences
that undeniably flowed from it.  As explained below, these arguments should be rejected.

## BACKGROUND[1]

### MEDICARE PART D

Medicare beneficiaries can obtain access to a drug through Part D, and plan sponsors can obtain payment from CMS for the cost of covering the drug, only if it is a "covered part D drug." *See* 42 U.S.C. §§ 1395w-102(a), (b), (e), 1395w-114, 1395w-115. Plan sponsors receive payments from CMS through several mechanisms. *See* Compl. ¶ 20. These payments are made only for the cost of covering Part D drugs.[2] Part D plans generally have very narrow profit margins, and without reimbursement from CMS, a Part D plan cannot economically cover a drug. *See* Declaration of Jane Barlow ¶ 10.[3]

### THE CMS DECISION REGARDING COVERAGE OF AURYXIA

CMS maintains a Formulary Reference File ("FRF") to identify drugs eligible for coverage under Part D and "that can be included on Part D sponsors' … formulary files." Dkt. 49-10 at 1. Following FDA's approval of Auryxia to treat hyperphosphatemia (elevated levels of phosphorus in the blood) and IDA in patients with chronic kidney disease ("CKD") in 2014 and

---

[1] A more detailed description of the Part D program and the factual background relevant to the merits of Akebia's claims are set forth in Akebia's complaint and its brief in support of its motion for a preliminary injunction or summary judgment. Dkt. 1 ("Compl."); Dkt. 16 at 2-5.

[2] For example, CMS pays plans monthly direct subsidies per beneficiary based on bids reflecting the cost of providing "basic prescription drug coverage" that is limited to covered Part D drugs. *See* 42 C.F.R. § 423.329(a), 423.258, 423.100. CMS also pays plans a reinsurance subsidy equal to 80 percent of patients' covered prescription drug costs that exceed Part D's out-of-pocket maximum, again limited to costs associated with Part D drugs. *Id.* §§ 423.329(a)(2), (c), 423.308, 423.100. For eligible low-income Part D beneficiaries, CMS also pays plans cost-sharing subsidies associated with Part D drugs. *Id.* § 423.329(d), § 423.782. *See also id.* §§ 423.329(b), 423.336 (risk corridors payments).

[3] Because the final agency action requirement of the APA implicates statutory jurisdiction, *see Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007), the Court can consider evidence outside the complaint, *see, e.g., Estabrook v. United States*, No. 16-cv-11772-ADB, 2018 WL 6592092, at *2 (D. Mass. Dec. 13, 2018).

2017, respectively, CMS treated Auryxia as a fully "covered Part D drug" for both indications. Compl. ¶ 34; Butler Decl. ¶ 6.  Auryxia was included on the FRF in 2014 and continued to be included on the FRF following FDA approval of the IDA indication in 2017.  *Id.*  As of September 2018, virtually all plan sponsors covered Auryxia without any restrictions.  *Id.*

On September 14, 2018, CMS sent a notice to Part D plan sponsors indicating that Auryxia is not a covered Part D drug when used to treat IDA in CKD patients.  Compl. ¶¶ 35-36 & Ex. 1 ("CMS Decision").  CMS stated that it was aware that FDA had approved Auryxia for the treatment of IDA in adult patients with CKD not on dialysis, but wrote that, "[c]onsistent with other iron products," Auryxia was removed from the August CY 2018 FRF.  Compl. Ex. 1. CMS recognized Auryxia was also approved to treat hyperphosphatemia and explained that, because "CMS does not consider it to be excluded from Part D for this use," Auryxia would be added back to the September 2018 FRF and maintained on the 2019 FRF.  *Id.*  The agency stated, however, that "[s]ince Auryxia may or may not meet the definition of a Part D drug depending on its use, we expect that Part D sponsors will utilize a prior authorization (PA) edit, or other process, to ensure that it is being used for a Part D covered indication."  *Id.*

After the CMS Decision, Part D sponsors terminated coverage of Auryxia for the treatment of IDA and imposed PA restrictions on the use of Auryxia for the treatment of hyperphosphatemia.  Compl. ¶ 37; Butler Decl. ¶ 8; Barlow Decl. ¶ 16.

**AKEBIA'S EFFORTS TO REVERSE THE CMS DECISION**

As the government concedes, "Part D does not include a mechanism for drug manufacturers to challenge coverage determinations administratively."  Mem. 10.  Akebia thus engaged in informal outreach to Defendants to try to persuade them to reverse the CMS Decision.  Beginning in 2018 and continuing in 2019, Akebia met with a number of CMS and Department of Health and Human Services ("HHS") officials.  Compl. ¶¶ 38-39; Butler Decl.

¶¶ 9-13.[4]  During the course of these efforts, CMS never rejected Akebia's request that it rescind

or modify the CMS Decision.  Compl. ¶ 39; Butler Decl. ¶ 11.  On August 23, 2019, Akebia

submitted a letter and legal memorandum to the General Counsel of HHS and the CMS Chief

Legal Officer outlining Akebia's legal position and seeking reconsideration of the CMS

Decision.  Compl.  ¶¶ 40-45; Butler Decl. ¶ 12; Silver Decl. Ex. A (letter & memorandum).

Akebia met with CMS to discuss its request on October 1, 2019.  Compl. ¶ 46; Butler Decl. ¶ 12.

On October 4, 2019, CMS informed Akebia that it would not revisit or rescind its Part D

coverage decision regarding Auryxia.  Compl. ¶ 46; Butler Decl. ¶ 13.  This suit followed.

## ARGUMENT

The Court should deny the government's motion to dismiss, which raises only

jurisdictional and threshold challenges to Akebia's claims, failing entirely to address them on the

merits.  As explained below, neither the Medicare statute's exhaustion provision nor the APA's

final agency action requirement poses a bar to reaching the merits of this suit.

## I.    THE MEDICARE STATUTE DOES NOT BAR AKEBIA'S APA CHALLENGE

The APA confers a cause of action on "[a] person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and

"creates a 'presumption favoring judicial review of administrative action,'" *Sackett v. EPA*,

566 U.S. 120, 128 (2012) (citation omitted); *see also Bowen v. Michigan Acad. of Family*

*Physicians*, 476 U.S. 667, 670 (1986) (discussing "the strong presumption that Congress intends

judicial review of administrative action").  "[J]udicial review of a final agency action by an

---

[4] These meetings included a March 21, 2019 meeting with Demetrios Kouzoukas, Principal Deputy Administrator, CMS; a May 13, 2019 meeting with Kristina Harder, Deputy Chief of Staff, Office of the Assistant Secretary for Health Operations, HHS; and a May 28, 2019 meeting with Amy Larrick Chavez-Valdez, Director of the Medicare Drug Benefit and C&D Data Group, CMS.  Compl. ¶ 39; Butler Decl. ¶ 10.

aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Bowen*, 476 U.S. at 670 (internal quotation marks and citation omitted). Here, there is no basis to believe Congress intended to foreclose APA review.

### A.    The Jurisdiction-Channeling Provision Does Not Apply

Through its incorporation of a Social Security Act provision, the Medicare statute withdraws general federal jurisdiction under 28 U.S.C. § 1331 for certain "action[s] against the United States, the [Secretary], or any officer or employee thereof ... to recover on any claim arising under" the statute. 42 U.S.C. §§ 405(h), 1395ii. But that provision, which is designed to "channel" review of Medicare decisions through applicable administrative review procedures, does not apply where there is no administrative remedy available—where dismissing the plaintiff's suit "would not lead to a channeling of review through the agency, but would mean no review at all." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10, 17 (2000); *see also id.* at 19; *Bowen*, 476 U.S. at 680 (rejecting argument that Congress "intended no review at all" of certain challenges the Medicare Part B program). This exception ensures that CMS determinations do not evade judicial scrutiny simply because CMS has failed to establish a viable mechanism for agency review.

"Although one might initially think that th[is] exception … is quite narrow and definite in scope, it turns out that the Medicare Act's complex judicial-review topography is punctured by sinkholes." *Empire Health Found. v. Burwell*, 209 F. Supp. 3d 261, 270 (D.D.C. 2016). With specific regard to Medicare Part D, the D.C. Circuit has explained that, when "no statute appears to make any affirmative grant of (channeled) jurisdiction over Medicare Part D claims of the type pressed by [a plaintiff]," those claims may be brought under the APA in federal court. *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 859 (D.C. Cir. 2007). Indeed, the *Illinois Council* "exception applies not only when administrative regulations foreclose judicial review,

5

but also when roadblocks *practically cut off* any avenue to federal court." *American Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) (emphasis added); *see also National Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 38 (D.D.C. 2000).

### 1.    There Is No Administrative Mechanism for a Challenge by Akebia

The exception recognized in *Illinois Council* is applicable here because the Medicare statute does not provide a mechanism for a drug manufacturer like Akebia to seek agency review of a determination by CMS that a drug is not a covered Part D drug, and denying judicial review under the APA therefore would foreclose judicial review entirely.  The Medicare statute and CMS's regulations provide for administrative and ultimately judicial review of challenges to individual Part D plan sponsor coverage determinations.  *See* 42 U.S.C. § 1395w-104(g), (h)(1) (incorporating procedures in 42 U.S.C. § 1395w-22(g)(4)-(5)); 42 C.F.R. § 423.566 (specifying "coverage determinations" subject to review).  But this administrative review mechanism can be invoked only by patients (or their representatives or doctors).  *See* 42 C.F.R. § 423.566(c) ("Individuals who can request a … coverage determination are—(1) The enrollee; (2) The enrollee's appointed representative, on behalf of the enrollee; or (3) The prescribing physician or other prescriber, on behalf of the enrollee.").  The government concedes that "Part D does not include a mechanism for drug manufacturers to challenge coverage determinations."  Mem. 10.

It is therefore clear that Akebia had no way to bring an administrative challenge to the CMS Decision.  Because "the Medicare statute appears to provide [Akebia] no avenue for judicial review," the only way for Akebia to challenge CMS's unlawful statutory interpretation and disparate treatment of similarly situated drugs was to bring an action under the APA in Federal court.  *Action All.*, 483 F.3d at 860 (permitting APA challenge to HHS's method of collecting premium payments because Part D permits administrative review only of claims against plan sponsors).  Absent such judicial review, Akebia would obtain "no review at all."

*Illinois Council*, 529 U.S. at 17.  The *Illinois Council* exception thus applies, preserving

Akebia's presumptively available right to challenge final agency action under the APA.

> **2.    The Possibility of a Future Challenge by Patients to a Part D Plan Sponsor Decision Does Not Foreclose Akebia's APA Challenge**

The prospect that a *patient* might one day pursue review of a Part D *plan sponsor's* denial

of coverage does not foreclose Akebia's APA challenge to the CMS Decision.

> a.    <u>A Patient Cannot Challenge the CMS Decision</u>

The government takes the extraordinary position (Mem. 10-11) that as long as some third

party is able to raise before CMS the claim Akebia asserts here, the jurisdiction-channeling

provision applies and withdraws jurisdiction over this case.  The government therefore argues

that Akebia's APA challenge is barred because a patient could invoke Part D administrative

procedures.  This argument fails at the outset because a patient would not be able to challenge

*the CMS Decision* using the available administrative remedy.  That remedy permits challenges

only to coverage determinations *by plan sponsors.  See* 42 C.F.R. § 423.566 (specifying plan

sponsor "coverage determinations" subject to agency review); *Action All.*, 483 F.3d at 860

(noting that the Part D statute permits administrative review only of claims against plan sponsors

and finding jurisdiction-channeling provision therefore inapplicable).  Because a patient could

not challenge the CMS Decision at issue, the government is wrong to contend that a patient

could bring the same "claim" Akebia asserts here.  Mem. 10.

> b.    <u>A Patient Challenge Would Not Protect Akebia's Interests</u>

An administrative challenge by a patient to an individual plan sponsor coverage

determination would not be sufficient to protect *Akebia's* interests for at least four reasons:

*First*, an administrative challenge by a patient to a plan sponsor's coverage determination

could not provide relief to Akebia because the agency adjudicator in such a challenge would not

be permitted to overrule the CMS Decision.  As the government notes (Mem. 5, 12), CMS

regulations governing these challenges provide that ALJs and the Medicare Appeals Council "are

not bound by CMS program guidance, such as program memoranda and manual instructions, but

will give substantial deference to these policies if they are applicable to a particular case."

42 C.F.R. § 423.2062(a).  The same regulation, however, also provides that "[a]n ALJ … or

Council decision to disregard a policy *applies only to the specific coverage determination or at-

risk determination being considered and does not have precedential effect*."  *Id.* § 423.2062(b)

(emphasis added).  In other words, while an ALJ or the Council could elect to disregard the CMS

Decision in a particular case (as the government argues, *see* Mem. 5, 12), a decision to do so

would apply only to the individual patient bringing the challenge and would not have no effect

on coverage for any other patient.  An ALJ or the Council cannot overrule the CMS Decision;

they can merely decide "not [to] follow[]" it in a particular case, 42 C.F.R. § 423.2062(b),

leaving it in place for everyone else.  That kind of decision provides no relief to Akebia.[5]

    *Second*, because a patient's challenge would be to a Part D plan sponsor's coverage

decision, it is unlikely to result in review of whether Auryxia is a covered Part D drug for its IDA

indication.  As the government notes, plan sponsors "do not have to cover all drugs that are

eligible for Part D coverage."  Mem. 3.  Instead, a plan sponsor may develop its own

"formulary" of drugs that it will offer.  For most classes of drugs, a formulary need only include

a single drug option.  *See* 42 U.S.C. § 1935w-104(b)(3)(C)(i).  Demonstrating that Auryxia is a

covered Part D drug when used for IDA therefore would not entitle a patient to coverage in a

challenge to a plan sponsor coverage determination.  To prevail under the applicable

---

[5] Moreover, a judicial decision in favor of a single patient would not bind CMS in
subsequent cases.  *See United States v. Mendoza*, 464 U.S. 154, 162 (1984) ("nonmutual
offensive collateral estoppel simply does not apply against the government").

"exceptions" process, a patient would need to submit evidence from his or her doctor and show that coverage was "medically necessary" in light of the ineffectiveness of other on-formulary treatment options. *See* 42 C.F.R. § 423.578(b)(5); Mem. 4 n.6. Moreover, even if a patient were successful, that would require only that the particular plan sponsor cover the drug for that particular patient. It would not require *CMS* to reimburse all plan sponsors for coverage of Auryxia for IDA in all cases.

*Third*, patients could not obtain agency or judicial review of CMS's imposition of the PA requirement. The administrative and judicial review provisions invoked by the government permit challenges only to a plan sponsor's "decision not to provide or pay for a Part D drug"— i.e., "coverage determinations." 42 C.F.R. § 423.566(b)(1). Complaints about the imposition of a PA requirement, which is not a "coverage determination," are subject only to the "grievance" provision of CMS's regulations. *Id.* § 423.564. Unlike a challenge to a "coverage determination," a "grievance" may be raised only with a Part D plan sponsor; an adverse plan sponsor grievance determination cannot be appealed to an ALJ, the Medicare Review Council, and then a federal court. *See id.* § 423.564(b) ("Grievance procedures are separate and distinct from appeal procedures, which address coverage determinations as defined in § 423.566(b).").[6]

### c.    Review by an Unrelated Third Party Is Irrelevant

Additionally, the ability of a *patient* to seek administrative review would not bar this suit even if a patient could challenge the CMS Decision at issue. Akebia "is not suing on behalf of anyone who could seek administrative review of its claims," and nothing in *Illinois Central* requires Akebia "to recruit [an enrollee] to act as its proxy in an administrative process." *Baxter Healthcare Corp. v. Weeks*, 643 F. Supp. 2d 111, 116 (D.D.C. 2009). In *Illinois Council*, the

---

[6] *See also* 42 C.F.R. §§ 423.580, 423.600(a), 423.2002(a), 423.2100, 423.2136.

Supreme Court considered whether an APA challenge to a regulation by an association of nursing homes was foreclosed. The association argued that its claim should not be barred because it could not "take advantage of the special review channel, for the statute authorizes review through that channel only at the request of a dissatisfied institution or agency." 529 U.S. at 24 (internal quotation marks and citation omitted). The Court rejected that argument because the association "speaks only on behalf of its member institutions, and thus has standing only because of the injury those members allegedly suffer." *Id.* Because it was "essentially their rights to review" that were at stake, the members' ability to utilize the "special review channel" through the agency foreclosed the association's APA claim. *Id.* Here, by contrast, Akebia asserts its own rights and it is not an association whose members could obtain review.

The cases cited by the government (Mem. 9-10)—involving challenges by associations whose members had access to administrative review procedures or might not encounter practical roadblocks—are inapposite. *E.g., Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United States*, 521 F.3d 46, 47 (1st Cir. 2008) (doctors' association challenge to regulation requiring physical therapists be specially trained for their services to be reimbursed under Part B); *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 658-659 (5th Cir. 2012) (plaintiff was association of hospitals that could press their own claims administratively). Unlike those associations, Akebia does not act on behalf of members who could seek administrative review.

*Southwest Pharmacy Solutions, Inc. v. CMS*, 718 F.3d 436 (5th Cir. 2013), is also not on point. In that case, the court held that the pharmacy plaintiff could act as a representative of Part D enrollees and pursue an administrative challenge to a CMS regulation on their behalf. *See id.* at 444 ("Southwest acknowledges that its enrollees could appoint a member pharmacy to act as their representative."); *see id.* at 446 (pharmacy "could shoulder the administrative and financial

10

burdens" of bringing a claim). CMS does not suggest that Akebia—a drug manufacturer—could serve as a representative or assignee of a beneficiary. Indeed, the government could take the position, under HHS guidance,[7] that providing such a benefit violates the federal anti-kickback statute. To the extent *Southwest Pharmacy* or other Fifth Circuit cases suggest that the ability of an *unrelated* third party to pursue administrative claims forecloses review, they are inconsistent with *Illinois Council*, as explained above. Finally, even under a broad reading of *Southwest Pharmacy*, it would not foreclose Akebia's claim, since a patient could not challenge the CMS Decision or protect Akebia's interests. *See supra* pp. 7-9.[8]

        d.    <u>Review by a Patient Is Not a Practically Available Alternative</u>

An administrative and judicial challenge by a patient is also not a "practically" available option. *See supra* pp. 5-6. The government has not pointed to any petitions by a patient challenging a Part D plan sponsor's refusal to cover Auryxia for IDA in the fourteen months since the Decision was announced. This significantly undermines its argument under *Illinois Council*'s "fundamentally … practical" inquiry. *See Council for Urological Interests v. Sebelius*, 668 F.3d 704, 712 (D.C. Cir. 2011) (failure of hospitals to challenge CMS rule showed presence of "roadblock" to administrative review). Nor does the government offer any evidence

---

[7] *See* HHS, Office of Inspector General, Manufacturer Safeguards May Not Prevent Copayment Coupon Use for Part D Drugs (Sept. 2014).

[8] Indeed, there is no reason to conclude that Congress intended to foreclose APA review by *drug manufacturers* of determinations by *CMS* that a drug is a "covered part D drug" just because it provided *Medicare beneficiaries* with a right to challenge individualized coverage determinations by *plan sponsors*. The Medicare statute "simply does not speak to challenges mounted against" decisions by CMS regarding whether a drug is a covered Part D drug. *Bowen*, 476 U.S. at 675. The judicial review provision is in a section that is almost entirely directed to requirements imposed on Part D plan sponsors, and the provision relates to individualized plan sponsor drug coverage determinations. *See* 42 U.S.C. § 1395w-104(h)(1). Accordingly, the general presumption of review under the APA applies. *See Bowen*, 476 U.S. at 674-75; *see also Illinois Council*, 529 U.S. at 19 (noting that the provision the government invokes here "is a channeling requirement, not a foreclosure provision").

to suggest that CKD patients with IDA have the resources and incentives to pursue expensive administrative and judicial review of the denial of coverage of Auryxia.  To even invoke the exceptions process that could permit a challenge to a sponsor's refusal to cover an off-formulary drug, a patient would need to come forward with evidence of medical necessity from her doctor.  *See supra* pp. 8-9.  In light of the difficulties of pursuing litigation against their plan sponsor, patients are more likely to cope with a coverage denial by traveling to an infusion center to receive IV iron or foregoing needed medication.  *See* Chertow Decl. ¶¶ 7-8; Burton Decl. ¶ 5.

### B.     Akebia Presented Its Claim to CMS and Further Exhaustion Is Not Required

Even if the jurisdiction-channeling provision were applicable, that would not warrant dismissal because Akebia presented its claim to CMS and exhausted it to the best of its ability.  As the government acknowledges, there are "separate presentment and exhaustion requirements" under the Medicare statute.  *See* Mem. 8 (citing *American Hosp. Ass'n v. Azar*, 895 F.3d 822, 825-26 (D.C. Cir. 2018)).  The requirement that a plaintiff have "presented" its claim to the agency "is not waivable." *American Hosp. Ass'n*, 895 F.3d at 825.  But if the plaintiff has presented its claim, the requirement that all internal administrative procedures be exhausted "is waivable." *American Hosp. Ass'n*, 895 F.3d at 825; *see also Illinois Council*, 529 U.S. at 24.

The "presentment" requirement does not require a plaintiff to invoke formal administrative procedures.  Courts have recognized that sending HHS a letter requesting relief with respect to a specific dispute can satisfy the requirement.  *American Hosp. Ass'n*, 895 F.3d at 825; *Action All. of Senior Citizens v. Johnson*, 607 F. Supp. 2d 33, 37-38 (D.D.C. 2009) (holding that letters seeking a waiver of a benefit repayment requirement satisfied the presentment requirement); *aff'd Action All. of Senior Citizens v. Sebelius*, 607 F.3d 860, 862 n.1 (D.C. Cir. 2010); *Mathews v. Eldridge*, 424 U.S. 319, 329 (1976) (answers to agency questionnaire and letter in response to the tentative determination sufficient).

Akebia more than satisfied that presentment requirement in this case. As noted above, Akebia engaged in lengthy outreach to Defendants seeking to persuade them to reverse the CMS Decision. Compl. ¶¶ 38-39; Butler Decl. ¶¶ 9-13; *supra* pp. 3-4. Notably, Akebia submitted a detailed legal memorandum to the General Counsel of HHS and the CMS Chief Legal Officer specifically challenging the CMS Decision and explaining why it was unlawful. Compl. ¶¶ 40-45; Butler Decl. ¶ 12; Silver Decl. Ex. A (letter & memorandum). CMS denied that request for reconsideration. Compl. ¶ 46; Butler Decl. ¶ 13. CMS therefore had "an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record." *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975). The government cites cases holding that the submission of comments to an agency during a notice-and-comment rulemaking process does not constitute presentment of a particular claim, where the plaintiff is seeking to challenge a regulation that has not yet even been applied. *See American Hosp. Ass'n*, 895 F.3d at 826-27; *American Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 52 (D.D.C. 2017). But that is not the situation here. Akebia is challenging an informal adjudication by CMS that took effect immediately, and it asserted a specific claim seeking relief from the CMS Decision.

Akebia was unable to pursue and exhaust any formal administrative review process, because none existed. As explained above, and as the government concedes, the Medicare statute and CMS regulations provided no mechanism for a manufacturer to challenge a decision like the CMS Decision before filing suit. *Supra* p. 6. Akebia thus did not fail to exhaust administrative remedies; there were no such remedies for Akebia to exhaust. *See Pena Martinez v. Azar*, 376 F. Supp. 3d 191, 202 (D.P.R. 2019). Attempting to exhaust remedies that the government concedes were not available, of course, would have been futile. *See Salfi*, 422 U.S. at 765; *Brown v. Sec'y of Health & Human Servs.*, 46 F.3d 102, 114-15 (1st Cir. 1995) (finding

futility when the agency had taken a "firm stand" on a particular issue); *Tataranowicz v. Sullivan*, 959 F.2d 268, 273-275 (D.C. Cir. 1992) (applying "futility" exception).

## II.    THE CMS DECISION WAS FINAL AGENCY ACTION

The CMS Decision was "final agency action … subject to judicial review" under the APA.  5 U.S.C. § 704.  As the Supreme Court explained in *Bennett v. Spear*, 520 U.S. 154 (1997), agency action is final if it (1) "marks the consummation of the agency's decisionmaking process—[meaning] it must not be of a merely tentative or interlocutory nature"; and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-178 (citations and quotation marks omitted).  "In other words, agency action is final when it is 'definitive' and has "direct and immediate effect on the day-to-day business of the part[y] challenging the action."  *Allergan, Inc. v. Burwell*, No. CV 13-00264, 2016 WL 1298960, at *6 (D.D.C. Mar. 31, 2016) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)).  The CMS Decision satisfies both prongs of the *Bennett* standard.

### A.    The CMS Decision Was the Consummation of the Agency Process

The CMS Decision represented the conclusion of the agency's process for considering whether Auryxia is a covered Part D drug when prescribed for IDA.  The Decision begins by noting that Auryxia was approved for IDA and then indicates that, as a result, it was "removed from" the FRF "[c]onsistent with other iron products."  Compl. Ex. 1.  The Decision then explains that Auryxia was "added back" to the FRF only because it is *also* indicated for hyperphosphatemia and "CMS does not consider it to be excluded from Part D *for this use*."  *Id.* (emphasis added).  CMS's language thus plainly indicates the agency has determined that Auryxia does "not meet the definition of a Part D drug" when prescribed for IDA.  *Id.*

CMS gave no indication its conclusion was tentative.  *See Allergan*, 2016 WL 1298960, at *6 ("Definitiveness is satisfied when there is no ambiguity in the statement, nor any indication

it is subject to further agency consideration." (quotation marks omitted)).  On the contrary, the Decision expresses CMS's "unequivocal position" and indicates that CMS "*expects* regulated entities [plan sponsors] to alter their primary conduct to conform to that position."  *Ciba-Geigy Corp.*, 801 F.2d at 436 (emphasis added).  CMS's Chief Legal Officer confirmed that CMS would not revisit the Decision.  Compl. ¶ 46.  Even now, the government does not suggest that CMS's position is unsettled—it affirmatively defends the Decision on the merits.  *See* Dkt. 49.

The government notes the possibility that an ALJ or the Council could reach a different view in a patient challenge to a plan sponsor coverage decision, particularly since the CMS Decision would not be binding in that context.  *See* Mem. 12 (invoking 42 C.F.R. § 423.2062).  But the "possibility" that an agency could "revise" a decision is "a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."  *United States Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016); *see Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016); 5 U.S.C. § 704 ("agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application … for any form of reconsideration").  Moreover, as explained above, an ALJ or the Council in fact would *not* have authority to overrule the CMS "policy" set forth in the CMS Decision, since a "decision to disregard a policy applies only to the specific coverage determination … being considered and does not have precedential effect."  42 C.F.R. 423.2062(b).  The existence of a mechanism for one-off review of individual plan sponsor decisions in no way indicates that the broad determination in the CMS Decision is non-final.  This is not a situation where the decision being challenged is merely the first step in a "single, unitary proceeding" that involves a subsequent final decision that has not yet occurred.[9]

---

[9] *Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline Co.*, 851 F.3d 105, 111

Other courts have confirmed that CMS's announcement of substantive decisions in correspondence with regulated parties constitutes final action.  In *Baxter Healthcare Corp.*, CMS announced by letter that it would code the plaintiff's drug product Advate® as a "multiple source drug" for Medicare reimbursement purposes.  643 F. Supp. 2d at 116.  Rejecting CMS's argument that the letter was not final agency action, the court explained that, regardless of form, the agency's conclusion that it would continue to treat Advate as a multiple source drug was "unequivocal," which distinguished the letter from non-final "preliminary determination[s]."  *Id.*  Similarly, in *Allergan*, CMS informed the plaintiff by email that it was required to report the average sales price for one of its products pursuant to a statutory requirement.  2016 WL 1298960, at *3.[10]  The court held that the email, which "unequivocally stated the agency's position" and "did not allude to … future changes in agency policy," was final agency action.  *Id.* at *6.  The same is true here.  CMS did not merely express a tentative view about the law; it told plan sponsors that it would not pay for Auryxia when used for the IDA indication under Part D.

## B.    The CMS Decisions Has Legal Consequences

Legal consequences unquestionably have "flow[ed]" from the CMS Decision.  *Bennett*, 520 U.S. at 156.  Whether or not a drug is a "covered part D drug" has enormous legal

---

(1st Cir. 2017); *see Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012).

[10] The government refers to the CMS Decision as an "informal communication," but the fact that CMS announced the Decision using the relatively informal means of an email is of no moment.  *See First Nat'l Bank of Chicago v. Comptroller of Currency of U.S.*, 956 F.2d 1360, 1364 (7th Cir. 1992) (although "[a] letter doesn't look much like final, formal agency action," one that "said flat out" that bank could not engage in proposed conduct was final); *see also Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314, 1324 (W.D. Wash. 2018) (State Department's "definitive[]" assertion in emails that an accrediting entity was prohibited from processing renewals was final agency action).  CMS cannot avoid judicial scrutiny through its practice of "typically address[ing] the applicability of the statutory exceptions to Part D coverage" in "informal communications like the one at issue in this case."  Mem. 3.

consequences for patients, Part D plan sponsors, and the drug's manufacturer.  Medicare beneficiaries can obtain access to a drug through Part D *only* if it is a Part D drug.  *See* 42 U.S.C. 1395w-102(a), (b), (e).  Plan sponsors can obtain payments from CMS to offset the cost of a drug only if it is a covered Part D drug.  *See, e.g., id.* §§ 1395w-114, 1395w-115.  Drug manufacturers receive the benefits of increased sales and also face the obligation to pay "coverage gap" discounts only if a drug is a covered Part D drug.  *See id.* § 1395w-114A(b)(1)(A), (g)(2) (Medicare Coverage Gap Discount Program); 42 C.F.R. §§ 423.2315, 423.100.

Here, the CMS Decision has legal consequences for a host of different parties, including Akebia.  Part D plan sponsors now cannot obtain payment from CMS for coverage of Auryxia for IDA and must force patients to obtain a PA in order to ensure that they are taking Auryxia for hyperphosphatemia.  This has, in fact, led Part D plan sponsors to stop covering Auryxia for IDA and impose a PA requirement.  *See* Compl. ¶ 37; Butler Decl. ¶ 8; Barlow Decl. ¶ 16.  Part D beneficiaries, as a result, cannot obtain Auryxia for IDA through the Part D program and must obtain a PA to obtain Auryxia to treat hyperphosphatemia.  The CMS Decision has directly caused a reduction in prescriptions of Auryxia and has had a negative impact on Akebia's revenues.  Compl. ¶¶ 51; Butler Decl. ¶¶ 14-34.  It also affects Akebia's legal obligations under the Medicare Coverage Gap Discount program.  *See* 42 C.F.R. §§ 423.2315, 423.100.

The D.C. Circuit recently held that CMS letters to a drug manufacturer, which set forth the agency's views on the drug price information the manufacturer was required to submit for purposes of calculating rebates, resembled "an individual adjudication" and constituted final action.  *Ipsen Biopharms., Inc. v. Azar*, ___ F.3d ___, 2019 WL 6482392, at *5 (D.C. Cir. Dec. 3, 2019).  The court explained that "*Bennett* prong-two determinations [are] based on the concrete consequences an agency action has or does not have as a result of the specific statutes

and regulations that govern it." *Id.* at *2. Under the "specific" statutory and regulatory scheme

governing Part D, plan sponsors cannot obtain payments for the cost of covering drugs that CMS

concludes are not covered under Part D. *See supra* p. 2 n.2; 42 C.F.R. §§ 423.329, 423.258,

423.100, 423.308, 423.782, 423.336.

In fact, plan sponsors are legally restrained from seeking payment for a drug that CMS

announces is not covered because they are required to agree "to operate in accordance with … all

… applicable … [CMS] policies." Silver Decl. Ex. B. The United States has cited analogous

contractual language in False Claims Act ("FCA") actions against Medicare Advantage plans for

failing to comply with requirements set forth in CMS policy documents.[11] Moreover, the HHS

Office of Inspector General has previously scrutinized whether plan sponsors were

inappropriately paid for coverage of drugs that are excluded from Part D.[12] Under *Ipsen*, the fact

that the CMS Decision could lead to agency penalties or an FCA action is sufficient alone to

show legal consequences flowed from it. 2019 WL 6482392, at *2; *see also National Ass'n of

Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005). The

risk of penalties and non-payment makes the CMS Decision binding on plan sponsors. Barlow

Decl. ¶¶ 9-16.[13] "[W]hen CMS has made clear its view that a drug or an indication is not

---

[11] *See* Pl. Mem. of Points & Auth. at 9, *United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. CV 16-8697-MWF (SSx) (C.D. Cal. May 22, 2018) (Silver Decl. Ex. C) ("[T]he contracts obligated defendants to operate their Part C and D plans 'in compliance with the requirements of [the] contract[s] and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.).'").

[12] *See, e.g.*, Silver Decl. Ex. D at i-ii (finding that in 2007 and 2008 CMS improperly paid for erectile dysfunction drugs that were not covered under Part D and recommending that CMS determine whether it could recoup the payments from plan sponsors).

[13] Because of the concrete legal consequences that flow from the CMS Decision, the government's reliance on cases explaining that agency action may not be final if it results only in certain "[p]ractical consequences" is misplaced. *See, e.g., Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427-28 (D.C. Cir. 2004) (no final action where letter at issue "merely restated in an abstract setting … EPA's longstanding interpretation" of its regulations and was "purely

covered, Part D plans feel compelled to adhere to that view." *Id.* ¶ 12.

Agency action determines obligations and imposes legal consequences where it commands regulated parties to adhere to the agency's view of the law. *Hawkes Co.*, 136 S. Ct. at 1815. CMS's determination that Auryxia is not a Part D drug when used to treat IDA and its dictate to plan sponsors that it "expect[s]" them to "utilize a prior authorization (PA) edit, or other process, to ensure that it is being used for a Part D covered indication" (Compl. Ex. 1) are binding instructions to plan sponsors from the Federal agency that makes payments to them, regulates their conduct, and can impose penalties for non-compliance. Indeed, the government concedes that the word "expect" can be read to "indicate a certain finality." Mem. 13.[14] This Court has held that "mandatory language" that causes a change in a party's position constitutes final agency action. *Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34, 42-43 (D. Mass. 2019). The CMS Decision thus warns Part D plan sponsors that if they cover Auryxia for IDA, "they do so at the risk of significant … civil" liability. *Hawkes*, 136 S. Ct. at 1815.[15]

The government argues that because CMS did not literally use the word "require" or "mention … possible enforcement," the CMS Decision cannot be final. Mem. 13, 14. But the "finality inquiry is a pragmatic and flexible one." *Safari Club*, 842 F.3d at 1289 (quotation marks omitted); *see also Hawkes Co.*, 136 S. Ct. at 1815. Courts assessing finality do not hold

---

informational in nature; it imposed no obligations and … [c]ompell[ed] no one to do anything").

[14] The case the government cites discounted "the seemingly mandatory requirements" in the challenged letter only in light of the agency's past practice of applying them flexibly. *See New York v. HHS*, 2008 WL 5211000, at *12 (S.D.N.Y. Dec. 15, 2008). Here, CMS has shown no such flexibility; it has not allowed any plan sponsors to cover Auryxia for IDA.

[15] The fact that September 2018 CMS Decision also indicated that Part D "sponsors *may* add prior authorization … on both their CY 2018 and CY 2019 formularies" is a red herring. *See* Mem. 13. That statement means only that CMS would permit sponsors to amend their then current 2018 and pending 2019 formularies to add PA for those years.

plaintiffs to some arbitrary talismanic formula that an agency could easily evade; what matters is that CMS "has given the [plan sponsors] their 'marching orders' and [CMS] expects the [plans] to fall in line." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). In making this assessment, courts look not just to the text of an agency's alleged "guidance" but to whether the document at issue "is applied by the agency in a way that indicates it is binding." *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). In this case, CMS has not wavered from its position that Auryxia is not a Part D drug when used to treat IDA.

The government relies on certain statements in a separate "FAQ" document—not directly at issue here—indicating generally that "Part D sponsors are ultimately responsible for making coverage determinations." Mem. 12 (quoting Dkt. 49-10 at 2, 5). But the same document makes clear that CMS's instructions to plan sponsors regarding Part D coverage are mandatory and reflect official policy regarding the medications CMS will pay for under the program.[16] CMS cannot escape judicial review through the use of boilerplate language disclaiming the binding nature of its pronouncements. *See Appalachian Power*, 208 F.3d at 1023.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

---

[16] The FAQs explain that the FRF "serves as a listing of drug products that can be included on Part D sponsors'" formularies, that Part D plan sponsors "must utilize" the FRF in submitting formularies to CMS, that "[o]nly drugs that could potentially meet th[e] definition [of Part D drug as defined in the Medicare statute] are considered for inclusion on the FRF," and that "[o]nly [drugs] contained on the FRF will be valid codes for formulary submissions." Dkt. 49-10 at 1-2. Appendix B of the Prescription Drug Benefits Manual, cited by the government (Mem. 13), reinforces the binding nature of CMS's alleged "guidance" in this area: It provides definitive "Yes" or "No" answers as to whether products listed in the table "[m]ay be covered under basic Part D benefit." Dkt. 25-15 at 9. The language the government points to says only that "products *not identified* in this table should always be evaluated against the statutory and regulatory definition of a 'Part D drug.'" *Id.* (emphasis added).

20

Dated:  December 16, 2019

Respectfully submitted,

/s/ *Lindsey B. Silver*

Nicole R. Hadas (#638031)*
AKEBIA THERAPEUTICS, INC.
245 First Street
Cambridge, MA 02142
Tel: (617) 871-2091
nhadas@akebia.com

*Of Counsel*

Lindsey B. Silver (#685731)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6772
Fax: (617) 526-5000
lindsey.silver@wilmerhale.com

Bruce S. Manheim*
Brian M. Boynton*
Leon T. Kenworthy*
WILMER CUTLER PICKERING HALE
  AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6781
Fax: (202) 663-6363
bruce.manheim@wilmerhale.com

*Counsel for Plaintiff*

*\* Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2019, a true and correct copy of the foregoing was filed electronically with the United States District Court for the District of Massachusetts. Notice of this filing has been sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

/s/ *Lindsey B. Silver*
LINDSEY B. SILVER