# EXHIBIT A



Akebia Therapeutics, Inc.
245 First Street
Cambridge, MA 02142
T: +1 617.871.2098  F: +1 617.871.2099
www.akebia.com

August 23, 2019

Robert P. Charrow
General Counsel
Department of Health and Human Services
200 Independence Avenue, S.W., Room 713-F
Washington, DC 20201

Kelly Cleary
Deputy General Counsel and Chief Legal Officer for
the Centers for Medicare & Medicaid Services
Department of Health and Human Services
200 Independence Avenue, S.W., Room 711
Washington, DC 20201

Re:   Coverage of Auryxia Under the Medicare Part D Prescription Drug Program

Dear Mr. Charrow and Ms. Cleary:

On behalf of Akebia Therapeutics, Inc. ("Akebia"), I am writing with regard to the decision of the Centers for Medicare & Medicaid Services ("CMS") to restrict coverage for Akebia's drug product, Auryxia® (ferric citrate) tablets, under the Medicare Part D Prescription Drug Program ("Part D"). In September 2014, the Food and Drug Administration ("FDA") approved Auryxia to treat hyperphosphatemia through the control of serum phosphorus levels in adult patients with chronic kidney disease ("CKD") on dialysis. Subsequently, in November 2017, FDA approved Auryxia as the only oral drug product for the treatment of iron deficiency anemia ("IDA") in adult patients with CKD not on dialysis.

Following approval by FDA of Auryxia for each of these indications, the drug product was covered under Part D without restrictions. In September 2018, however, CMS abruptly revoked coverage for the IDA indication and advised Part D plans to require prior authorization ("PA") for the product's indication to treat hyperphosphatemia. In reaching these determinations, CMS erroneously concluded that a chemically synthesized drug product approved by FDA to treat a disease (*e.g.*, IDA) is, instead, a mineral product meant for iron supplementation. Moreover, in establishing a PA requirement for the use of Auryxia to treat hyperphosphatemia, CMS contravened its own policies and guidance concerning PA requirements for drugs used to treat End Stage Renal Disease.

These actions by CMS have subjected numerous CKD patients, both dialysis and non-dialysis dependent, to additional risks and burdens, and they have irreparably harmed Akebia. During the past ten months, Akebia has sought to address this situation with representatives from CMS and the Department of Health and Human Services ("HHS"). So too has the medical community, with many nephrologists submitting a letter to Secretary Azar in March 2019 calling for prompt and full restoration of Part D coverage for Auryxia. We appreciate the willingness of officials from CMS and HHS to meet with Akebia and consider these concerns but, with no resolution in sight, we now respectfully request that your office promptly intervene in this matter so that coverage for Auryxia under Part D can be restored.

Robert P. Charrow
Kelly Cleary
August 23, 2019
Page 2

To that end, we would like to meet with you and your colleagues from the Office of General Counsel at your earliest convenience. Our hope is that we can avoid litigation over this matter by discussing our legal position with you and reaching a resolution together. In advance of such a meeting, I am enclosing an attachment to this letter that sets forth the bases for our position that the decision of CMS to restrict coverage for Auryxia is unlawful under the Social Security Act and the Administrative Procedure Act. We look forward to discussing this matter with you as soon as possible.

Thank you for your consideration of this request.

Respectfully,

*Nicole R. Hadas*

Nicole R. Hadas
Senior Vice President & Chief Legal Officer

Enclosure

# MEMORANDUM

Date: August 23, 2019

To: Office of General Counsel, U.S. Department of Health and Human Services

From: Hogan Lovells and WilmerHale

Re: The Legal Obligations of CMS to Cover Both FDA Approved Indications for Auryxia® Without Restrictions Under the Medicare Part D Program

## I. Introduction

Patients with chronic kidney disease ("CKD") who suffer from Iron Deficiency Anemia ("IDA") face an especially daunting challenge. Oral iron dietary supplements are poorly absorbed and, therefore, are generally ineffective in treating IDA in patients with CKD.[1] At the same time, while intravenous iron products have been approved by the Food and Drug Administration ("FDA") for the treatment of IDA in CKD patients, intravenous administration of iron has been associated with infrequent but severe adverse reactions and the use of such intravenous products raises long term safety concerns.[2]

In November 2017, the FDA approved Auryxia® (ferric citrate) tablets for the treatment of IDA in CKD patients. Auryxia® marked a breakthrough in this area as it is the first oral drug product to be approved for IDA. Indeed, the active ingredient in Auryxia® is a unique, chemically synthesized metal-ion coordination complex not found in nature or conventional iron products. With this novel coordination complex, Auryxia® has a dual mechanism of action – it provides for systemic bioavailability of iron and it binds excess phosphate in the body. Auryxia® was initially approved to treat excess phosphorus levels in adult patients with CKD on dialysis (*i.e.*, hyperphosphatemia).

Auryxia®'s dual mechanism of action makes it is unlike any other drug product in the United States. It is approved by the FDA both to control phosphorus levels and to treat IDA in patients with CKD. No other phosphate binder has a separate indication to treat anemia, and no other anemia treatment has a separate indication to treat hyperphosphatemia. Moreover, this dual effect of both lowering phosphorus and increasing hemoglobin cannot be bifurcated or isolated from one another, regardless of the indication for which the drug is prescribed. Thus, Auryxia® is distinct from other iron products as a result of its dual mechanism of action and effect on two diseases confronting CKD patients.

Despite the unique nature of Auryxia®, CMS decided in September 2018 that Auryxia®'s IDA indication should not be covered under Part D. CMS further stated that sponsors should utilize a prior authorization ("PA") to ensure that Auryxia® is being used only for it covered indication to treat hyperphosphatemia, not IDA.[3] These determinations are very troubling as they leave IDA patients with little choice but to undergo intravenous-administered treatment, which puts future hemodialysis access at risk and is contrary to CMS's longstanding "Fistula First Initiative" to encourage fistula placement over catheters, which are associated

---

[1] Ian C. Macdougall, *Iron Treatment Strategies in Nondialysis CKD*, 36 Seminars in Nephrology 99–104 (2016).

[2] Chapter 2: Use of Iron to Treat Anemia in CKD, *Kidney International Supplements* (2012) 2, 292–298; doi:10.1038/kisup.2012.34.

[3] CMS Email to Formulary Contacts and Medicare Compliance Officers, Sept. 14, 2018.

with high infection rates and mortality. At the same time, the imposition of a PA requirement for hyperphosphatemia patients has led to long delays in obtaining Auryxia®.

As set forth below in detail, the decisions of CMS to restrict coverage for Auryxia® are unlawful under the Social Security Act ("SSA") and the Administrative Procedure Act ("APA"). Specifically, CMS erroneously concluded that a chemically synthesized drug product approved by FDA to treat a disease (*e.g.*, IDA) is, instead, a mineral product meant for iron supplementation. The CMS decision is also inconsistent with the manner in which the agency has treated functionally indistinguishable products. Finally, in establishing a PA requirement for use of Auryxia® to treat hyperphosphatemia, CMS contravened its own policies concerning PA requirements for drugs used to treat End Stage Renal Disease.

## II. Coverage of Drug Products under Part D

### A. Statutory and Regulatory Background

A new drug product may not be marketed in the United States until the FDA has approved a new drug application ("NDA") for the proposed product under Section 505 of the Food Drug and Cosmetic Act ("FDCA"). 21 U.S.C. §§ 331 and 355. The FDA will approve an NDA only if it finds, on the basis of clinical investigations and other information in the NDA, that the new drug product is safe and effective for its indication and other conditions of use. *Id.* § 355(d). To gain approval of a new indication for a previously approved drug, a sponsor must submit a supplemental NDA ("sNDA"). The approval requirements for an sNDA are the same as those for an NDA. 21 C.F.R. §§ 314.1, 314.71(b).

Under the FDCA, the FDA also maintains authority to regulate dietary supplements, which includes mineral supplements. 21 U.S.C. § 321(ff)(1)(B). Unlike drug products, which are approved by FDA to treat a particular disease, a dietary supplement may not be marketed for the purposes of treating, diagnosing, preventing or curing a disease. 21 U.S.C. §§ 321(g)(1)(B), 321(p)(1), 352(f)(1). In fact, dietary supplements must be labeled with a disclaimer that specifically states that the claims made for the product have not been evaluated by FDA and the products are not intended to diagnose, treat, cure or prevent any disease. *Id.* § 343(r)(6)(C).

A prescription drug product approved by FDA is, with certain limited exceptions, treated as a covered product under Medicare Part D. In pertinent part, a "covered part D drug" is "a drug that may be dispensed only upon a prescription and that is described in subparagraphs (A)(i), (A)(ii), or (A)(iii) of section 1927(k)(2)" of the Medicaid statute. SSA § 1860(e)(1)(A). Section 1927(k)(2)(A)(i), in turn, defines a "covered outpatient drug" to mean, among other things, a drug "which is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the FDCA." A covered Part D drug includes any use of the drug for a "medically accepted indication," which is a use approved by FDA under the FDCA. SSA § 1860(e)(1)(B).

A covered Part D drug "does not include drugs or classes of drugs, or their medical uses, which may be excluded from coverage or otherwise restricted under section 1927(d)(2) . . . ." SSA § 1860(e)(2). Section 1927(d)(2), in turn, provides that States may restrict or exclude coverage under Medicaid for drugs when used for anorexia, weight loss, weight gain, infertility, cosmetic purposes or hair growth, symptomatic relief of coughs and colds, smoking cessation, or erectile dysfunction. In addition, and of relevance here, the list of drugs subject to restriction includes "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations." SSA § 1927(d)(2)(E).

### B. Coverage of Auryxia® under Part D

On September 5, 2014, FDA approved Auryxia® for the control of serum phosphorus levels in adult patients with CKD on dialysis. The active ingredient in Auryxia® is a unique, chemically synthesized metal-ion coordination complex not found in nature or conventional iron products. Akebia utilizes a proprietary manufacturing process designed to yield the precise structure of this coordination complex. The coordination complex is based on a 2:2 ratio of ferric to citrate with a precisely defined hexa-aquairon counter-ion. With this novel coordination complex, Auryxia® has a dual mechanism of action – it binds excess phosphate based on the donation of ferric(III) from the complex and also provides systemic bioavailability of ferric(III) based on the solubility of the complex under physiologically relevant conditions.

Given Auryxia®'s dual mechanism of action, Akebia's predecessor company (Keryx) invested substantial resources in conducting clinical studies to develop an oral drug product for the treatment of IDA in adult patients with CKD not on dialysis. This was especially important since the only other FDA-approved treatments for this disease are intravenous medications and they subject CKD patients to additional risks and burdens. On November 6, 2017, FDA approved Auryxia® for the treatment of IDA in adult patients with CKD not on dialysis. This approval was based on an sNDA containing robust clinical studies demonstrating that Auryxia® with its unique coordination complex is safe and effective for the treatment of CKD patients with IDA.

Following FDA approval of Auryxia® for IDA, virtually all Medicare Part D sponsors covered the product for both indications without restriction. Then, on September 14, 2018, CMS abruptly notified plan sponsors that Auryxia®, "[c]onsistent with other iron products," had been removed from the August 2018 formulary reference file ("FRF"), which is a listing of drugs that Part D plan sponsors are permitted to cover. CMS further explained that, because plan sponsors are permitted to cover Auryxia® for its initial indication -- to treat hyperphosphatemia -- the drug would be added back to the September 2018 FRF and maintained on the 2019 FRF. The agency stated, however, that it expects sponsors will utilize a PA edit, or other process, to ensure that Auryxia® is being used only for its indication to treat hyperphosphatemia, not IDA.

## III. Medicare Part D Must Cover Auryxia® for Both of Its Indications

### A. CMS Has a Non-Discretionary Obligation Under the SSA to Fully Cover Auryxia® Under Part D

Under the APA, agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be held unlawful and set aside. 5 U.S.C. § 706(2)(A). Here, there is no dispute that Auryxia® has been "approved for safety and effectiveness as a prescription drug under section 505 or 507 of the FDCA." SSA § 1927(k)(2)(A)(i). As a result, it is a "covered Part D drug" unless it falls within an exception to coverage. *See* SSA § 1860(e)(1)(A). CMS erred, however, when it determined that, for the purposes of its IDA indication, Auryxia® is a mineral product used for iron supplementation and, therefore, cannot be covered under Part D. Auryxia® is neither a mineral product nor is it approved for use as an iron supplement.

#### 1. Auryxia® Is Not a Mineral Product

The term "mineral product" is not defined in the SSA. Accordingly, under basic principles of statutory construction, the meaning of the statute should, in the first instance, be based on the usual and ordinary meaning of the words chosen by Congress. The Merriam-Webster Dictionary defines a "mineral" as "a solid homogeneous crystalline chemical element or compound that results from the inorganic processes of nature" and, secondarily, as "a synthetic substance having the chemical composition and crystalline form and

properties of a naturally occurring mineral." Against this plain language, Auryxia® is not a mineral product under the SSA.

The active ingredient in Auryxia® is a synthetic, highly processed compound with a unique structure and novel pharmacologic properties. Although "iron" or iron in the form of "ferric citrate" is a common mineral and an essential nutrient, the iron in Auryxia® is in a distinct form that is neither found in nature nor synthesized to have the composition, form and properties of naturally occurring nutritional iron. Rather, the iron in Auryxia® is in the form of a "coordination complex" designed to achieve pharmacologic effects (as discussed below) that cannot be achieved with conventional iron supplements.

This critical distinction was expressly recognized by FDA reviewers during the drug approval process for Auryxia®.[4] The properties of this distinct form were confirmed through the clinical study of Auryxia®, where it was shown that the Auryxia® coordination complex was effective in treating IDA specifically in patients "who were intolerant of or have had an inadequate therapeutic response to *oral iron supplements . . . .*"[5] (emphasis added) Accordingly, FDA itself has previously concluded that Auryxia® is not the structural or functional equivalent of conventional mineral-based iron. CMS should not and cannot arbitrarily depart from FDA's treatment of Auryxia® as a drug product and not a mineral supplement.[6]

### 2. Auryxia® Is Not Used for Iron Supplementation

Moreover, Auryxia® has not been approved by FDA as the functional equivalent of a vitamin or mineral supplement – the predicate for CMS's decision to exclude coverage of the IDA indication under Part D. Rather, FDA has approved Auryxia® as a drug product to treat the disease of renal anemia associated with iron deficiency. Auryxia® is a different kind of treatment from oral iron supplement products for patients with IDA in CKD. Auryxia® does not merely replace missing iron; it also causes the body to produce more hemoglobin. This point is critical because IDA can exist without CKD and can be treated with changes in diet or mineral products that are nutritional supplements. In contrast, IDA in CKD has been demonstrated to be poorly responsive to nutritional supplements.

The FDA's approval of Auryxia® for IDA, and the clinical studies upon which that approval is based, make this abundantly clear. Approval for this indication was based on clinical studies demonstrating the drug product's efficacy in raising hemoglobin in adult patients with CKD not on dialysis. The IDA indication for Auryxia® is based on a primary clinical endpoint of change in hemoglobin—not iron repletion. By demonstrating safety and efficacy in improving anemia as measured by effect on hemoglobin in the narrower and more difficult to treat CKD population, Auryxia® cleared a much higher and different clinical bar than mere iron supplementation. The FDA-approved labeling for Auryxia® expressly states that, for the pivotal registration trial for Auryxia® in IDA, a study inclusion criterion required that patients were intolerant to or had an unsatisfactory response to conventional oral iron.[7]

---

[4] FDA Approval Package, NDA 205874, Pharmacology Review at PDF page 8 ("Ferric citrate has been approved in the United States (US) as a food supplement and is listed in 21 Code of Federal Regulations (CFR) 184.1298 as generally recognized as safe (GRAS). Ferric citrate (KRX-0502, a coordination complex) as submitted by the Sponsor differs from the GRAS ferric citrate . . . .") *available* at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/205874Orig1s000PharmR.pdf.

[5] Auryxia® Professional Labeling, Clinical Studies 14.2 (updated 11/2017) (emphasis added).

[6] It is well established that that "administrative agencies ordinarily [must] construe the same term in closely related statutes consistently." *Butterbaugh v. DOJ*, 336 F.3d 1332, 1339 (Fed. Cir. 2003).
[7] Auryxia® Label § 14.2, https://www.accessdata.fda.gov/drugsatfdadocs/label/2017/205874s013lbl.pdf.

Should there be any doubt, IDA that arises from CKD has been expressly recognized by FDA as a disease in the agency's correspondence with manufacturers of dietary supplements. In those letters, FDA makes clear that, under the FDCA, manufacturers may not market dietary supplements, including mineral products, for the purpose of treating IDA.[8] A mineral product in the ordinary sense, *i.e.* a natural element or its synthetic equivalent normally ingested as a nutrient, cannot as a matter of law be labeled or otherwise intended for use in the treatment, cure or prevention of disease. The FDA carefully regulates Auryxia® as a prescription drug and, importantly, has approved labeling for the product that unequivocally is directed to a disease claim – a claim which would be prohibited for a conventional mineral product.[9]

In sum, just as Auryxia®'s first indication for the control of serum phosphorus levels in dialysis patients with CKD is a covered medical use under Part D, so too is Auryxia®'s second indication for the treatment of IDA in adult patients with CKD not on dialysis, based on a direct application of the statute. For CMS to conclude otherwise makes no sense and is an arbitrary and capricious action under the APA.

> B. <u>CMS Must Consider Auryxia® a Covered Part D Drug to Be Consistent with the Agency's Prior Decisions Concerning Functionally Indistinguishable Products</u>

An administrative agency must treat similarly situated cases in the same manner unless it provides a reasoned and rational explanation for not doing so. *Huntington Hosp. v. Thompson*, 319 F.3d 74-76 (2d Cir. 2003) (quoting *Indep. Petroleum Ass'n of America v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996)); *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 115 (1st Cir. 2006). And when an agency contemporaneously treats equivalent cases differently, that action is particularly likely to be arbitrary and capricious. *Cf. Baptist Health v. Thompson*, 458 F.3d 768, 776-77 (8th Cir. 2006). Here, CMS's decision to stop covering Auryxia® stands in stark contrast to other functionally indistinguishable cases in which CMS has covered vitamin and mineral products under Part D.

First, CMS has provided Part D coverage to Vitamin D analogs (*e.g.*, Zemplar® (paracalcitol) and Hectorol® (doxercalciferol)) that are approved by FDA to treat secondary hyperparathyroidism due to Vitamin D deficiency in CKD patients, the same population treated by Auryxia®. As with Auryxia®, such products have been shown to be effective in CKD patients not responding to oral supplementation of native Vitamin D. Both the Vitamin D analogs and Auryxia®'s coordination complex are chemically synthesized organic drug substances, not naturally occurring vitamins or elemental minerals. In both cases, these products have been approved by FDA to treat disease conditions associated with a critical deficiency that cannot be adequately addressed through dietary sources or nutritional supplements.[10]

---

[8] The FDA has taken the position that references to IDA are disease claims that require the product to undergo premarket review and approval. *See, e.g.*, FDA Courtesy Letter #1162 to the Burdick Group LLC (dba PreventSource), July 12, 2012; FDA Courtesy Letter #1163 to Mount Spring International Inc. (Nature's Essence Blood Nutrient Syrup), July 12, 2012.

[9] In this context, CMS must consider the label of Auryxia® in its entirety, rather than relying on the "iron replacement product" language which references the "Established Pharmacologic Class (EPC)" assigned by FDA. Auryxia®'s full labeled indication reads, "Auryxia® is an iron replacement product indicated for the treatment of iron deficiency anemia in adult patients with chronic kidney disease not on dialysis." The fact that Auryxia®'s label contains EPC language does not and cannot change its status as an approved drug intended to treat a disease.

[10] The native Vitamin D products are ineffective in treating secondary hyperparathyroidism caused by Vitamin D deficiency in patients with chronic kidney disease because the activation of this natural form must occur in the kidney. With impaired kidney function, patients need a physiologically activated form of Vitamin D. CMS covers the activated, chemically-synthesized analogs of Vitamin D for patients with CKD. The same rationale must be applied to coverage of Auryxia®.

Second, CMS has determined that certain mineral-based products intended for the treatment of conditions associated with a mineral deficiency do not fall within the statutory exclusion under Part D. For example, Klor-Con® and K-Tab® (potassium chloride) are oral drug products that contain the mineral ingredient, potassium, for the treatment and prevention of potassium deficiency (hypokalemia). The labeling for these mineral-based products describes them as "electrolyte replenishers;" however, the labels also describe these products interchangeably as potassium supplements. In fact, the Klor-Con® label describes the product as a potassium supplement numerous times. Coverage of Auryxia® for the treatment of IDA in CKD patients is completely consistent with coverage of these other mineral-based products.

Third, CMS has determined that the vitamin-based drug product, Niaspan® (niacin) oral tablets, does not fall within the statutory exclusion under Part D. Niaspan® is indicated for the treatment of dyslipidemia or abnormal levels of blood lipids. While the active ingredient in Niaspan, nicotinic acid, is a common form of Vitamin B3, CMS reasoned that the disease being treated is not a vitamin deficiency disease but rather a disease of abnormal lipid levels, and the doses administered are in excess of what would be needed for nutritional supplementation. This reasoning applies with equal force to Auryxia®: it is approved to treat IDA, not a nutritional deficiency.

Finally, CMS has repeatedly interpreted the statute to permit coverage of other classes and uses of drugs that could be excluded under SSA § 1927(d)(2). For example, CMS has determined that certain therapies for weight gain are available under Part D, despite the express exclusion of such products under SSA § 1927(d)(2)(A). Similarly, CMS permits coverage of drugs used to treat acne, psoriasis, rosacea, or vitiligo, despite a statutory exclusion for drugs used for cosmetic purposes. *Id.* § 1927(d)(2)(C). On the basis of the foregoing precedents and the broader exercise of its discretionary authority under the exclusion provision, CMS must also cover Auryxia® under Part D. *See Huntington Hosp.*, 319 F.3d at 75-76 (treating "functionally indistinguishable" cases differently is "the very meaning of arbitrary and capricious").

## IV.  CMS Must Take Actions Consistent with its Policies Governing ESRD Products

Under the APA, if an agency announces and follows a general policy by which its exercise of discretion will be governed, "an irrational departure from the policy . . . could constitute action that must be overturned as arbitrary, capricious, or an abuse of discretion." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (cited by *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018)); *see also Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 406 (D.C. Cir. 2005) ("[A]gencies must either abide by their precedent or provide a 'reasoned explanation' for departing from it."). Here, CMS departed from its policy governing PAs for End Stage Renal Disease ("ESRD") drug products, without explanation, in violation of the APA.

As a consequence of CMS's decision to eliminate coverage for the IDA indication of Auryxia®, PA is now imposed on <u>all</u> prescriptions for Auryxia® to ensure that its use is for the covered indication to treat hyperphosphatemia in CKD patients on dialysis. That decision, however, is flatly inconsistent with CMS guidance to Part D plans regarding drugs that might be payable under either the ESRD Prospective Payment System (PPS) or Part D. CMS has previously advised Part D plans not to apply PA requirements to certain ESRD drugs because those requirements would impose significant burdens on patients.

In 2014, CMS declared that "imposing prior authorization edits for all drugs in these categories [ESRD and Part D], the majority of which are being used for purposes unrelated to the treatment of ESRD, [created] barriers to beneficiary access."[11] Recognizing "concerns regarding the impact on access to drugs for ESRD

---

[11] *See* Memo to All Part D Plan Sponsors and Renal Dialysis Facilities re: Part D Payment for Drugs for Beneficiaries Receiving Renal Dialysis Services, November 14, 2014.

beneficiaries," CMS "strongly encouraged" plan sponsors "to limit the use of PA to [. . .] drugs that are always used for the treatment of ESRD for ESRD beneficiaries receiving renal dialysis services."[12]  Thus, CMS advised Part D plan sponsors not to require PA for drugs used by dialysis patients when the majority of claims for those patients are for uses covered by Part D.

Auryxia® falls squarely into this category of drug products.  It is used by dialysis patients and the vast majority of claims are for the hyperphosphatemia indication, which is covered under Part D.  In fact, Auryxia® and other phosphate binders that are available only in oral form belong to a special class of drugs.  They are considered to be ESRD-related because they treat bone and mineral metabolism disease secondary to dialysis, even though they are not payable under the ESRD PPS until January 1, 2025.[13]  Medicare payment for these drugs is available only under Part D until then.  In this context, it is notable that no other phosphate binder other than Auryxia® has a CMS-directed PA mandate.

Accordingly, requiring PA for Auryxia®'s indication to treat hyperphosphatemia is exactly the barrier to access for patients with ESRD that CMS sought to address with its policy on treatment of ESRD-related products.  To bring its coverage decision for Auryxia® into compliance with this policy, CMS should restore coverage for the IDA indication.  That would obviate the need for PA on any prescribed use of Auryxia®.

## V. CMS's Part D Determinations for Auryxia® Are Causing Harm to CKD Patients

Anemia is a consequential disease in CKD patients and is associated with more rapid kidney disease progression, high prevalence of major cardiovascular events, increased mortality, and reduced quality of life. There are significant clinical and cost consequences to Medicare beneficiaries with kidney disease who are denied access to a safe and effective oral drug to treat their anemia. Leading nephrologists have expressed serious concerns that damage to the veins of CKD patients receiving IV iron can seriously compromise options for future arteriovenous fistula used for hemodialysis access (the patient's "lifeline"), if they progress to end stage disease.  Requiring patients to undergo IV-administered treatment puts their future "lifeline" for dialysis at risk and is contrary to CMS's longstanding objective, the "Fistula First Initiative," to encourage fistula placement over catheters, which are associated with high infection rates and mortality.[14]  It is also contrary to HHS Secretary Azar's Kidney Disease Initiative goals.

As a result, the determination of CMS to exclude Auryxia® from coverage under Part D has subjected CKD patients to the additional risks and burdens of receiving intravenous drugs.  Auryxia® is the only approved oral medication for CKD patients with IDA.  Approval of the product for this indication represented a significant breakthrough for CKD patients as their only recourse before this approval was to travel to a healthcare provider for an intravenous infusion.  Yet with the determination by CMS to exclude coverage for IDA, these patients now face the additional safety risks associated with IV administration, including anaphylaxis, hypersensitivity, and infection.

---

[12] Medicare Prescription Drug Benefit Manual, Ch. 6, § 20.2.

[13] CMS Memo to All Part D Plan Sponsors re: Clarification of Exclusion of Part D Payment for Drugs Included in the End-Stage Renal Disease Prospective Payment, February 17, 2011.  *See also* Stephen Beck, Jr., Achieving a Better Life Experience Act of 2014 (ABLE), Pub. L. No. 113–295, § 204 (2014).

[14] Iron products administered intravenously are associated with infrequent but severe adverse reactions, such as anaphylaxis, hypersensitivity and infection. Accordingly, their labels include warnings that they should be administered only when personnel and therapies are immediately available for the treatment of these reactions or when "resuscitation equipment and personnel trained in the detection and treatment of anaphylactic-type reactions" are readily available. These products also raise long-term safety concerns.

CMS appears to be concerned about extending coverage to Auryxia® because it may then also have to cover intravenous iron products under Part D.  Yet, for the foregoing reasons, intravenous iron products are readily distinguishable from Auryxia® and do not necessitate Part D coverage.  Moreover, to the extent that intravenous products must also be covered, CMS has substantial authority to require the use of PA procedures to protect against inappropriate use of such products under Part D.[15]  Because intravenous iron can be covered by Part B, CMS has instructed Part D sponsors to apply PA requirements to confirm that the drug is appropriately covered by Part D, rather than Part B, as prescribed and dispensed and administered.[16]

Finally, beyond the impact to CKD patients from the decision of CMS to deny coverage for the treatment of IDA, the imposition of a PA requirement for Auryxia®'s indication to treat hyperphosphatemia is also causing harm to patients with CKD on dialysis.  While that indication remains covered under Part D, dialysis patients have faced long delays during the past months in obtaining Auryxia® for its covered use due to prior authorization requirements that do not apply to other phosphate binders.  In many cases, confusion based on the CMS non-coverage decision for IDA has made nephrologists reluctant to prescribe Auryxia® at all for their Part D patients.

## VI.  Conclusion

On the basis of the foregoing, CMS must consider Auryxia® a covered Part D drug for both of its indications.  Under the SSA, CMS has a mandatory obligation to cover a drug under Part D where, as here, the product meets the definition of a drug under the statute and it does not fall within the classes of drugs and medical uses that may be excluded from coverage.  Moreover,  even assuming, *arguendo*, that CMS does not have a non-discretionary obligation to cover Auryxia® under Part D, it must exercise its discretion under the APA to cover the drug product consistent with other decisions involving functionally indistinguishable products.  That is especially true in this case given CMS policies and guidance governing ESRD products.  To fulfill its legal obligations and address the ongoing harm to CKD patients and Akebia, CMS must immediately restore full and unrestricted coverage to Auryxia® under Part D.

---

[15]  CMS has instructed Part D plans to place PA requirements on drugs that are always considered to be related to ESRD when furnished to a patient on dialysis for specific indications.  *See* CMS Memo to All Part D Plan Sponsors re: Clarification of Exclusion of Part D Payment for Drugs Included in the End-Stage Renal Disease Prospective Payment, February 17, 2011.  This includes anemia management drugs, such as iron.  These drugs are payable under Part B, not Part D, when they are furnished to an ESRD patient and used for specific indications.

[16] Medicare Prescription Drug Benefit Manual, Ch. 6, § 30.2.2.3.