# EXHIBIT C

Case 1:10-cv-12102-ABB Document 60-3 Filed 12/16/19 Page 2 of 33
Case 2:16-cv-08697-MWF-SS Document 2840-3 Filed 05/22/18 Page 106 of 32 Page ID
#:3289

1  CHAD A. READLER
   Acting Assistant Attorney General, Civil Division
2  NICOLA T. HANNA
   United States Attorney
3  DAVID M. HARRIS
   DAVID K. BARRETT
4  JOHN E. LEE (CBN 128696)
   Assistant United States Attorneys
5       300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
6       Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
7  MICHAEL D. GRANSTON
   DANIEL R. ANDERSON
8  EDWARD CROOKE
   CAROL L. WALLACK
9  JUSTIN DRAYCOTT
   PAUL G. FREEBORNE
10 JESSICA KRIEG
   PAUL PERKINS
11 Attorneys, Civil Division
   United States Department of Justice
12      P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
13      Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: carol.wallack@usdoj.gov
14 JAMES P. KENNEDY, JR.
   United States Attorney
15 KATHLEEN ANN LYNCH
   Assistant United States Attorney (Admitted PHV)
16      138 Delaware Avenue
        Buffalo, New York 14201
17      Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
18 Attorneys for the United States of America

19              UNITED STATES DISTRICT COURT

20          FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                   WESTERN DIVISION

22 UNITED STATES OF AMERICA *ex*      No. CV 16-08697 MWF (SSx)
   *rel.* BENJAMIN POEHLING,
23                                    PLAINTIFF'S MEMORANDUM OF
            Plaintiffs,               POINTS AND AUTHORITIES IN
24                                    SUPPORT OF MOTION FOR PARTIAL
            v.                        SUMMARY JUDGMENT
25
   UNITEDHEALTH GROUP, INC., *et al.*,
26
            Defendants.
27                                    Date:  July 30, 2018
                                      Time:  10:00 a.m.
28                                    Court: 5A. Hon. Michael W. Fitzgerald

1    Additional Attorneys (continued from previous page):

2    ERIC R. HAVIAN (CBN 102295)
          ehavian@constantinecannon.com
3    HARRY LITMAN (CBN 127202)
          hlitman@constantinecannon.com
4    JESSICA T. MOORE (CBN 183431)
          jmoore@constantinecannon.com
5    HENRY C. SU (CBN 211202)
          hsu@constantinecannon.com
6    Constantine Cannon LLP
     150 California Street, Suite 1600
7    San Francisco, CA 94111
     Tel: (415) 639-4001
8    Facsimile:  (415) 639-4002

9    STEPHEN HASEGAWA (CBN 198472)
          shasegawa@phillipsandcohen.com
10   Phillips & Cohen LLP
     100 The Embarcadero, Suite 300
11   San Francisco, CA 94105
     Tel:  (415) 836-9000
12   Facsimile:  (415) 836-9001

13   WILLIAM CHRISTOPHER CARMODY (*pro hac vice*)
          wcarmody@susmangodfrey.com
14   ARUN SUBRAMANIAN (*pro hac vice*)
          asubramanian@susmangodfrey.com
15   GENG CHEN (*pro hac vice*)
          gchen@susmangodfrey.com
16   Susman Godfrey L.L.P.
     1301 Avenue of the Americas, 32nd Floor
17   New York, New York 10019-6023
     Tel:  (212) 336-8330
18   Facsimile:   (212) 336-8340

19   MENG XI (CBN 280099)
          mxi@susmangodfrey.com
20   CATRIONA LAVERY (CBN 310546)
          clavery@susmangodfrey.com
21   Susman Godfrey L.L.P.
     1900 Avenue of the Stars, Suite 1400
22   Los Angeles, California 90067
     Tel:  (310) 789-3100
23   Facsimile: (310) 789-3100

24
     Attorneys for Relator Benjamin Poehling
25

26

27

28

                                    ii

Case 1:09-cv-10182-ABB Document 60-3 Filed 12/16/19 Page 4 of 33

MEMORANDUM OF POINTS AND AUTHORITIES

TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    BACKGROUND ................................................................ 4

    A.    Medicare Parts A, B, and C .................................. 4

    B.    The Risk Adjustment Payment System ........................ 6

    C.    Part C and D Payment Data Integrity Requirements and Obligations.......... 8

III.   ARGUMENT.................................................................... 13

    A.    Partial Summary Judgment on Defendants' Obligation to Correct Known Coding Errors Will Facilitate the Just and Efficient Resolution of This Action ................................................. 14

    B.    An MAO's Obligation to Delete Errors it Identified in Its Coding is Determined as a Matter of Law ........................................ 15

          1.    United's Post Hoc Arguments Do Not Excuse Its Violation of Express Contract Terms ................................ 17

          2.    The Ninth Circuit Has Already Rejected United's Data Equivalency Argument ................................ 18

          3.    United's Data Equivalency Argument Cannot be Applied in a Case in Which United Reviewed and Edited Provider Data ........... 20

          4.    Well-Established Principles of Statutory Construction Preclude United's Tortured Interpretation of 42 U.S.C. § 1395w-23(a)(1)(C)(i) ........... 22

IV.   CONCLUSION................................................................ 25

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                  **Page(s)**

3

4

*Arctic Slope Reg'l Corp. v. FERC*,
   832 F.2d 158 (D.C. Cir. 1987) ............................................................ 22

5

*Arizona State Bd. For Charter Schs. v. U.S. Dept. of Educ.*,
   464 F.3d 1003 (9th Cir. 2006) .......................................................... 22

6

*Bryson v. United States*,
   396 U.S. 64 (1969) ........................................................................ 18

7

8

*Cedars-Sinai Med. Ctr. v. Shalala*,
   125 F.3d 765 (9th Cir. 1997) ............................................................ 18

9

*City and County of San Francisco v. Tutor-Saliba Corp.*,
   2005 WL 645389 (N.D. Cal. 2005) .................................................. 17

10

11

*Dennis v. United States*,
   384 U.S. 855 (1966) ...................................................................... 18

12

*In Re Pharm. Indus. Average Wholesale Price Litig.*,
   460 F. Supp. 2d 277 (D. Mass. 2006) .............................................. 14

13

*Ma v. Ashcroft*,
   361 F.3d 553 (9th Cir. 2004) ............................................................ 22

14

15

*Matthews v. Leavitt*,
   452 F.3d 145 (2d Cir. 2006) ........................................................ 4, 5

16

*Methodist Hosp. of Sacramento v. Shalala*,
   38 F.3d 1225 (D.C. Cir. 1994) ......................................................... 5

17

*Ne. Hosp. Corp. v. Sebelius*,
   657 F.3d 1 (D.C. Cir. 2011) .............................................................. 4

18

19

*Orr v. Bank of America, NT & SA*,
   285 F.3d 764 (9th Cir. 2002) ............................................................. 1

20

*Parra v. Wright*,
   2013 WL 6669235 (W.D.N.Y. Dec. 18, 2013) ................................. 14

21

22

*Rhoades, McKee & Boer v. United States,*
   43 F.3d 1071 (6th Cir. 1995) ............................................................ 23

23

*State Bd. For Charter Schs. v. U.S. Dept. of Educ.,*
   464 F.3d 1003 (9th Cir. 2006) ......................................................... 22

24

*United Food and Commercial Workers Union, Local 1036 v. NLRB,*
   307 F.3d 760 (9th Cir. 1986) ........................................................... 23

25

26

*United Healthcare Ins. Co. v. Hargan,*
   No. CV 16-00157-RMC (D.D.C. filed Jan. 29, 2016) ...................... 16

27

*United States ex rel. Swoben v. United Healthcare Ins. Co.,*
   848 F.3d 1161 (9th Cir. 2016) ................................................ passim

28

*United States v. Weiss*,
914 F.2d 1514 (2d Cir.1990) ................................................................ 18

*Vinson & Elkins v. Comm'r*,
7 F.3d 1235 (5th Cir.1993) ................................................................ 23

*Wachtell, Lipton, Rosen & Katz v. Comm'r*,
26 F.3d 291 (2d Cir.1994) ................................................................ 23

**Statutes, Regulations, Rules**

Balanced Budget Act of 1997, Pub. L. No. 105-33, 11 Stat. 251, 299 (Aug. 25, 1997).. 6

26 U.S.C. § 412(c)(3) ................................................................ 23

31 U.S.C. §§ 3729-3733 ................................................................ 13

42 U.S.C. § 1395 *et seq*................................................................ 4

42 U.S.C. §§ 1395c to 1395i-5 ................................................................ 4

42 U.S.C. §§ 1395j to 1395w-4 ................................................................ 4

42 U.S.C. §§ 1395w-21 to 1395w-29 ................................................................ 4

42 U.S.C. § 1395w-22(a)(1) ................................................................ 4

42 U.S.C. § 1395w-22(a)(3) ................................................................ 4

42 U.S.C. § 1395w-23(a)(1)(A) ................................................................ 5, 6

42 U.S.C. § 1395w-23(a)(1)(C)(i) ................................................................ passim

42 U.S.C. § 1395w-23(a)(3)(C)(i) ................................................................ 6

42 C.F.R. § 422.504(i)(4)(v) ................................................................ 8

42 C.F.R. § 422.504(*l*) ................................................................ 10

42 C.F.R. § 422.505(i)(3)(iii) ................................................................ 10

42 C.F.R. § 422.505(i)(3)(iv) ................................................................ 10

42 C.F.R. § 423.329(b)(1), (2) ................................................................ 6

42 C.F.R. § 423.329(b)(3) ................................................................ 12

42 C.F.R. § 423.503(b)(4)(vi) ................................................................ 1

42 C.F.R. § 423.503(b)(4)(vi)(G)(2) ................................................................ 9

42 C.F.R. § 423.504 ................................................................ 5, 8, 9

42 C.F.R. § 423.504(b)(4)(vi)(G)(2) ................................................................ 9

42 C.F.R. § 423.504(b)(4)(vi) ................................................................. 9

42 C.F.R. § 423.505 .................................................................... 5, 8, 9

42 C.F.R. § 423.505(i)(3)(iii), (iv) ........................................................ 8

42 C.F.R. § 423.505(k) .................................................................... 10

42 C.F.R. § 423.505 .................................................................... 5, 8, 9

42 C.F.R. § 423.505(k) ................................................................... 109

45 C.F.R. § 162.103 ....................................................................... 11

45 C.F.R. § 162.1000(a) ................................................................... 11

45 C.F.R. § 162.1002(a)(1) ............................................................... 11

45 C.F.R. § 162.1002(b)(1) ............................................................... 11

45 C.F.R. § 162.1002(c)(2)(i) ............................................................ 11

65 Fed. Reg. 40,268 ............................................................... 7, 10, 24

Fed R. Civ. P. 56(b) ...................................................................... 14

Fed. R. Evid. 803(6) ....................................................................... 1

Fed. R. Evid. 803(8)(A)(i) ................................................................. 1

Fed. R. Evid. 901(b)(7)(A) ................................................................. 1

Fed. R. Evid. 901(b)(7)(B) ................................................................. 1

**Other Authorities**

10A C. Wright, A. Miller & M. Kane, Fed. Prac. and Proc. § 2725 (4th ed. 2016) ...... 14

# I.  INTRODUCTION

A fundamental requirement of the Medicare Advantage (MA) program is that diagnosis codes submitted by Medicare Advantage Organizations (MAOs) for risk adjusted payments must be supported by their beneficiaries' medical records.  The Ninth Circuit – and United[1] itself – have recognized this long-standing requirement.  *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016) ("CMS requires medical diagnosis codes to be supported by a medical record"); Joint Answering Brief of Defendants-Appellees, *United States ex rel. Swoben v. United Healthcare Ins. Co.*, No. 13-56746, Dkt. 39, at 36 (9th Cir. filed June 2, 2014) (Exhibit 9) ("CMS regulations deem a diagnosis code proper if it is supported by a . . . medical record").[2]  A corollary to the medical record requirement is that MAOs are obligated to withdraw diagnosis codes if they know that their beneficiaries' medical records do not support the diagnoses for which they have claimed payment.  Again, the Ninth Circuit has already held that an MAO has an obligation to correct unsupported diagnoses submitted for risk adjusted payments.  *Swoben,* 848 F.3d at 1174-75 (citing MA compliance obligations at 42 C.F.R. § 422.503(b)(4)(vi)).  The United States requests that the Court enter partial summary judgment in this case on the legal issue of whether defendants were required to delete diagnosis codes they knew (as that term is used in the False Claims Act) were unsupported by their beneficiaries' medical records.

United is seeking to justify its fraudulent conduct by contending that it was legally permitted to ignore the medical record requirement and its obligation to withdraw unsupported diagnoses.  Over the course of this case and the *Swoben* action, United has offered a series of arguments in pursuit of this position.  For example, in conferrals with

---

[1] "United" is being used in this brief to refer to all Defendants in this action.

[2] Exhibits 1-8 are attached to the Declaration of Cheri Rice, filed herewith, which authenticates the exhibits pursuant to Fed. R. Evid. 901(b)(7)(A), (B) and shows their admissibility pursuant to Fed. R. Evid. 803(6) and 803(8)(A)(i).  *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773, 778 (9th Cir. 2002) (requiring summary judgment evidence to be authenticated and admissible).  Exhibits 9-15 are attached to the Joint Request for Judicial Notice, also filed herewith.

1   the government, United has asserted a tortured interpretation of the Medicare statute's

2   reference to "actuarial equivalence" to justify its failure to delete unsupported diagnosis

3   codes.  According to United, because claims submitted by healthcare providers under

4   Parts A and B of the Medicare Program (the fee-for-service or FFS programs) likely

5   contain diagnosis coding errors, United is allowed to knowingly submit erroneous

6   diagnoses codes to Medicare (or refrain from withdrawing such codes) for payments

7   under the MA program.

8           The Counterclaim recently filed by United against the United States contains a

9   slight variant of United's argument that it may refrain from correcting even those coding

10  errors revealed by its own chart reviews.  According to the Counterclaim, if "CMS also

11  required MA plans to delete all codes that are not supported in provider-submitted codes,

12  such that they received payments only for supported codes even as CMS continued

13  calculating payment amounts using both its supported and unsupported FFS codes, CMS

14  would receive a windfall . . . ."  UnitedHealth's Answer to United States' Amended

15  Complaint-in-Partial-Intervention and Counterclaim ¶ 11 (Dkt. 223).  Although the

16  Counterclaim does not use the term "actuarial equivalence," United's objective of

17  nullifying an explicit legal requirement of accurate, chart-based coding has been

18  consistent across Defendants' cases, briefs and pleadings.  The Court should resolve that

19  there is no merit to Defendants' legal contention in whatever form they may elect to

20  frame it – an issue, as noted, that United has already litigated in the Ninth Circuit and

21  lost.  *See Swoben,* 848 F.3d at 1178-79.

22          Nevertheless, United is pressing the argument in this case and using it to justify

23  irrelevant and burdensome discovery from the United States.  United flatly told the

24  government that it was seeking "documents . . . directly relevant to UnitedHealth's

25  defense that the data verification requirements imposed on MAOs versus fee-for-service

26  providers violate the governing statute's actuarial equivalence language."  Letter from

27  Abid R. Qureshi, at 4 (Nov. 7, 2017) (Exhibit 15).  So that the parties and the Court do

28  not waste substantial time and resources on discovery issues that are not pertinent to this

case, the United States requests that this Court resolve the legal issue by ruling, as the Ninth Circuit already has done, that United was required by regulation and contract to correct diagnostic codes which its own chart reviews had revealed were not supported by its beneficiaries' medical records.  There are no factual issues subject to any legitimate dispute that preclude the Court from resolving the issue at this time.  The data integrity requirements that control United's entitlement to payments present pure questions of law.

For at least four reasons, summary judgment on this issue is appropriate.  First, United was required by regulation and contract to comply with its legal obligations to submit valid diagnosis data and delete diagnoses that it knew were invalid.  United was not permitted to unilaterally retain payments based on invalid diagnoses because of any purported disagreement with the manner in which CMS calculates the amounts of risk adjusted payments it makes to MAOs.  Just as a physician who believes she should be paid more for a particular medical procedure cannot bill for additional procedures she did not perform, United cannot knowingly fail to delete invalid diagnoses because it claims to be underpaid for valid diagnoses.  If United was unwilling to comply with its obligation to correct invalid diagnoses, it should not have executed the contracts under which it agreed to be bound by the CMS payment rules.

Second, United made the same essential argument in *Swoben*, relying on a regulation similar to the statutory language it now invokes.  The Ninth Circuit summarily rejected the argument, and United's attempt at a second bite at the apple similarly should be rejected.  *See Swoben*, 848 F.3d at 1179.

Third, United's argument that diagnosis code data may be submitted by United with invalid codes just as data submitted by treating physicians to CMS may contain invalid codes is inconsistent with United's own conduct.  United has admitted that it modified provider-reported diagnosis data for years by performing millions of its own reviews of its beneficiaries' medical records in order to submit hundreds of thousands of diagnosis codes that the providers did not report.  With this history, United cannot now

1    legitimately contend that provider-reported diagnosis data cannot be modified without

2    violating actuarial equivalency or conflicting with the manner in which payment

3    amounts were set by the agency.  United's position that the principle works in only one

4    direction, and permits United to submit additional codes (purportedly because they are

5    supported by the beneficiaries' medical records based on its medical record reviews) but

6    does not permit the government to require the deletion of unsupported diagnoses (based

7    on the results of the same medical record reviews), is transparently self-serving and

8    logically untenable.

9         Fourth, United's interpretation of the statutory term "actuarial equivalence" is

10   unreasonable and unsupported.  This reference in the Medicare Statute was intended to

11   give CMS broad discretion to determine how to make risk adjusted payments to MAOs

12   in the MA Program; it was not intended to entitle individual MAOs to payments based

13   on erroneous diagnosis data.  For these reasons, the Court should grant this motion.

## II.    BACKGROUND

### A.    Medicare Parts A, B, and C

16        Medicare is a federal health insurance program for the elderly and disabled, *see* 42

17   U.S.C. § 1395 *et seq.*, administered by CMS.  Medicare Part A "covers medical services

18   furnished by hospitals and other institutional care providers."  *Ne. Hosp. Corp. v.*

19   *Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011) (citing 42 U.S.C. §§ 1395c to 1395i-5).

20   Medicare Part B "is an optional supplemental insurance program that pays for items and

21   services not covered by Part A, including outpatient physician services," as well as

22   "clinical laboratory tests, and durable medical equipment," among other things.  *Id.* at 2

23   (citing 42 U.S.C. §§ 1395j to 1395w-4).  Medicare Part C, now known as Medicare

24   Advantage, allows people to opt out of Parts A and B and instead enroll in health

25   insurance plans offered by private insurers, the MAOs.  *See* 42 U.S.C. §§ 1395w-21 to

26   1395w-29.  MAOs "must provide enrollees the benefits and services (other than hospice

27   care) that are available to people . . . under Medicare Parts A and B, *see* 42 U.S.C. §

28   1395w-22(a)(1), and may also offer supplemental benefits approved by the Secretary of

Health and Human Services (HHS), *see* 42 U.S.C. § 1395w-22(a)(3)." *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006). Pursuant to contracts with CMS, MAOs receive monthly payments from Medicare for each beneficiary enrolled in their Medicare Advantage (MA or Part C) plans and Prescription Drugs (PD or Part D) plans. *See, e.g.* Medicare Advantage Contract between United Healthcare of California and CMS ("MA Contract"), 2011, Article IV, CMS Payment to MA Organization (Exhibit 1).[3]

Under Parts A and B, CMS pays providers directly for medical services rendered to beneficiaries under a "fee-for-service" regime. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994). In contrast, under Part C, MAOs contract with providers to render services to the beneficiaries enrolled in their plans and pay those providers. For each beneficiary in a MA plan, CMS pays the MAO a monthly base amount (which CMS and the MAO agree to before the start of the payment year) which is adjusted based on that beneficiary's risk score. 42 U.S.C. § 1395w-23(a)(1)(A). The adjusted amount is based on the characteristics of each beneficiary, including "such risk factors as age, … gender, … and such other factors as the Secretary determines to be appropriate, including adjustment for health status." *Id.* § 1395w-23(a)(1)(C)(i). Under this "risk adjustment" system, MAOs are paid the predicted cost of providing benefits to a given beneficiary (regardless of the services, if any, actually provided to the beneficiary). MAOs thus receive more for providing benefits to older and sicker people, and less for younger and healthier ones. Adjusting the monthly payments based on risk

---

[3] Exhibit 1 is the Part C and D MA Contract for calendar year 2011 between United's California MAO and CMS. *See* Rice Decl., ¶ 2. It consists of the following parts: the Part C contract; the Part D Addendum; the Attestation of Benefit Plan, identifying the Plan Benefit Packages; and the Signature Attestation page, *Id.* Thomas Paul executed all parts of this agreement for the California MAO in his capacity as Chief Executive Officer of UnitedHealthcare Medicare & Retirement, which is a group within Defendant UnitedHealthcare, Inc. *Id.* The terms of the contract referenced in this brief for calendar year 2011 and included in Exhibit 1 are the same as those in the contracts for the other calendar years at issue in this case, 2009 to 2010 and 2012 to 2017, and for the other Defendant MAOs. *Id.* The contract terms did not change because the regulations governing the terms and conditions of the contracts did not change. *See* 42 C.F.R. § 422.504 (Part C); 42 C.F.R. §§ 423.504, 423.505 (Part D).

1  factors is the Secretary's method of ensuring "actuarial equivalence" between the

2  average payments that CMS would expect to make under fee-for-service Medicare, and

3  the payments that CMS makes to MAOs for covering an individual with the same

4  characteristics.  *Id.*

5  **B.    The Risk Adjustment Payment System**

6          When Congress established Part C, it directed the Secretary to implement "a risk

7  adjustment methodology that accounts for variations in per capita costs based on health

8  status and other demographic factors."  *Id.* § 1395w-23(a)(3)(C)(i).[4]  The Secretary has

9  broad discretion under this provision to adopt a methodology and determine how to

10 adjust payment levels based on the health status of Medicare beneficiaries.  Since 2004,

11 the Secretary has used the Hierarchical Condition Category (HCC) model to determine

12 these amounts under Part C.  The Secretary has used a similar model (the RxHCC

13 model) to risk adjust for health status under Part D.  *See* 42 C.F.R. § 423.329(b)(1), (2).

14 HCC is a complex regression model that collects and analyzes payment data in order to

15 assign estimated costs to certain characteristics of Medicare beneficiaries such as age,

16 gender, and health status.  The model includes a set of multipliers – that is, "coefficients"

17 – used to determine "the marginal (additional) cost" of each medical "condition or

18 demographic factor (*e.g.*, age/sex group, Medicaid status, disability status)."  Medicare

19 Managed Care Manual, Pub. 100-16, Chapter 7, § 70.1 (June 7, 2013) (Exhibit 5).  The

20 multipliers are determined based on data included in claims submitted to CMS by

21 providers for payments for their services to beneficiaries under Parts A and B of the

22 Medicare Program.  *See* Advance Notice of Methodological Changes for Calendar Year

23 (CY) 2014 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment

24 Policies and 2014 Call Letter, at 17 (Feb. 15, 2013) (Exhibit 6). For each Part C

25 beneficiary, the multipliers are added to form a "risk score" and then computed against

26

27         [4] Part C was established by the Balanced Budget Act of 1997, Pub. L. No. 105-33,
28 111 Stat. 251, 299 (Aug. 25, 1997).

the negotiated base (fixed) monthly rate to determine how much CMS will pay an MAO for insuring that beneficiary.[5]

MAOs submit diagnosis codes to CMS so the agency can apply the multipliers for each beneficiary's health status. Since 2004, they have submitted the codes through CMS's Risk Adjustment Processing System ("RAPS"). In the last several years, they submit the codes through RAPS and CMS' Encounter Data System ("EDS"). Each RAPS submission includes only a few data fields: the beneficiary's identification number, the date of the medical encounter, the type of healthcare provider, and the diagnosis code(s) reported by the provider for that encounter. *See, e.g.,* 2013 Medicare Managed Care Manual, Pub. 100-16, chapter 7 at § 120.2.3 (Exhibit 5). RAPS also has a field called a "Delete Indicator" that allows MAOs to delete invalid diagnosis codes that were previously submitted and thereby retract the claim for payment for those invalid diagnoses. *Id.* A diagnosis that has been deleted in RAPS will, of course, not cause an increase in the risk score or risk adjusted payment that otherwise would have been based on the deleted diagnosis code. When an MAO acquires information about invalid diagnoses after payment is made, it can still delete the invalid diagnosis codes through RAPS, and CMS will reconcile its payments as part of a routine process. EDS works

---

[5] For example, a 72-year-old woman living independently without a disability would have "demographic" characteristics (*i.e.,* age, sex, institutional and disability statuses) assigned a coefficient of 0.348 in 2014. Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies, Table 1, at 67 (Exhibit 7). If the woman had no diagnosed conditions, an MAO would be paid 34.8% of its base rate. If the beneficiary had diabetes without complications, another 0.118 would be added to her score, which would become 0.466 (0.348 + 0.118). *Id.* Her expected healthcare costs would be 46.6% as much as the average beneficiary, and an MAO would thus be paid 46.6% of its base rate for covering her. A diagnosis of multiple sclerosis would add another 0.556 to her risk score, for a total of 1.022 (0.348 for demographics + 0.118 for diabetes without complications + 0.556 for multiple sclerosis). *Id.* at 68. Her expected healthcare costs would now be 102.2% as much as the average beneficiary, and an MAO would receive 102.2% of its base rate for covering her. Thus, when an MAO submits a diagnosis code that maps to an HCC for a beneficiary, that code increases the amount paid to the MAO for coverage. *See* 2000 Rule, 65 Fed. Reg. at 40,268 (explaining that the diagnosis data is a claim for payment); *see generally* Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in APA case, Dkt. 57-1, at 14-16 (Exhibit 13).

much the same way with respect to the deletion of invalid diagnosis codes.  *See* CMS
2012 Regional Technical Assistance Participant Guide, Encounter Data, at 3-32 to 3-33
(Exhibit 8).

**C.    Part C and D Payment Data Integrity Requirements and Obligations**

MAOs have a financial incentive to submit as many risk-adjusting diagnoses as
possible to generate as much payment as possible.  Accordingly, to ensure that payments
are based on valid diagnosis data and are not improperly inflated, payment integrity
requirements and obligations are imposed on MAOs.  These requirements and
obligations are contractual as well as regulatory, and apply to all United MAOs and to
entities related to these MAOs, including, the non-MAO United Defendants in this
action.  *See* Section D(5) of Article V of the MA Contract (Exhibit 1) (if any MAO
responsibility is delegated to another entity, "all contracts or written agreements must
specify that the related entity, contractor or subcontractor must comply with all
applicable Medicare laws, regulations, and CMS instructions"); *see also* 42 C.F.R.
§ 422.504(*i*)(3)(iii), (4)(v) (Part C) (requiring related entities and contractors to comply
with the MAO's contractual obligations to CMS and to comply with all applicable
Medicare laws, regulations, and CMS instructions); 42 C.F.R. § 423.505(*i*)(3)(iii), (iv)
(Part D) (same).  One of the most fundamental data integrity requirements is that
diagnoses must be substantiated by the beneficiaries' medical records to be valid and one
of the most important payment integrity obligations is that MAOs and their related
entities and contractors withdraw diagnoses that they know are invalid based on
information available to them.

In order to participate in the Part C and Part D programs, the Defendant MAOs
were required to agree in writing to comply with Part C and D regulations and other
terms and conditions.  42 C.F.R. § 422.504 (Part C); 42 C.F.R. §§ 423.504, 423.505
(Part D).  Each year, one or more executives of defendant UnitedHealthcare, Inc. or its
affiliates or predecessors entered into these contracts with CMS on behalf of the
Defendant MAOs.  *See, e.g.,* Signature Attestation page at the end of Exhibit 1.

During the payment years at issue in this case,[6] the contracts obligated defendants to operate their Part C and D plans "in compliance with the requirements of [the] contract[s] and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" and to comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse," including the False Claims Act. *See, e.g.*, Section A of Article II and Section A(1) of Article IX of the Part C contract, which is part of Exhibit 1.[7]  The contracts also required defendants to implement an effective compliance program in accordance with the Part C and D compliance regulations. *See, e.g.,* Section F of Art. III of the MA Contract and Section J of Art. II of the Part D Addendum, also part of Exhibit 1.  Since 2005, the Part C compliance regulation itself has obligated United to monitor for noncompliance with CMS requirements, identify compliance risks, and respond to and correct compliance problems, including taking "affirmative steps to address errors" in the data it submitted for payments. *Swoben*, 848 F.3d at 1174 (citing 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)); *see also* 42 C.F.R., § 423.504(b)(4)(vi), (vi)(F), (vi)(G) (2007) (Part D compliance regulation setting forth same requirements). The compliance regulations state that the MAO "must conduct appropriate corrective actions (for example, repayment of overpayments . . .)."  42 C.F.R. § 422.503(b)(4)(vi)(G)(2); s*ee also* 42 C.F.R. § 423.504(b)(4)(vi)(G)(2) (Part D) (same). In 2013, the obligation to withdraw erroneous risk adjustment data was also reiterated in the Medicare Managed Care Manual, which, as noted above, was expressly incorporated into all of the contracts.  *See, e.g.,* 2013 Medicare Managed Care Manual, Pub. 100-16, chapter 7 at § 40 (Exhibit 5) (stating:  "If upon conducting an internal review of submitted diagnosis codes, the plan sponsor [or MAO] determines that any ICD-9-CM

---

[6] This action seeks damages for payment years 2009-17.  Defendants, however, continue to refrain from correcting invalid diagnoses revealed by their chart reviews. The United States reserves its rights to recover damages for payment years after 2017.

[7] The Attestation of Benefit Plan, which is part of the contract, also requires compliance with the Medicare Managed Care Manual and other documents issued by CMS. This Attestation is included as part of Exhibit 1.

1    diagnosis codes that have been submitted do not meet risk adjustment submission

2    requirements, the plan sponsor [or MAO] is responsible for deleting the submitted ICD-

3    9-CM diagnosis codes as soon as possible").

4         In addition, in accordance with 42 C.F.R. § 422.504(*l*) (Part C), the contracts

5    obligated an officer of each United MAO to annually attest to the accuracy,

6    completeness, and truthfulness of the diagnosis data submitted for risk adjustment

7    payments based on best knowledge, information, and belief.  *See* Section D.2 of Article

8    IV of the MA Contract (Exhibit 1).[8]  This regulatory and contractual obligation also

9    applied to each related entity and contractor that generated (that is, submitted) risk

10   adjustment data for the United MAOs, including defendant Optum (and its predecessor,

11   Ingenix).  *Id*.  Importantly, this contractual and regulatory attestation requirement

12   imposed affirmative duties on the MAOs and their related entities and contractors.  As

13   explained by the Ninth Circuit and "as CMS has long made clear," to attest to the

14   accuracy, completeness, and truthfulness of their risk adjustment data submitted to CMS,

15   MAOs have always had a duty to take actions to ensure the accuracy, completeness, and

16   truthfulness of the data and are responsible for "making good faith efforts" to certify the

17   accuracy, completeness, and truthfulness of the data.  *Swoben*, 848 F.3d at 1174 (citing

18   65 Fed. Reg. at 40,268); *see also* 2004 Manual (Exhibit 4), § 111.7 (discussing this

19   requirement).  Thus, MAOs and their related entities and contractors cannot turn blind

20   eyes to information about the invalidity of their diagnosis data or act with reckless

21   disregard or deliberate ignorance of the falsity of the data and one of the affirmative

22   duties or actions that MAOs and their related entities and contractors must take because

23   of the attestation requirement is to correct or withdraw erroneous data.  *Id*. at 1174.

24        The Medicare Managed Care Manual has long specified that diagnosis data must

25   be substantiated by the beneficiaries' medical records – a requirement that has been in

---

[8] The Part D regulations include a similar attestation requirement for diagnoses
submitted for risk adjustment payments under the prescription drug program.  Under the
applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R.
§ 423.505(k).

10

every version of the Manual since at least 2001.  *See, e.g.,* 2001 Manual (Exhibit 3),
§§ 110.3, 110.4 (requiring diagnosis data to "be substantiated by the hospital's medical
record"); 2004 Manual (Exhibit 4), §§ 111.1, 111.4, 111.8 and Exhibit 30 [to the
Manual] (Aug. 13, 2004) ("a medical record must substantiate all diagnostic information
provided to CMS"); 2013 Manual (Exhibit 5), § 40 ("All diagnosis codes submitted must
be documented in the medical record").  The Manual, in accordance with federal
regulation, also has long specified that diagnoses be coded according to *International
Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and
Reporting* and the ICD Guidelines have long specified that the medical record must
substantiate the diagnosis coding.  *See*, *e.g*., 2013 Manual § 40 (Exhibit 5); *see also* 45
C.F.R. §§ 162.103, 162.1000(a) and 162.1002(a)(1), (b)(1), (c)(2)(i) (by which the
Secretary of HHS adopted certain "code sets as the standard medical data code sets[,]"
including the ICD-9-CM (Ninth Edition) until it was superseded in October 2015 by the
ICD-10-CM (Tenth Edition), and made their use mandatory for "covered entities," which
includes health plans and providers).  The Ninth Edition of the ICD Guidelines (effective
during many of the years at issue here), "published by the United States Government"
and "required for reporting diagnoses and diseases to all . . . [CMS] programs," ICD-9-
CM Preface at 1, included the requirement of medical record documentation to
substantiate diagnosis coding.  Joint Appendix of Rulemaking Record Excerpts from
APA case, ICD-9-CM Coding Guidelines, at 5 (Exhibit 10) (explaining "[t]he
importance of consistent, complete documentation in the medical record," without which
accurate diagnosis coding "is a difficult, if not impossible, task").  The Tenth Edition of
the ICD Guidelines does the same.  ICD-10-CM Official Guidelines for Coding and
Reporting FY 2018, at 1 (Exhibit 11) ("importance of consistent, complete
documentation in the medical record cannot be overemphasized").

Moreover, pursuant to their MA Contracts, the Defendant MAOs agreed "to
comply with the requirements in § 422.310 for submitting risk adjustment data to CMS"
and could be terminated if they "fail[ed] to provide CMS with valid risk adjustment data

as required under § 422.310 and 423.329(b)(3)." *See* Section B.7 of Art. VI and Section B.1(a)(vii) of Article VIII of the MA Contract.[9] One of the requirements of § 422.310 (a Part C regulation) pertains to the "[v]alidation of risk adjustment data." It also establishes the medical record as the source for determining the validity of risk adjustment data: "MA organizations and their providers and practitioners will be required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS. There may be penalties for submission of false data." 42 C.F.R. § 422.310(e).[10] Similarly, the regulation relating to CMS' risk adjustment data validation (RADV) audits refers to the medical records as the source for validating diagnoses in order "to ensure risk adjusted payment integrity and accuracy." 42 C.F.R. § 422.311(a). And, because the medical record is the "source of truth" for the determining the validity of risk adjustment data, United's MA Contracts, in accordance with 42 C.F.R. § 422.504(e)(2), provided the government with the right to audit, evaluate, and inspect "medical records," "patient care documentation, and other records" in the possession or control of the United MAOs, related entities, and contractors that relate to the "determination of amounts payable under the contract[s]." *See, e.g.*, Section A.2(b), (d) of Article VI of the MA Contract (Exhibit 1).

During the relevant time period, the United Defendants were also bound by the terms and conditions of Electronic Data Interchange ("EDI") agreements. The United MAOs and any related entity or contractor that submitted risk adjustment data on their behalf (here Optum and its predecessor, Ingenix) were required to execute these agreements in order to submit the data, including diagnoses, to CMS' RAPS and EDS and to receive payments. *See, e.g.*, Electronic Data Interchange Agreement between

---

[9] The contracts are also subject to termination when "[t]here is credible evidence that the MA Organization committed or participated in false, fraudulent or abusive activities affecting the Medicare program, including the submission of false or fraudulent data." *See, e.g.*, Section B.1(a)(iv) of Article VIII of the MA Contract (Exhibit 1).

[10] Section 423.329(b)(3) addresses the collection of data for Part D risk adjustment based on health status. It references the requirements of section 422.310.

United and CMS (Exhibit 2),[11] *see also* 2004 Manual (Exhibit 4), § 111.6.1 (discussing this requirement).  Pursuant to the EDI agreements, the defendant MAOs and Optum (and its predecessor, Ingenix) agreed that they were responsible for all risk adjustment data submitted by themselves, their employees, and agents and that "[b]ased on best knowledge, information, and belief, [they would] submit risk adjustment data that are accurate, complete, and truthful."  *Id*. at Sections A.1 and 5.  Moreover, they agreed to "correct risk adjustment data discrepancies."  *Id*. at Section A.11.  Of equal significance, pursuant to the EDI agreements, they also agreed that the government had the right to "audit and confirm" the data submitted by them and that they would provide the government with access to "medical records related to the eligible organization's submissions" in order for the government to audit data and confirm that the submitted-diagnosis were supported by the medical records.  *Id*. at Section A.4.  Thus, the EDI Agreements also established the medical records as the "source of truth" for validating diagnosis data and Defendants' entitlement to payments.

## III.   ARGUMENT

In this action under the False Claims Act, 31 U.S.C. §§3729-3733 ("FCA"), the United States seeks to recover Medicare funds improperly retained by United.  The United States alleges first that, over the past decade, United reviewed millions of its beneficiaries' medical records looking for diagnoses that its providers had not reported so that it could submit additional codes to CMS and thereby obtain increased payments from Medicare.  Second, the United States alleges that during the course of its reviews seeking additional diagnosis codes to submit, United identified diagnoses that had improperly been submitted because they were not supported by its beneficiaries' medical records.  Third, the government contends that United was obligated to delete these unsubstantiated codes from its previous RAPS and EDS submissions to CMS, and that by failing to delete those codes, United improperly retained the increased payments

---

[11] Exhibit 2 is a United EDI Agreement dated May 10, 2011, but is substantially similar to other EDI agreements with CMS during 2004 to 2017.  *See* Rice Decl., ¶ 3.

based on the invalid diagnoses.  This third contention, which involves strictly a legal question, is the subject of this motion and its resolution at this stage will help streamline the case, including the scope of discovery.

**A.    Partial Summary Judgment on Defendants' Obligation to Correct Known Coding Errors Will Facilitate the Just and Efficient Resolution of This Action**

Rule 1 of the Federal Rules of Civil Procedure provides that the federal rules should be construed to secure a "just, speedy, and inexpensive determination of every action."  Contentions or defenses lacking either merit or relevance should not be the basis for unnecessary discovery nor allowed to consume the time and resources of the Court or parties.  A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).  While, in some cases, a summary judgment motion may properly await some amount of discovery, where, as here, the legal issues are clear, partial summary judgment can and should be granted, even before discovery has been completed.  *See, e.g., Parra v. Wright*, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013) (granting pre-discovery summary judgment motion where "the legal principles are clear").

Partial summary judgment is appropriate to resolve purely legal questions.  *See In Re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 284, 288 (D. Mass. 2006) (granting partial summary judgment on meaning of statutory phrase "average wholesale price" under "plain language canon of statutory construction"); *see also* 10A C. Wright, A. Miller, & M. Kane, Fed. Practice and Procedure § 2725 at 416 (4d ed. 2016) ("when the only issues to be decided in the case are issues of law, summary judgment may be granted"); *id*. at 422-23 ("fact that difficult questions of law exist or that the parties differ on the legal conclusions to be drawn from the facts is not in and of itself a ground for denying summary judgment in as much as refusing to grant the motion does not obviate the court's obligation to make a difficult decision") (footnotes omitted).

14

The Court should enter partial summary judgment here and hold that United was and is legally obligated to delete those diagnosis codes revealed by its own medical record reviews to be unsubstantiated.  This issue should be laid to rest now so that it is not used to divert and waste the resources of the parties or the Court, which will otherwise be called upon to decide discovery disputes and other motions related to this issue.  Indeed, United has made this issue the centerpiece of a Counterclaim against the United States as well as serving extensive written discovery and demanding the production of countless documents that it contends relate to its purported "actuarial equivalence" argument.  Letter from Abid R. Qureshi, at 4 (Nov. 7, 2017) (Exhibit 15).

**B.      An MAO's Obligation to Delete Errors it Identified in Its Coding is Determined as a Matter of Law**

Having been caught improperly pocketing Medicare funds based on invalid diagnoses, United now contends that it was legally entitled to ignore requirements in its contracts and regulations that "medical diagnosis codes … be supported by a medical record." *Swoben*, 848 F.3d at 1176.  Among the various arguments alluded to by United in support of this position, United has most consistently relied on the notion that the express requirement of accurate diagnosis coding is purportedly in tension with the governing statute's reference to "actuarial equivalence." *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).[12]  United contends that "actuarial equivalence" trumps the longstanding contractual and regulatory requirement that diagnosis codes be substantiated by its beneficiaries' medical records, and therefore, United could disregard the medical record requirement even when its own chart reviews revealed that diagnosis codes were unsupported. *See, e.g.*, Amended Joint Rule 26(f) Report at (Dkt. 224) at 12 ("United's

---

[12] This subsection reads follows:  "Subject to subparagraph (I), the Secretary shall adjust the payment amount under subparagraph (A)(i) and the amount specified under subparagraph (B)(i), (B)(ii), and (B)(iii) for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, including adjustment for health status under paragraph (3), so as to ensure actuarial equivalence.  The Secretary may add to, modify, or substitute for such adjustment factors if such changes will improve the determination of actuarial equivalence."  42 U.S.C. § 1395w-23(a)(1)(C)(i).

15

1   Position: . . . Congress has required CMS to use the "same methodology" to determine
2   payment amounts in the MA program . . . and has directed CMS to "ensure actuarial
3   equivalence" between the two programs . . . .  In light of those statutory requirements,
4   UnitedHealth believes that CMS cannot require MA plans to use a different approach to
5   the diagnosis codes they submit than the one CMS itself uses, such as by requiring MA
6   plans to delete all unsupported codes, unless CMS also provides a means of adjusting for
7   the different methodologies." (Citations omitted).[13]

8          United's actuarial and data equivalence arguments fail as a matter of law and are
9   not a defense to liability in this FCA action.  First, these arguments violate not just
10  regulatory, but also contractual provisions with which Defendants expressly promised
11  compliance.  United, when submitting claims for Medicare funds, cannot agree to
12  comply with applicable payment requirements and then unilaterally declare those same
13  requirements void.  Second, the Ninth Circuit already rejected essentially the same
14  arguments in *Swoben*.  Third, the data equivalency argument cannot be applied where
15  United reviewed medical records to add additional diagnosis codes not reported by
16  providers.  United contends that an actuarial principle mandates that provider-reported
17  health status information, *i.e.*, diagnosis codes, should not be subject to further medical
18  record review or verification – yet United did precisely that when it added codes based
19  on its own chart reviews.  Fourth, as the government has explained at length in briefs
20  filed in the APA case brought by United challenging a MA overpayment regulation,
21  *United Healthcare Ins. Co. v. Hargan*, No. CV 16-00157-RMC (D.D.C. filed Jan. 29,
22  2016) ("APA case"), United's construction of "actuarial equivalence" in 42 U.S.C. §
23  1395w-23(a)(1)(C)(i) lacks merit.  The agency's interpretation of this term is reasonable
24  and consistent with the language and intent of the statute.

---

26  [13] United incorrectly states that the contractual and regulatory dispute in this FCA
    case is about an obligation to "attempt to delete *all* unsupported diagnostic codes
27  submitted to them by providers . . . ."  Amended Joint Rule 26(f) Report at 11 (emphasis
    added).  That statement mischaracterizes Defendants' obligation and the theory of this
28  FCA case.  *See Swoben*, 848 F.3d at 1173 -74.  This FCA case is about those diagnosis
    codes that United identified as unsupported yet nonetheless failed to delete.

### 1. United's Post Hoc Arguments Do Not Excuse Its Violation of Express Contract Terms

United's MA Contracts (including the Managed Care Manual and MA regulations expressly incorporated into the contracts) and the EDI agreements all establish the medical record as the "source of truth" for determining entitlement to risk adjustment payments. *See* discussion at pp. 8-13, *supra*. United acknowledged the requirement that diagnoses must be validated by the medical records in its brief to the Ninth Circuit in *Swoben*. *See* Joint Answering Brief, *United States ex rel. Swoben v. United Healthcare Ins. Co.*, No. 13-56746, Dkt. 39, at 36 (9th Cir. filed June 2, 2014) (Exhibit 9) ("CMS regulations deem a diagnosis code proper if it is supported by a . . . medical record"). The compliance and attestation requirements and the EDI agreements also established the obligation to delete invalid diagnoses. The 2013 Manual reiterated this obligation. *See* 2013 Manual (Exhibit 5), § 40.

If United disagreed with its regulatory and contractual obligation to delete codes known to be unsupported by its beneficiaries' medical records or if United thought it would be underpaid if it complied with the longstanding medical record requirement, it was free to forego participation in a program governed by terms it found objectionable. But United cannot agree to these regulatory and contractual requirements and then simply ignore them. Acceptance of United's contention – that it may violate contract and regulatory requirements it agreed to honor and then litigate its program-level grievance only when its misconduct is exposed in an FCA matter – would create a perverse incentive for a range of entities participating in the Program. Such entities would claim payment from the federal government by promising compliance with contractual and regulatory obligations and then violate those obligations in order to enhance profits with the intention that the violation either goes unnoticed or, if it is exposed, they can then assert a legal challenge to the requirements to which they had expressly agreed. *Accord City and County of San Francisco v. Tutor-Saliba Corp.,* 2005 WL 645389, at *8 (N.D. Cal. 2005) (rejecting argument in state FCA case that

17

1    "allegedly fraudulent conduct should be excused because part of the contract [in which
2    fraud occurred] is invalid" and that "invalid portion of the contract is no excuse for
3    fraudulent behavior"); *see also Bryson v. United States*, 396 U.S. 64, 68 (1969) ("One
4    who elects [fraud] as a means of self-help may not escape the consequences by urging
5    that his conduct be excused because the statute which he sought to evade is [invalid].")
6    (quoting *Dennis v. United States*, 384 U.S. 855, 867 (1966)); *Cedars-Sinai Med. Ctr. v.*
7    *Shalala*, 125 F.3d 765, 769 (9th Cir. 1997) (purported "invalidity" of payment rule held
8    "no defense" to submission of false claims in violation of challenged rule) (citing
9    *Bryson*); *United States v. Weiss*, 914 F.2d 1514, 1522-23 (2d Cir.1990) (holding that the
10   fact that a Medicare Manual provision requiring filing of statements had not undergone
11   statutorily-required approval procedures was no defense to charge of false statements).

12       United executed part C and D contracts year after year agreeing to comply with
13   express requirements that diagnoses be supported by the enrollees' medical records.
14   United scoured medical records for additional diagnoses to submit for increased
15   payments by CMS, but refrained from deleting diagnosis codes that it knew were
16   unsupported based on those same record reviews.  Having knowingly violated the
17   medical record requirements with which it contractually agreed to comply, United
18   cannot now raise grievances about the contract terms in this FCA case.

19       **2.      The Ninth Circuit Has Already Rejected United's Data**
20       **Equivalency Argument**

21       United previously challenged the medical record requirement in *Swoben*.  848
22   F.3d at 1179.  In that case, instead of relying on the statutory term "actuarial
23   equivalence," United pointed to a regulation which requires that MAOs "must submit
24   data that conform to CMS' requirements for *data equivalent* to Medicare fee-for-service
25   data."  *Id.* (citing 42 C.F.R. § 422.310(d)) (emphasis supplied).  United argued that this
26   data equivalency requirement was somehow inconsistent with the requirement that
27   diagnoses be supported by the medical record and therefore excused its knowing
28   submission of erroneous diagnosis codes.  The Ninth Circuit not only rejected this

18

1    argument on the merits, but concluded that it did not provide a defense to the defendants'
2    FCA liability in light of their bad faith in conducting chart reviews.

3         The Ninth Circuit's reasoning applies with equal force to United's similar
4    actuarial equivalence argument here.  In *Swoben*, the Ninth Circuit rejected United's data
5    equivalence argument, holding that "because nothing in § 422.310(d) speaks to [an
6    MAO's] obligations to ensure the accuracy of risk adjustment data, it does not modify
7    [an MAO's] obligations under §§ 422.503(b)(4)(vi) and 422.504(l)."  *Id*. at 1179.  The
8    appellate court explained that under these sections and others, CMS had made "clear"
9    that MAOs "have always had 'an obligation to undertake steps to ensure the accuracy,
10   completeness and truthfulness of encounter data'" submitted to CMS.  *Id*. at 1174.

11        There is no significant difference between United's current legal argument based
12   on the term "actuarial equivalence" and its previous one based on "data equivalence."
13   Neither the statute nor the regulation alters United's obligation to delete invalid
14   diagnosis codes.  The provision United relies on here, 42 U.S.C. § 1395w-23(a)(1)(C)(i),
15   merely directs the Secretary to "adjust the . . . amount" of the Part C payments to
16   account "for such risk factors . . . as the Secretary determines to be appropriate," such as
17   the "age, disability status, gender, institutional status, and . . . health status" of each
18   beneficiary being covered, "so as to ensure actuarial equivalence."  *Id*.  Just like section
19   422.310(d), as the Ninth Circuit held, does not modify United's other regulatory
20   obligations requiring the submission of valid data and deletion of invalid data, the statute
21   does not give United any right to submit invalid diagnosis codes or to refrain from
22   deleting them.

23        The Ninth Circuit also found United's data equivalency argument inapposite in
24   light of the conduct alleged by Swoben concerning United's chart reviews.  In *Swoben*,
25   United had noted that diagnostic codes are, in the first instance, determined by the
26   healthcare providers who treat the beneficiaries, and argued that there was no "authority
27   indicat[ing] that a [MAO] was obligated to undertake affirmative steps to unearth
28   potentially unsupported codes . . . ."  *Swoben,* 848 F.3d at 1173.  The Ninth Circuit

19

found that this argument entirely missed the mark: "Defendants' attempts to portray
themselves as the passive victims of their providers' errors wholly misstates Swoben's
legal theory, which focuses on the defendant's own conduct in allegedly conceiving,
directing and conducting retrospective reviews designed to identify only favorable
coding errors." *Id.* at 1174. After considering, first, whether Part C regulations on their
face, supported United's defense, the appellate court added that, "[s]econd, this is not a
case about whether [MAOs] have to *take* affirmative steps to verify risk adjustment data.
[United] indisputably took such steps by conducting retrospect chart reviews." *Id.* at
1179 (emphasis in original). Importantly, it then added that, when an MAO adopts
"affirmative verification procedures, [they] have to conduct them in good faith." *Id.*

The Ninth Circuit's unequivocal rejection of United's data equivalence argument
does not leave room for United's argument that actuarial equivalence, as it relates to risk
adjusted payments, entitles it to payment for unsupported diagnoses or would allow
United to disregard its obligation to correct diagnostic data it knows to be invalid.
United's attempt to resurrect and rename its "data equivalence" argument, which is
plainly at odds with the Ninth Circuit's decision, should be similarly rejected.

### 3. United's Data Equivalency Argument Cannot be Applied in a Case in Which United Reviewed and Edited Provider Data

As in *Swoben*, in this case, United's role with respect to diagnosis codes was *not*
that of a passive conduit of data supplied by healthcare providers. Like *Swoben*, this
action focuses on "defendant's own conduct in allegedly conceiving, directing and
conducting retrospective reviews designed to identify only favorable coding errors." *Id.*
at 1174. By conducting its own chart reviews and using them to add diagnosis codes,
United deprived itself of any plausible actuarial equivalence argument in this case.

In the APA case, United has described its actuarial equivalence argument as
follows: because CMS uses unaudited claims data from healthcare providers under
Medicare Parts A and B to establish the coefficients for the condition categories assigned
to beneficiaries enrolled in Part C, CMS may use only unverified RAPs data when

1    determining the risk score for each Part C beneficiary and the amount of the monthly

2    risk-adjusted payment for that beneficiary.  *See* Memorandum in Support of United's

3    Motion for Summary Judgment in APA case (Dkt. 47-1), at 1-2, 21-22 (Exhibit 12).  In

4    other words, United contends that because diagnostic information in the Part A and B

5    claims data is *not verified* by CMS when used to establish the coefficients for

6    determining risk scores, invalid diagnoses reported by providers to MAOs for Part C and

7    D beneficiaries can be submitted for payment *and* cannot be deleted even when the

8    MAOs own chart reviews show that the diagnoses are invalid.  *Id.* at 21-22.  According

9    to United, correcting erroneous Parts C and D diagnosis data based on the results of

10   medical record reviews contravenes "the basic actuarial principle that the data used to

11   calibrate a risk adjustment model should be consistent with the data to which that model

12   is then applied."  *See* United's Opp. To Govt. Motion for Summary Judgment in APA

13   case (Dkt. 60), at 18 (Exhibit 14).

14          United, however, violated the very principle it relies upon.  United's role with

15   respect to diagnosis codes was *not* that of a passive conduit of data supplied by

16   healthcare providers.  Even assuming United's actuarial equivalence argument had any

17   merit – which it does not – United's own conduct makes application of that principle

18   impossible with respect to the diagnostic data that is the subject of this case.  By

19   conducting chart reviews and *adding* diagnosis data (which increased its beneficiaries'

20   risk scores) based on those reviews, United tampered with – *i.e., verified* – the provider-

21   reported diagnosis data and created the very data inconsistencies that it contends are

22   illegitimate and preclude it from being required to delete unsubstantiated diagnoses.

23          In reality, what defendants propose is that United may review and edit data

24   submitted by providers in order *to add* unreported diagnoses that are purportedly

25   supported by their beneficiaries medical records, but United cannot be required *to delete*

26   invalid diagnoses codes reported to CMS – even when it is United's own chart reviews

27   that reveal that those codes are unsubstantiated and, thus, invalid.  Such a one-sided view

28   of actuarial equivalence defies reason and common sense and should be rejected by this

1    court as a matter of law.

2         **4.    Well-Established Principles of Statutory Construction Preclude**

3              **United's Tortured Interpretation of 42 U.S.C. § 1395w-**

4              **23(a)(1)(C)(i)**

5         For any of the preceding reasons, the Court should reject United's actuarial

6    equivalence argument without having to construe the term as it applies to risk adjustment

7    under Part C.  However, United's wholly unreasonable construction of the statute can

8    also be summarily rejected.  In construing a statute, courts "first evaluate whether the

9    meaning of the statute is plain and unambiguous and, therefore controlling."  *Arizona*

10   *State Bd. For Charter Schs. v. U.S. Dept. of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006).

11   The starting point is to "engage in a textual analysis of the relevant statutory provisions

12   and to read the words of a statute in their context and with a view to their place in the

13   overall statutory scheme."  *Id.*  "Statutory interpretations which would produce absurd

14   results are to be avoided."  *Id.* at 1008 (quoting *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th

15   Cir. 2004)).  "When a natural reading of the statutes leads to a rational, common-sense

16   result, an alteration of meaning is not only unnecessary, but also extrajudicial."  *Id*.

17        The Medicare statute directs that the Secretary of HHS "adjust the . . . amount" of

18   the monthly payments  to MAOs to account "for such risk factors . . . as the Secretary

19   determines to be appropriate," such as the "age, disability status, gender, institutional

20   status, and . . . health status" of each beneficiary being covered, "so as to ensure actuarial

21   equivalence."  42 U.S.C. § 1395w-23(a)(1)(C)(i).  The Secretary may develop an

22   adjustment methodology "as he determines to be appropriate," *id*., a phrase that is used

23   to "trumpet[]," in "sweeping terms," the breadth of its grant of discretionary power.

24   *Arctic Slope Reg'l Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987) (construing a

25   Federal Energy Regulatory Commission rule).  The language of 42 U.S.C. § 1395w-

26   23(a)(1)(C)(i) is discretionary because it allows the Secretary to take into account "such

27   other [risk] factors as the Secretary determines to be appropriate" and says that he "may

28   add to, modify, or substitute for such adjustment factors if such changes will improve the

1  determination of actuarial equivalence." Similar language has also been understood to

2  be discretionary. *See United Food and Commercial Workers Union, Local 1036 v.*

3  *NLRB*, 307 F.3d 760, 770-72 (9th Cir. 1986) (rejecting that "statutory equivalence"

4  means "identical" and stating, "[t]he practical effect of the nonmembers' argument

5  would be to deprive the NLRB of its jurisdiction to make factual determinations").[14]

6  The MA risk adjustment model (*i.e.*, the HCC model) is designed to satisfy the

7  actuarial equivalence provision by paying MAOs a sum commensurate with the expected

8  cost of providing traditional Medicare benefits to a given beneficiary. And that is what

9  "actuarial equivalence" means in this context: an equivalence between an expected cost,

10  on the one hand, and a known payment, on the other, achieved through the application of

11  actuarial principles. This construction leaves no room for United's argument that it was

12  free to disregard the medical record requirements of CMS's risk adjustment system – the

13  implementation of which, by statute, falls within the Secretary's discretion – and

14  reconfigure it in a way that permits United to ignore the medical record requirement and

15  knowingly retain payment for unsupported diagnoses.

16  United's APA case contends that the per-beneficiary payments calculated by the

17  Secretary systematically underestimate the costs associated with any given disease.

18  United claims that the system can nonetheless function properly, because insurers

19  regularly claim payments for diagnoses that are not substantiated by the beneficiaries'

20  medical records, and these extra payments compensate for the fact that each individual

21  payment is lower than the expected cost of covering someone with the disease in

22

23

24  [14] Such language has also been held to be procedural only and not a basis for
   creating substantive rights. *See Rhoades, McKee & Boer v. United States*, 43 F.3d 1071,
   1075 (6th Cir. 1995) (26 U.S.C. § 412(c)(3)'s "best estimate" requirement is "procedural
   only," does not place a "substantive" requirement on actuarial assumptions); *Wachtell,*

25  *Lipton, Rosen & Katz v. Comm'r*, 26 F.3d 291, 296 (2d Cir. 1994) (§ 412(c)(3)'s "best

26  estimate" requirement is procedural only and "factoring in a discount for conservatism
   after an actuary has [already] arrived at his or her best estimate of anticipated experience

27  would be contrary to the statutory mandate"); *Vinson & Elkins v. Comm'r*, 7 F.3d 1235,
   1238 (5th Cir. 1993) (stating that Congress "intended to give actuaries some leeway and

28  freedom from second-guessing" and that it was inappropriate for anyone to "substitute
   his judgment . . . for that of a qualified actuary").

23

1    question.  United argues that it is therefore unlawful for the Secretary to limit insurers to

2    claiming payment for the medical conditions that are actually substantiated by their

3    beneficiaries' medical records.  If MAOs are not allowed to submit diagnoses not

4    reflected in any medical record, the argument goes, they may be undercompensated.  The

5    submission of invalid diagnoses (and the receipt of payments for them) is not only

6    permitted, United argues – it is, as a practical matter, required.

7            United's interpretation of "actuarial equivalence" would lead to absurd results.  Its

8    argument – that it is legally entitled to retain payments for conditions it knows are not

9    substantiated by its beneficiaries' medical records – is utterly at odds with the regulatory

10   and contractual regime that has been in place in the MA Program for the last two

11   decades and is untenable given the Ninth Circuit's unequivocal holding that MAOs

12   "have an obligation to undertake 'due diligence' to ensure the accuracy . . . and

13   truthfulness" of the risk adjustment data "submitted to [CMS]"  for Medicare

14   payments.  *Swoben*, 848 F.3d at 1169 (quoting 2000 Rule, 65 Fed. Reg. at 40,268).

15   Nothing exempts United from compliance with this obligation.  Congress has never

16   embraced the notion of Medicare payments based on invalid data.  This Court should not

17   imply such an absurd notion from the term "actuarial equivalence."

18          In sum, there is nothing in the statute or its legislative history that supports the

19   notion that United could engage in an *ad hoc* restructuring of the legal obligations

20   established by the Secretary and set out in Part C and D contracts and regulations.  Nor

21   does the statute or legislative history support the notion that United was entitled to

22   ignore the longstanding medical documentation requirement and submit a certain

23   percentage – of its own choosing – of invalid diagnoses as compensation for purported

24   imperfections in the multipliers for the HCC model and the amount of the risk- adjusted

25   payments.  The Court should, as a matter of law, reject United's actuarial equivalence

26   argument as an after-the-fact attempt to justify its fraudulent conduct based on a tortured

27   reading of a statutory phrase.

28

# IV.   CONCLUSION

For the foregoing reasons, the United States and Relator respectfully request that the Court grant this motion.

                                        Respectfully submitted,

Dated:  May 22, 2018                    CHAD A. READLER
                                        Acting Assistant Attorney General
                                        NICOLA T. HANNA
                                        United States Attorney
                                        DAVID M. HARRIS
                                        DAVID K. BARRETT
                                        Assistant United States Attorneys

                                        MICHAEL D. GRANSTON
                                        DANIEL R. ANDERSON
                                        EDWARD CROOKE
                                        CAROL L. WALLACK
                                        JUSTIN DRAYCOTT
                                        PAUL G. FREEBORNE
                                        JESSICA KRIEG
                                        PAUL PERKINS
                                        Civil Division, Department of Justice

                                        JAMES P. KENNEDY, JR.
                                        Acting United States Attorney
                                        KATHLEEN ANN LYNCH
                                        Assistant United States Attorney

                                            /S/ John E. Lee
                                        _____
                                        JOHN E. LEE, AUSA
                                        Attorneys for the United States of America

Dated:  May 22, 2018                    ERIC R. HAVIAN
                                        HARRY LITMAN
                                        JESSICA MOORE
                                        Constantine Cannon LLP

                                        STEVE HASEGAWA
                                        Phillips & Cohen LLP

                                        WILLIAM CHRISTOPHER CARMODY
                                        ARUN SUBRAMANIAN
                                        MATTHEW R. BERRY
                                        JOHN P. LAHAD
                                        MENG XI
                                        Susman Godfrey LLP

                                            /S/ Henry C. Su
                                        _____
                                        HENRY C. SU
                                        Attorneys for Relator Benjamin Poehling

1

Attestation

2    I hereby attest that the other signatory listed, on whose behalf the filing is

3 submitted, concurs in the filing's content and has authorized the filing.

4  Dated:  May 22, 2018

5                                    /S/ John E. Lee

6                                    _____
                                     JOHN E. LEE
7                                    Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28