UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKEBIA THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SEEMA VERMA in her official capacity as Administrator of the CENTERS FOR MEDICARE & MEDICAID SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendants. | Civil Action No. 19-cv-12132-ADB |

**MEMORANDUM AND ORDER
ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

BURROUGHS, D.J.

Plaintiff Akebia Therapeutics, Inc. ("Akebia") seeks a preliminary injunction, enjoining a decision of the Centers for Medicare & Medicaid Services ("CMS") which eliminated coverage under Medicare Part D for Akebia's product Auryxia for use in treating iron deficiency anemia in patients with chronic kidney disease. [ECF No. 15]. Because Akebia has failed to make a sufficient showing that it is likely to succeed on the merits or will suffer irreparable harm, Akebia's motion for a preliminary injunction, [ECF No. 15], is DENIED.

1

## I. BACKGROUND

### A. Medicare Part D

Medicare provides healthcare coverage for, in relevant part, (1) people age 65 and older; (2) people under the age of 65 with certain disabilities; and (3) people under the age of 65 with end-stage renal disease. 42 U.S.C. § 1395c. Medicare Part D provides low-cost prescription drug coverage to Medicare beneficiaries. Unlike other coverage under Medicare, Part D beneficiaries enroll in a Part D plan offered by private insurance companies. CMS contracts with these health insurance providers, called "sponsors," which in turn administer prescription drug plans to provide coverage for drugs that have been identified as "covered part D drugs." 42 U.S.C. § 1395w-102(a)(1), (b); 42 U.S.C. § 1395w-111(e)(2)(A); 42 U.S.C. § 1395w-112. Part D participants may choose from several benefits packages and sponsors, and pay a monthly premium for their selected plan.

Part D requires that plan sponsors pay for the actual costs of covered Part D drugs. 42 U.S.C. § 1395w-111(e)(2)(A). A "covered part D drug" is defined as "a drug that may be dispensed only upon a prescription" that has been "approved [by the U.S. Food and Drug Administration] for safety and effectiveness as a prescription drug under section 505" of the Federal Food, Drug, and Cosmetic Act. 42 U.S.C. § 1395w-102(e)(1)(A); 42 U.S.C. § 1396r-8(k)(2)(A)(i). Relevant to this case, the definition of "covered Part D drug" excludes "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations." 42 U.S.C. § 1395w-102(e)(2); 42 U.S.C. § 1396r-8(d)(2)(E).

### B. Akebia's Product, Auryxia

In December 2018, Akebia purchased Keryx Biopharmaceuticals ("Keryx"), which had developed the drug "Auryxia," an iron salt. According to Akebia, "Auryxia is a unique,

chemically synthesized organic compound called a ferric citrate 'coordination complex' and is distinct from the active ingredient in iron nutritional supplements." [ECF No. 16 at 8]. Akebia has obtained or is a licensee of fifteen patents covering Auryxia or methods of using the drug. [Id.]. Akebia alleges that Auryxia "does not merely replace missing iron," but "causes the body to transport ferric iron into the blood, where it 'can be incorporated into hemoglobin.'" [Id. at 9 (quoting ECF No. 25-5 at 7, FDA Label, Auryxia)].

Auryxia has been approved by the U.S. Food and Drug Administration ("FDA") for treatment of two diseases associated with chronic kidney disease.  In September 2014, the FDA approved Auryxia to treat hyperphosphatemia (elevated levels of phosphate in the blood) in patients with chronic kidney disease who receive dialysis.[1]  [ECF No. 25-5 at 2].  Following additional clinical trials, the FDA approved Auryxia in November 2017 to treat iron deficiency anemia in patients with chronic kidney disease who are not on dialysis.[2]  [ECF No. 25-5 at 2]. After the FDA's approval, CMS treated Auryxia as a covered Part D drug under the Medicare Part D Prescription Drug Program.

Almost a year after the approval of the second indication, CMS emailed Part D sponsors in September 2018 and revoked Part D coverage for the second indication, treating iron deficiency anemia in patients not on dialysis, and advised that Part D plan sponsors would require patients to obtain prior authorization before Auryxia could be reimbursed for the first indication, treating hyperphosphatemia.  In relevant part, that email provided:

---

[1] For this approval, Auryxia is labeled as "a phosphate binder indicated for the control of serum phosphorus levels in adult patients with chronic kidney disease on dialysis." [ECF No. 25-5 at 2].

[2] For this approval, Auryxia is labeled as "an iron replacement product indicated for the treatment of iron deficiency anemia in adult patients with chronic kidney disease not on dialysis." [ECF No. 25-5 at 2].

> The Centers for Medicare & Medicaid Services (CMS) is aware that the U.S. Food and Drug Administration (FDA) recently approved Auryxia® (ferric citrate) tablets for the treatment of iron deficiency anemia in adult patients with chronic kidney disease (CKD) not on dialysis.  Consistent with other iron products, ferric citrate was removed from the August CY 2018 formulary reference file (FRF).
>
> Given that Auryxia® is also indicated for the control of serum phosphorous levels in adult patients with chronic kidney disease on dialysis, and CMS does not consider it to be excluded from Part D for this use, Auryxia® will be added back to the September CY 2018 FRF (and will be maintained on the CY 2019 FRF).  Since Auryxia® may or may not meet the definition of a Part D drug depending on its use, we expect that Part D sponsors will utilize a prior authorization (PA) edit, or other process, to ensure that it is being used for a Part D covered indication.  Part D sponsors may add prior authorization to the affected RXCUI on both their CY 2018 and CY 2019 formularies.

[ECF No. 18-1 at 2].

Following the CMS email, Part D sponsors terminated coverage of Auryxia for its second indication, treatment of iron deficiency anemia, and required prior authorization for payment to ensure that Auryxia was being used for its first indication, treatment of hyperphosphatemia. [ECF No. 18 at 3].  Akebia met with a number of CMS and HHS officials in an effort to get Part D coverage reinstated.  [Id. at 3–4].  On August 23, 2019, it submitted a memo to HHS' General Counsel and Deputy General Counsel, as well as to CMS' Chief Legal Officer.  [Id.].  On October 4, 2019, CMS confirmed that it would not revisit its decision regarding Auryxia's Part D coverage.  [Id. at 4].

  **C. Procedural Background**

On October 15, 2019, Akebia filed its complaint in this action, alleging that CMS' decision is contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA").  [ECF No. 1].  Akebia then filed its motion for a preliminary injunction on October 29, 2019. [ECF No. 15].  The Court permitted briefing from amici Massachusetts Biotechnology Council, [ECF No. 39], the Medicare Advocacy Project of Greater Boston Legal Services, [ECF

No. 43], and the Center for Medicare Advocacy, Inc., [ECF No. 51], in support of Akebia's preliminary injunction. After the Court granted a motion to extend time to file its opposition, [ECF No. 42], the Government opposed on December 3, 2019, [ECF No. 48].[3]

## II.     DISCUSSION

### A.     Legal Standard

Preliminary injunctions function to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). As a result, "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir. 1968)). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' . . . 'that is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).

When deciding whether to grant a motion for preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). As the moving party, Akebia bears the burden of satisfying each of these four elements. See Nieves–Marquez v. P.R., 353 F.3d 108, 120 (1st Cir. 2003).

---

[3] On December 3, 2019, the Government also filed its motion to dismiss for lack of jurisdiction. [ECF No. 46].

The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Corp. Techs., 731 F.3d at 9.  Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10.  "[P]roving likelihood of success on the merits is the '*sine qua non*' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).  Therefore, "[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." Id.  (quoting New Comm Wireless Servs., 287 F.3d at 9).

### B.     Likelihood of Success on the Merits

Under 5 U.S.C. § 706, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).[4]

#### 1.     The Court Will Assume That the Email Is a Final Agency Action

Akebia seeks a judgment declaring that CMS acted arbitrarily and capriciously or contrary to the Medicare statute governing Part D drug coverage, 42 U.S.C. § 1395w-102(e). Under the Administrative Procedure Act, "Agency action made reviewable by statute and final

---

[4] Akebia argues that CMS' email to Plan D sponsors is not entitled to Chevron deference.  [ECF No. 16 at 16].  "In the usual course, when an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces, the interpretation receives [Chevron] deference if the statute is ambiguous and if the agency's interpretation is reasonable." Encino Motorcars, LLC v. Navarro, 136 S.Ct. 2117, 2124 (2016).  The Government does not seek any such deference for the CMS email.  [ECF No. 48 at 6].  The parties therefore agree that the CMS email is not entitled to deference under Chevron.  See, e.g., Davis v. Prof. Reps. Org., 666 Fed. App'x 433, 440–42 (6th Cir. 2016) (finding that an email was not entitled to Chevron deference because "it was not promulgated by the agency in the exercise of rule-making authority").

agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Akebia argues that the CMS email is a final agency action "because it (1) 'marks the consummation of the agency's decisionmaking process' and (2) is one 'from which legal consequences will flow.'" [ECF No. 16 at 11 n.2 (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)].

The Government argues that the CMS email is not a "final agency action" and therefore is not subject to judicial review. [ECF No. 48 at 6]. For purposes of Akebia's motion for a preliminary injunction, the Court will assume that there has been a valid final ruling.

        2.      Akebia Has Failed to Demonstrate That the CMS Decision Was "Not in Accordance with" the Medicare Statute

Akebia first argues that the CMS decision was "not in accordance with" the Medicare statute under the APA. See [ECF No. 16 at 11–17]; 5 U.S.C. § 706(2)(A). According to Akebia, the Medicare statute's plain meaning, context, and congressional purpose demonstrate that Auryxia should be covered.

Akebia asserts that Auryxia is not included within the plain meaning of a "mineral." If "Congress defines what a particular term 'means,' that definition controls to the exclusion of any meaning that is not explicitly stated in the definition." United States v. Roberson, 459 F.3d 39, 53 (1st Cir. 2006). Where, as here, Congress has not defined a statutory term, "[t]o determine ordinary meaning, [courts] may consult dictionary definitions, interpretations given to the same term by judicial construction, and the statutory context in which the words are used." Hernandez-Miranda v. Empresas Diaz Masso, Inc., 651 F.3d 167, 171 (1st Cir. 2011).

CMS determined that Auryxia is a "mineral product" under 42 U.S.C. § 1396r-8(d)(2)(E). Akebia claims that Auryxia is not included in the plain meaning of "mineral product," because it is neither naturally occurring nor inorganic. See, e.g., Heineman v. Terra Enters., LLC, 817 F. Supp. 2d 1049, 1058 (E.D. Tenn. 2011) (finding that "mineral" refers to "a solid homogenous crystalline chemical element or compound (as diamond or quartz) that results from the inorganic processes of nature and that has a characteristic crystal structure and chemical composition or range of compositions") (quoting Webster's Third International Dictionary 1437 (1993)). The Government responds that a "mineral product" could include a synthetic, organic compound like Auryxia and that dictionary definitions of "mineral" are disfavored. See [ECF No. 48 at 7]; Watt v. Western Nuclear, Inc., 462 U.S. 36, 42–43 (1983) ("[T]he word 'minerals' is used in so many senses, dependent on the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case." (internal citations and quotation marks omitted)).

Akebia defines "mineral product" too narrowly. "Mineral product," for purposes of the statute, cannot be read to refer only to naturally occurring inorganic compounds. First, the statute itself includes an exception from the mineral product exclusion for "fluoride preparations," which are covered under Part D, meaning that they would otherwise fall into the mineral product exclusion. See 42 U.S.C. § 1396r-8(d)(2)(E) (excluding "[p]rescription vitamins and mineral products, except prenatal vitamins and fluoride preparations"). "Fluoride preparations" are not naturally occurring inorganic compounds. Therefore, Congress anticipated that the mineral exclusion could include products that were not naturally occurring inorganic compounds. Second, the statute has not previously been read to mean that "mineral products" would refer exclusively to naturally occurring inorganic compounds. For example, Polysaccharide Iron Complex, another manufactured compound that contains mineral iron, is not

naturally occurring, yet is not covered under Part D because it is a "mineral product." [ECF No. 49-1 at 56]. Akebia has therefore failed to demonstrate that CMS' interpretation of "mineral product" is contrary to the plain meaning of the statute.

### 3. Akebia Has Not Demonstrated That CMS' Decision Was Arbitrary or Capricious

Akebia argues that CMS' decision regarding Auryxia coverage was arbitrary or capricious, first, because the agency treated Auryxia differently from other similar products that receive Part D coverage and, second, because the agency found that Auryxia may be a covered product depending on its use.

#### a. Inconsistent Prior Treatment of Other Products

Akebia argues that CMS' decision was arbitrary and capricious because it departed from the agency's treatment of similar products that receive Part D coverage. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC, 136 S.Ct. at 2125; see also Harrington v. Chao, 280 F.3d 50, 58 (1st Cir. 2002) ("[I]t is commonplace in APA review to require an agency to accompany a change in position with an explanation."). "An agency's decision cannot simply depart from the agency's prior precedent without explaining its reasoning for doing so." Harrington, 280 F.3d at 58 (citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973)).

"The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Penobscot Air Servs., Ltd. v. F.A.A., 164 F.3d 713, 719 (1st Cir. 1999) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). "While this is a highly deferential standard of review, it is not

a rubber stamp." Id. at 720 (quoting Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43.

In denying Part D coverage for Auryxia when used to treat iron deficiency anemia, the CMS decision explained that "[c]onsistent with other iron products," Auryxia was removed from the formulary reference file. [ECF No. 1-1 at 2]. Under 42 U.S.C. § 1396r-8(d)(2)(E), "mineral products," including iron products, are excluded from coverage. It is therefore necessary to determine whether "other iron products," as referenced by CMS, are usually excluded from Part D coverage as "mineral products" under the statute.

As discussed above, supra Section II.B.2, Polysaccharide Iron Complex, an iron product, is not covered under Part D because CMS has determined that it is a "mineral product" and therefore excluded from coverage. [ECF No. 49-1 at 56]. Similarly, "[i]njectable or IV iron products such as Iron Dextran, Iron Sucrose[,] and Sodium ferric gluconate," all of which are used to treat iron deficiency anemia, like Auryxia, are not covered under Part D because they are "[p]rescription vitamin/mineral product[s]." [ECF No. 49-1 at 54]. Finally, prescription iron supplements are excluded from coverage under Part D. [ECF No. 49-1 at 56]. Therefore, CMS consistently treats iron products as not covered under Part D when used as an iron replacement.

Beyond directly analogous iron products, however, Akebia argues that Auryxia was treated inconsistently based on four other classifications: (1) "covered products that include a synthetically derived mineral component combined with citric acid"; (2) vitamin D analogs; (3) niacin-based drug products; and (4) inorganic mineral salts. [ECF No. 16 at 18–20].

First, Akebia asserts that CMS has covered products that include a synthetically derived mineral product combined with citric acid. [ECF No. 16 at 18]. Those products, however, are

10

covered when they are used to treat diseases unrelated to a mineral deficiency. Lithium salts, for example, are covered under Part D when used as a mood stabilizer, [ECF No. 25-13 at 2], but are not covered to address a lithium deficiency. CMS routinely denies coverage to mineral products when used only to treat a mineral deficiency. The decision to cover Auryxia when used to treat elevated levels of phosphate, but not to cover Auryxia when used to treat iron deficiency, was therefore consistent with CMS' prior decisions regarding synthetically derived mineral products.

Second, Akebia claims that the CMS's decision regarding coverage of Auryxia is inconsistent with previous decisions that provided Part D coverage to Vitamin D analogs, including chemically synthesized organic drug substances. [ECF No. 16 at 19]. The Government concedes that these other products "are in some ways similar to Auryxia: they are chemically synthesized compounds that are often prescribed to chronic kidney disease patients to treat conditions arising from vitamin deficiencies." [ECF No. 48 at 12]. CMS guidance explains that "Vitamin D analogs such as calcitriol, doxercalciferol, and paricalcitol," are covered "when used for a medically-accepted indication . . . ." [ECF No. 49-1 at 15]. Specifically, those analogs are indicated for prevention and treatment of hyperparathyroidism associated with chronic kidney disease. [ECF No. 25-16 at 10]. "CMS interprets the exclusion of prescription Vitamin D products as being limited to products consisting of ergocalciferol (vitamin D2) and/or cholecalciferol (vitamin D3)," which are used to treat Vitamin D deficiency. [ECF No. 49-1 at 15]. Therefore, consistent with other decisions, CMS denies Part D coverage for Vitamin D analogs when used to treat Vitamin D deficiency, but provides coverage when used to treat a different condition, such as hyperparathyroidism. [ECF No. 49-1 at 56–57]. If used to treat a vitamin deficiency, then the products would be excluded under Part D as prescription vitamins, part of the same statutory exclusion at issue in this case. See [ECF No. 25-15 at 14].

Third, Akebia maintains that CMS has previously covered synthetically produced drugs where "the active ingredient . . . is a common, naturally occurring form of Vitamin B3," [ECF No. 16 at 19], and that if CMS is going to cover a naturally occurring vitamin, then it must cover a synthetically produced mineral. But, in explaining why these Vitamin B3 products are covered, CMS has said that they "are approved by the [FDA] as safe and effective drugs, are used therapeutically for the treatment of dyslipidemia, and do not serve as nutritional supplements or address a vitamin deficiency." [ECF No. 25-18 at 2]. The Vitamin B3 products are therefore covered because they are not treating a Vitamin B deficiency. Again, this evidences CMS' consistency in denying Part D coverage to Auryxia, an iron replacement product, when used to treat iron deficiency anemia.

Finally, Akebia notes that CMS' denial of coverage for Auryxia was inconsistent with the agency's prior coverage of drugs that consist of inorganic salts, like Auryxia. [ECF No. 16 at 20]. Specifically, several "calcium-based mineral salts" and "potassium chloride" products are covered under Part D, even for treatment of a deficiency of that specific substance. [Id.]. These substances have been approved for coverage as electrolytes, however. [ECF No. 48 at 11–12]. When a substance contains both electrolyte and non-electrolyte minerals, it is excluded from coverage under Part D if it is used to replace the mineral. [Id. at 12 n.7]. For example, Potassium Iodide products, which combine an electrolyte with a mineral, are not covered under Part D "because they are not used for potassium supplementation." [ECF No. 49-1 at 53]. If, however, the product is used to replenish electrolytes, then it is covered under Part D. Therefore, a mineral supplement may be covered under Part D for replenishing electrolytes, so long as it is not simply treating a mineral deficiency. The decision to deny coverage for Auryxia under Part D was therefore consistent with CMS' treatment of other non-electrolyte mineral products.

Akebia has thus failed to demonstrate that CMS "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Massachusetts v. U.S. Nuclear Regulatory Comm'n, 708 F.3d 63, 73 (1st Cir. 2013) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)).

Given the prior treatment of analogous products, as well as CMS' treatment of iron products specifically, CMS was consistent in denying coverage under Part D for Auryxia when it is used to treat iron deficiency anemia. Further, vitamin and mineral products are not covered when used to treat a deficiency of that specific vitamin or mineral, but may be covered when used to treat a different issue. Supra at 10–11. Finally, iron products are frequently not covered under Part D because they are "mineral products" under 42 U.S.C. § 1396r-8(d)(2)(E), though they may be covered when categorized as an "electrolyte" used for electrolyte replenishment and not for simply treating a mineral deficiency. Supra at 12.

The Auryxia decision therefore reflects a consistent application of CMS' prior rulings. Auryxia, an iron replacement product, has been approved for two indications: (1) treating elevated levels of phosphate in the blood in patients with chronic kidney disease who receive dialysis; and (2) treating iron deficiency anemia in patients with chronic kidney disease who are not on dialysis. The first indication is still a covered treatment. The second indication, however, uses Auryxia to treat an iron deficiency. Auryxia, labeled as "an *iron replacement product*[,] [is] indicated for the treatment of *iron deficiency* anemia in adult patients with chronic kidney disease not on dialysis." [ECF No. 25-5 at 2 (emphasis added)]. It is therefore an iron-based mineral product that is being used to treat an iron deficiency. CMS does not cover vitamins or

13

minerals being used to treat a corresponding vitamin or mineral deficiency. Auryxia's second indication is therefore not a covered use under Part D. At this early state of the litigation, Akebia has failed to demonstrate that the decision was arbitrary and capricious.

                        b.        Inconsistent Treatment of Auryxia's Two Indications

Akebia also argues that the CMS decision is arbitrary and capricious because it treats Auryxia differently for its two FDA-approved indications, providing coverage under Part D for one use and denying coverage for its other approved use. "An '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" Encino Motorcars, LLC, 136 S.Ct. at 2120, 2126 (quoting Nat'l Cable & Telecomm. Assn. v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)). Auryxia has been approved to treat hyperphosphatemia and to treat iron deficiency anemia. CMS explained that Auryxia "may or may not meet the definition of a Part D drug depending on its use." [ECF No. 1-1 at 2]. Specifically, Auryxia would be considered a "mineral product" when used to treat iron deficiency anemia in patients with chronic kidney disease, but would be a covered Part D drug when used to treat hyperphosphatemia in patients with chronic kidney disease on dialysis.

The relevant exclusion provides that certain "drugs or classes of drugs, *or their medical uses*, may be excluded from coverage or otherwise restricted . . . ." 42 U.S.C. § 1396r-8(d)(2) (emphasis added). CMS therefore properly considers the product's use when determining coverage. For example, though cough and cold medications are generally not covered under Part D, CMS guidance in the Medicare Prescription Drug Benefit Manual notes that they "are eligible to meet the definition of a Part D drug *in clinically relevant situations other than those of symptomatic relief of cough and/or colds*." [ECF No. 49-1 at 15 (emphasis added)]. When these cough suppressants are used not to treat a cough, but "to treat a medical condition that causes a

cough, such as bronchodilators for the treatment of bronchospasm in asthma, CMS does not consider these 'cough' medications as excluded drugs and, therefore, these medications may be covered under Part D." [Id.].  This is consistent with CMS' treatment of Auryxia's two indications.  Auryxia is not covered when used to treat iron deficiency, because it is a mineral product used to address a deficiency of that same mineral, but is covered when used to treat something besides iron deficiency, specifically high levels of phosphorous due to chronic kidney disease.

> **C. Akebia Has Not Demonstrated That It Is Likely to Suffer Irreparable Harm Without a Preliminary Injunction**

"[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  Arborjet, 794 F.3d at 173 (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).  The Court nonetheless notes, however, that Akebia also would likely have been unable to make a sufficient showing of irreparable harm.

"Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction."  Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  "[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction."  Suero v. Fed. Home Loan Mortg. Corp., No. 13-cv-13014, 2013 WL 6709001, at *7 (D. Mass. Dec. 17, 2013 (quoting Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 506 N.E.2d 140, 142 (Mass. 1987)).  If, however, "the loss threatens the very existence of the movant's business," economic losses may be sufficient.  Id.

Auryxia is Akebia's only commercially marketed product. Akebia claims that the Medicare Part D program "accounts for approximately 60%" of the iron deficiency anemia market for the product. [ECF No. 16 at 22]. Akebia therefore claims that it has already incurred millions of dollars in costs and will sustain even more losses in revenue going forward.

Further, as Akebia notes, it would not be able to recover damages for its alleged losses stemming from the CMS decision, because sovereign immunity bars recovery of damages in this case. "The government does not dispute Akebia's assertion that, in the absence of a waiver of sovereign immunity, Akebia cannot seek money damages from the United States." [ECF No. 48 at 14].

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995). "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985). CMS issued its decision in September 2018. Akebia purchased Keryx, which developed Auryxia, in December 2018. Akebia then spent months in discussions with representatives from CMS in an attempt to persuade the agency to reverse its decision regarding Auryxia's coverage. It was not until October 2019 that Akebia filed its motion for injunctive relief. Given that Akebia knew of the CMS decision at the time that it purchased Keryx, it strikes the Court as disingenuous for Akebia to now say that it will suffer irreparable harm if the Court does not enjoin an agency decision that was made before Akebia even took interest in the product. See, e.g., Oxford

Immunotec Ltd., 271 F. Supp. 3d at 368–69 (finding that plaintiff company failed to demonstrate irreparable harm when it waited eight months to file a preliminary injunction); see also Voice of the Arab World, Inc., 645 F.3d at 36–37 (discussing Citibank, N.A. 756 F.2d at 276, and finding that plaintiff's delay "undercut" a finding of irreparable harm).

Further, Akebia has not included any financial records or other data to support the predicted losses. Although a declaration from an executive officer notes that the company has experienced lower revenues and a lower rate of growth than it had projected, it has not offered an explanation for those numbers, such as financial reports. See, e.g., Braintree Labs, Inc. v. Citigroup Global Markets, Inc., 622 F.3d 36, 42 (1st Cir. 2010) ("[A]lthough Braintree stressed at oral argument that its case is exceptional because its year-to-year performances would be too volatile to provide such a reference point, there is no record evidence to support that contention. Braintree's mere say-so is insufficient to convert its desire for prejudgment cash into a justification for a prejudgment injunction.").

### III. CONCLUSION

Accordingly, Akebia's motion for a preliminary injunction, [ECF No. 15], is DENIED. Akebia has failed to make a sufficient showing that it is likely to succeed on the merits. At this time, Akebia has failed to demonstrate that CMS' decision regarding Part D coverage for Auryxia when used to treat iron deficiency anemia was inconsistent with its prior rulings. Additionally, Akebia has failed to demonstrate that it is likely to suffer irreparable harm that would justify injunctive relief.

**SO ORDERED.**

February 4, 2020                               /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE