UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AKEBIA THERAPEUTICS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 19-cv-12132-ADB |
| | * | |
| XAVIER BECERRA,[1] in his official capacity as Secretary of Health and Human Services, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER ON MOTION TO DISMISS

BURROUGHS, D.J.

Plaintiff Akebia Therapeutics, Inc. ("Akebia") brings this action seeking declaratory and injunctive relief concerning a decision by the Centers for Medicare and Medicaid Services ("CMS") that eliminated coverage under Medicare Part D for Akebia's drug, Auryxia, for use in treating iron deficiency anemia ("IDA") in patients with chronic kidney disease ("CKD") who are not on dialysis. [ECF No. 1 ("Compl.")]. Akebia maintains that CMS's decision violates the Administrative Procedure Act ("APA") and requests, among other things, an injunction requiring the Government to rescind the decision.[2] [Id. at 27]. Currently before the Court is the Government's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Becerra is substituted for his predecessor, Alex M. Azar II. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[2] For brevity, the Court refers to defendants collectively as the "Government."

dismiss for failure to state a claim.  [ECF No. 46].  For the reasons set forth below, the motion is

DENIED.

## I.     BACKGROUND

### A.     Regulatory Scheme and Factual Background

Rather than providing its own account of the regulatory scheme at issue and the relevant

factual background, the Court simply adopts the First Circuit's cogent summary:

> The federal Medicare statute provides health-care coverage for certain segments of
> the United States population, particularly individuals sixty-five years of age or
> older and individuals with certain disabilities (regardless of age).  Medicare is
> divided into several parts, each corresponding to a different dimension of the
> health-care landscape.  This case revolves around Medicare Part D, which addresses
> prescription drug coverage for Medicare beneficiaries.
>
> As opposed to other types of Medicare coverage, through which the federal
> government pays health-care providers directly in a typical fee-for-service
> arrangement, Medicare Part D involves a contractual relationship with private
> insurance companies known as "sponsors."  Medicare beneficiaries select their
> preferred sponsor and benefits package and pay a monthly premium to the chosen
> sponsor.  In turn, the sponsor receives reimbursement from the Medicare program
> for the cost of covered drugs.
>
> As a default, Part D requires sponsors to provide Medicare beneficiaries access to
> all covered Part D drugs, subject to various exclusions.  A covered Part D drug is a
> drug dispensed by means of a prescription that the federal Food and Drug
> Administration (FDA) has approved as safe and effective.  In enacting Part D,
> Congress specified several categories of drugs that CMS may exclude from
> coverage.
>
> The battleground in this case is a category of excluded drugs encompassing
> "[p]rescription vitamins and mineral products, except prenatal vitamins and
> fluoride preparations."  At the center of the dispute is the scope of this category,
> specifically, whether or not Auryxia, when prescribed for treatment of IDA in
> patients with CKD, constitutes a "mineral product" that CMS may properly exclude
> from coverage. . . .
>
> In September of 2014, the FDA approved Auryxia for the treatment of
> hyperphosphatemia (elevated phosphate levels in the blood), a condition commonly
> associated with CKD, for patients who are receiving dialysis.  Over three years later
> (in November of 2017), the FDA approved Auryxia for a second use: the treatment
> of IDA in patients with CKD who are not on dialysis.  Akebia, which now owns

Auryxia,[3] describes the drug as a ferric citrate coordination complex that differs from traditional iron supplements in that it facilitates iron transport to the blood rather than simply replacing missing iron. This distinction is salient, Akebia insists, because Auryxia can be used to treat patients who have sufficient iron stores but have difficulty transporting the iron to the blood in order to create red blood cells. Seen in this light, Auryxia offers an alternative to intravenous or oral iron supplements in situations in which such traditional iron supplements are ineffective for patients who have sufficient iron in their bodies but suffer from inadequate iron transportation to the blood.

Although Auryxia initially was covered under Part D for both of its permitted uses, CMS e-mailed sponsors in September of 2018, informing them that CMS had decided to exclude Auryxia from coverage when used to treat IDA in patients with CKD who are not on dialysis. CMS's e-mail stated that "[c]onsistent with other iron products, ferric citrate was removed" from the list of drugs covered under Part D. Following this guidance, Medicare sponsors thereafter refused to cover Auryxia when prescribed to treat IDA.

Inheriting the existing state of Medicare coverage in December of 2018, Akebia made repeated efforts to extract information from CMS about the coverage determination and to persuade CMS to revisit it. These efforts included outreach to CMS, in-person meetings with CMS officials, and a formal legal memorandum submitted to both [the Department of Health and Human Services ("HHS")]'s General Counsel and CMS's Chief Legal Officer. Akebia's campaign proved unavailing: on October 4, 2019, CMS affirmed its coverage determination, making clear that it would not revisit its position.

Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 89–90 (1st Cir. 2020) (citations omitted). To the extent the parties dispute relevant facts, the Court, as it must when deciding a motion to dismiss, gives credence to Akebia's factual allegations and draws all reasonable inferences in its favor.

See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

---

[3] In December of 2018, Akebia purchased Keryx Biopharmaceuticals, which had developed Auryxia.

## B.     Procedural Background

On October 15, 2019, Akebia, invoking federal question jurisdiction pursuant to 28 U.S.C. § 1331,[4] filed its complaint, alleging that CMS's decision regarding Auryxia violates the APA because it is both contrary to law and arbitrary and capricious.  [Compl. ¶¶ 53–70].  On October 29, 2019, Akebia moved for a preliminary injunction.  [ECF No. 15].  On December 3, 2019, the Government opposed the preliminary injunction motion, [ECF No. 48], and also filed a motion to dismiss, [ECF No. 46].  With respect to the motion to dismiss, the Government argued that the Court lacks subject matter jurisdiction to resolve Akebia's claims because they have not been presented and exhausted administratively as required by the Medicare Act and, even assuming jurisdiction, Akebia has failed to state a viable claim because there has been no final agency action, which is a requirement for judicial review under the APA.  [ECF No. 47 at 8–16].  Akebia opposed the Government's motion to dismiss on December 16, 2019, [ECF No. 59], and the Government filed a reply on January 13, 2020, [ECF No. 71].[5]

On February 4, 2020, the Court denied Akebia's motion for a preliminary injunction without reaching the issues raised in the Government's motion to dismiss.  [ECF No. 72].  Pursuant to 28 U.S.C. § 1292(a)(1), which permits litigants to appeal interlocutory orders denying requests for preliminary injunctions, Akebia appealed the Court's ruling to the First Circuit.  See [ECF No. 73].  The Court then denied the Government's motion to dismiss with

---

[4] Akebia also seems to rely on the APA, see [Compl. ¶ 13 (citing to 5 U.S.C. § 702)], but the APA itself does not confer subject matter jurisdiction, see Conservation L. Found., Inc. v. Busey, 79 F.3d 1250, 1261 (1st Cir. 1996) ("While the APA does not provide an independent source of subject matter jurisdiction, it does provide a federal right of action where subject matter jurisdiction exists under 28 U.S.C. § 1331 (giving district courts jurisdiction of all civil actions arising under the laws of the United States).").

[5] With the Court's permission, the Medicare Advocacy Project filed an amicus brief opposing the Government's motion to dismiss.  [ECF No. 64].

leave to renew, reasoning that because that motion touched on Akebia's then-pending interlocutory appeal, the Court lacked jurisdiction to consider it. [ECF No. 82 at 7].

On September 30, 2020, the First Circuit affirmed the Court's denial of Akebia's motion for a preliminary injunction. See [ECF No. 84]; Akebia Therapeutics, 976 F.3d at 89. In its opinion, the First Circuit did not resolve the issues raised in the Government's motion to dismiss, but it did briefly address them:

> In this venue, as in the court below, CMS argues that the dispute between the parties is not fit for judicial review. This argument rests on two pillars. First, CMS says that Akebia did not properly channel its grievances through the agency's internal appeals processes. Second, CMS says that its coverage determination e-mail does not constitute final agency action and, thus, is not ripe for judicial review under the APA.
>
> With respect to the first of these claims, CMS posits that Akebia has flouted the internal appeals process by attempting an end run around the Medicare Appeals Council (through which all coverage disputes arising under the Medicare statute must be channeled). In response, Akebia brands this review process as inapposite, complaining that only Medicare beneficiaries—not drug manufacturers—have standing to bring administrative appeals to the Medicare Appeals Council. So, Akebia's thesis runs, it should be excused from compliance with the existing review structure because that structure affords "no review at all" for its grievances.
>
> Akebia's response strikes a nerve: CMS concedes that there is no intra-agency mechanism through which drug manufacturers may challenge coverage determinations for Medicare Part D. But CMS suggests that this is Akebia's tough luck, and CMS would leave Akebia high and dry, forcing Akebia to rely on individual beneficiaries to challenge the contested coverage determination to Akebia's behoof.
>
> With respect to its second nonjusticiability claim, CMS suggests that the September 2018 e-mail (which contained the adverse coverage determination) was merely guidance to Medicare sponsors and, thus, not final agency action. Since a "final agency action" is a prerequisite to judicial review under the APA, CMS submits that a reviewable Part D coverage determination may only be made by the Medicare Appeals Council.
>
> Akebia demurs. The September 2018 e-mail, it says, satisfies the requirements for final agency action because it is a decision that marks the consummation of CMS's decisionmaking process (rather than a tentative decision) and is plainly a decision from which legal consequences flow. In this regard, Akebia notes both the apparent

finality of CMS's coverage determination and the fact (which CMS does not deny) that Medicare sponsors are now expected to comply with this determination.

In appellate review, as in life, discretion is sometimes the better part of valor. The parties' arguments weave a jurisdictional riddle, which is both intricate and difficult to resolve. We are, however, steadfast in our belief that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." So it is here.

To decide this appeal, it is not necessary for us to determine either whether Akebia has exhausted its intra-agency remedies or whether the CMS e-mail constituted final agency action. Although hypothetical jurisdiction is generally disfavored, such a barrier is insurmountable only when Article III jurisdiction is in issue. The justiciability questions that CMS poses relate only to our statutory jurisdiction, not our Article III jurisdiction (which is not in doubt). Precedent teaches that where, as here, an appeal presents a question of statutory jurisdiction, that question need not be resolved if a decision on the merits will favor the party challenging the court's jurisdiction. Because this is such a case, we (like the court below) bypass the jurisdictional issue and go directly to the parties' dueling over the denial of preliminary injunctive relief.

Akebia Therapeutics, 976 F.3d at 91–92 (citations omitted).

Following the First Circuit's decision, the parties attempted to mediate, see [ECF Nos. 86, 87, 98, 99], but were unsuccessful, see [ECF No. 100]. During an April 8, 2021 status conference, the Government renewed its motion to dismiss, and the parties agreed on a schedule for short supplemental submissions. [ECF No. 104]. Those submissions were filed on April 22, 2021, [ECF No. 107 (Government)], and May 6, 2021, [ECF No. 108 (Akebia)].

## II.     DISCUSSION

As noted by the First Circuit, the Government makes two arguments in favor of dismissal. First, that the Court lacks subject matter jurisdiction to adjudicate Akebia's claims because they have not been presented and exhausted administratively. [ECF No. 47 at 8–12]. Second, that, even if the Court did have jurisdiction, the CMS decision at issue in this case was

not a final agency action and it is therefore unreviewable under the APA.  [Id. at 12–16].

Because neither argument is persuasive, the Government's motion, [ECF No. 46], is <u>DENIED</u>.

### A. Subject Matter Jurisdiction

42 U.S.C. § 1395ii provides that certain provisions of the Social Security statute apply, *mutatis mutandis*, to the Medicare statute.  42 U.S.C. § 1395ii ("The [applicable] provisions . . . shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II, except that, in applying such provisions with respect to this subchapter, any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively.").  One such provision of the Social Security statute, 42 U.S.C. § 405(h), states:

> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing.  No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h).  Thus, "[t]he third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g) [the subsection describing how to obtain judicial review of a final decision by the Commissioner], to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." <u>Heckler v. Ringer</u>, 466 U.S. 602, 614–15 (1984); <u>see</u> <u>Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United States</u>, 521 F.3d 46, 48 (1st Cir. 2008) ("Under 42 U.S.C. § 405(h), which in terms relates to the Social Security program but is incorporated *mutatis mutandis* into the Medicare Act, neither federal question nor federal defendant jurisdiction is available for suits 'to recover on any claim arising under' the Act." (citation omitted)).  Although § 405(h)'s scope is

broad, <u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. 1, 13 (2000) (noting that "it demands the 'channeling' of virtually all legal attacks through the agency, [and] it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying 'ripeness' and 'exhaustion' exceptions case by case"), it is not all-encompassing, <u>id.</u> at 19. Section "1395ii does not apply § 405(h) [to the Medicare statute] where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." <u>Id.</u>

Akebia seeks to invoke the exception from <u>Illinois Council</u>, arguing that "because the Medicare statute does not provide a mechanism for a drug manufacturer like Akebia to seek agency review of a determination by CMS that a drug is not a covered Part D drug, . . . denying judicial review under the APA therefore would foreclose judicial review entirely."[6] [ECF No. 59 at 12]. The Government responds that, even though Akebia cannot administratively challenge whether Auryxia is covered by Part D, the "no review" exception from <u>Illinois Council</u> is unavailable because individual Part D participants can mount the challenge, therefore allowing a meaningful review. [ECF No. 47 at 10–12; ECF No. 71 at 2–5]. Thus, while the parties agree that pharmaceutical companies like Akebia cannot challenge Part D coverage determinations administratively, [ECF No. 47 at 2 (Government's concession that Akebia "itself cannot be a party to such a proceeding before the agency"); ECF No. 59 at 12 (Akebia noting that "the Medicare statute does not provide a mechanism for a drug manufacturer like Akebia to seek

---

[6] Because Akebia does not appear to dispute that this case is an action "to recover on a[] claim arising under" the Medicare statute, and is therefore governed by § 405(h), the Court will assume, for present purposes, that it is.

agency review")], they disagree about what follows from that fact.[7]  The Government contends

that Akebia is out of luck and must rely on individual Part D participants to pursue the issue

administratively; Akebia maintains that it is permitted to challenge the coverage determination in

---

[7] The parties agree that a Part D beneficiary can administratively challenge his or her sponsor's decision that a particular drug is not covered under Part D.  See [ECF No. 47 at 4–6; ECF No. 59 at 12–18].  That process involves multiple steps.  First, the beneficiary must seek review by the sponsor.  See 42 U.S.C. §§ 1395w-104(g), 1395w-22(g)(1)–(3); 42 C.F.R. § 423.566(b)(1).  Second, if the sponsor denies coverage, a beneficiary, an appointed representative, or a prescribing physician may request a redetermination by the sponsor.  See 42 C.F.R. §§ 423.580, 423.586.  Third, a beneficiary, an appointed representative, or a prescribing physician may seek additional review from an independent contractor.  See 42 U.S.C. §§ 1395w-104(h), 1395w-22(g)(4)–(5); 42 C.F.R. 423.600.  Fourth, a beneficiary or appointed representative may request a hearing in front of an administrative law judge ("ALJ") at the Office of Medicare Hearings and Appeals ("OMHA"), subject to a statutory amount-in-controversy requirement.  See 42 U.S.C. § 1395w-104(g)(5); 42 C.F.R. § 423.2002.  Fifth, a beneficiary or appointed representative may appeal an adverse OMHA decision to the Medicare Appeals Council ("MAC").  See 42 C.F.R. §§ 423.2100, 423.2102, 423.2130.  Finally, a beneficiary may seek judicial review of an adverse MAC decision.  See 42 U.S.C. §§ 1395w-104(h)(1), 1395w-22(g)(5); 42 C.F.R. §§ 423.2006(b), 423.2100, 423.2102, 423.2130.

The parties also agree regarding the deference that would be afforded to the CMS decision at issue in this case if an individual beneficiary challenged a sponsor's non-coverage of Auryxia under Part D:

> (a) ALJs or attorney adjudicators and the [MAC] are not bound by CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case.
>
> (b) If an ALJ or attorney adjudicator or [MAC] declines to follow a policy in a particular case, the ALJ or attorney adjudicator or [MAC] decision must explain the reasons why the policy was not followed.  An ALJ or attorney adjudicator or [MAC] decision to disregard a policy applies only to the specific coverage determination or at-risk determination being considered and does not have precedential effect.

42 C.F.R. § 423.2062.  Thus, in an administrative review of a Part D participant's claim that Auryxia should be covered, the ALJ and/or MAC would either adhere to the CMS decision by denying coverage or disregard the CMS decision (but only for that particular participant).  An administrative challenge by an individual participant, would not, however, lead to an ALJ or MAC decision—with any precedential effect or more general applicability—that Auryxia is covered under Part D.

federal court. Given that both parties are ably represented and neither has cited a case directly on point, the precise issue presented here appears to be one of first impression.

Akebia bears the burden of establishing that the Court has subject matter jurisdiction over its claims, see Klimowicz v. Deutsche Bank Nat'l Tr. Co., 907 F.3d 61, 64 (1st Cir. 2018), and, for the reasons below, the Court finds that it has met its burden.

The only First Circuit case discussing § 405(h) cited by either party is Puerto Rican Ass'n of Physical Medicine & Rehabilitation, Inc. v. United States. In that case, an association of Puerto Rican doctors "sued to challenge a regulation restricting Medicare reimbursement for physical therapy services." 521 F.3d at 47. After concluding that the plaintiff's suit was one "to recover on any claim arising under" the Medicare statute, and therefore covered by § 405(h), id. at 48, the court rejected plaintiff's argument that the "no review" exception from Illinois Council applied, id. at 49. In so doing, the court noted that "doctors and therapists [who were members of the plaintiff-association] certainly ha[d] ample economic incentive to frame and support a test case," which meant, in effect, that the plaintiff could "at some point, using some process, obtain judicial review of its claims." Id.

Given the dearth of on-point First Circuit cases, the parties rely on cases from other Circuits. The two cases identified by the parties that are most factually similar to this one are Sensory Neurostimulation, Inc. v. Azar, a 2020 Ninth Circuit case, and Baxter Healthcare Corp. v. Weeks, a 2009 District of Columbia case. Both involved plaintiffs, like Akebia, on the periphery of the Medicare system: a medical device supplier in Sensory Neurostimulation and a drug manufacturer in Baxter.

In Sensory Neurostimulation, the Ninth Circuit addressed whether the district court had subject matter jurisdiction over a suit filed by a medical device supplier seeking to have

Medicare cover its product. 977 F.3d 969, 973 (9th Cir. 2020). Although medical device makers, like the plaintiff in that case, may request a national coverage determination ("NCD") that a given device is covered, see id. at 974, only individual beneficiaries, known as "aggrieved parties," can appeal the government's decision not to issue an NCD (and aggrieved parties cannot assign their rights), see id. at 974–75.[8] The question presented, therefore, was "what, if any, rights to appeal are available to NCD requestors like [plaintiff] who are not Medicare beneficiaries." Id. at 975. After noting that the plaintiff could not "directly avail itself of th[e] administrative channel," the court found that the fact that the plaintiff "could indirectly avail itself of th[e] channel . . . [wa]s enough to take th[e] case out of the [Illinois Council] exception,"[9] and therefore affirmed the district court's dismissal based on lack of subject matter jurisdiction. Id. at 983–84.

In Baxter, the plaintiff, a pharmaceutical company, alleged that the government had violated the APA by treating its drug, which was used to control and prevent bleeding in hemophiliacs, as a "multiple source drug" under the Medicare statute.[10] 643 F. Supp. 2d 111, 113 (D.D.C. 2009). The government made a number of arguments, including, as is relevant here, that § 1395ii divested the court of jurisdiction over the plaintiff's claim. See id. at 115–16. In that case, as in this one, the government conceded that the plaintiff "itself could not access HHS'

---

[8] The "result of that appeal is a final agency action subject to judicial review." Sensory Neurostimulation, 977 F.3d at 974.

[9] The court identified two ways for the plaintiff to seek administrative review: "either accept assignment of an individual claim for benefits and pursue that claim or recruit an aggrieved party to file a request for an NCD then challenge an adverse decision through the [administrative] appeals process." Sensory Neurostimulation, 977 F.3d at 981.

[10] "'[M]ultiple source drugs' and 'single source drugs or biologicals' are reimbursed at different rates." Baxter, 643 F. Supp. 2d at 113.

administrative review process," but argued that the claim was still barred because the plaintiff "could find a doctor or a hospital to present its claims for HHS adjudication." Id. The district court rejected this argument, finding that the plaintiff was "not suing on behalf of anyone who could seek administrative review of its claims" and was not "require[d] . . . to recruit a physician or hospital to act as its proxy in an administrative process." Id. at 116.

The other cases relied upon by the parties, though factually distinguishable, still provide helpful guidance. In two—Council for Urological Interests v. Sebelius and Action Alliance of Senior Citizens v. Leavitt—the D.C. Circuit found that § 405(h) did not preclude federal question jurisdiction. In the other three—Southwest Pharmacy Solutions, Inc. v. Centers for Medicare and Medicaid Services, Physician Hospitals of America v. Sebelius, and American Chiropractic Ass'n, Inc. v. Leavitt—the respective courts found that jurisdiction was lacking.

In Council for Urological Interests, "an association of doctor-owned equipment providers challenge[d] regulations issued by the [government] that effectively prevent its members from obtaining Medicare reimbursement for their services." 668 F.3d 704, 705 (D.C. Cir. 2011). The government raised a subject matter jurisdiction challenge under § 405(h),[11] and the court viewed the case as presenting the following question: "How does section 405(h) apply when the Medicare Act provides an avenue for administrative and judicial review of a particular claim . . . but not by the category of affected parties who wish to bring it . . . ?" Id. at 708. In assessing § 405(h)'s potential applicability, the court stated:

> Although . . . the Illinois Council exception is primarily concerned with whether a
> particular *claim* can be heard through Medicare Act channels, we see nothing in the

---

[11] The government also argued, to no avail, that "the failure of anything in the Medicare Act to provide administrative remedies for non-Medicare providers, such as the [plaintiff] and its members, reflects congressional intent to limit the right of judicial review to Medicare providers." See Council for Urological Interests, 668 F.3d at 708–11. Here, because neither party has made arguments concerning congressional intent, the Court does not address it.

case law requiring us to disregard factors that speak to a potential proxy's willingness and ability to pursue the plaintiff's claim. To the contrary, the <u>Illinois Council</u> inquiry is fundamentally a practical one. The exception applies not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court. In cases where the only entities able to invoke Medicare Act review are highly unlikely to do so, their unwillingness to pursue a Medicare Act claim poses a serious practical roadblock to judicial review.

<u>Id.</u> at 712 (citations and internal quotation marks omitted). Based on the facts of that case, the court concluded that the entities that could challenge the regulation administratively, hospitals, had little (or no) incentive to do so and noted that in three years since the regulation was promulgated, no hospital had challenged it. <u>Id.</u> at 713–14. For those reasons, and because there was no relationship between the hospitals and the plaintiff's members that "would ensure an alignment of interests," the court held that the <u>Illinois Council</u> exception applied and that the plaintiff could therefore proceed in federal court pursuant to 28 U.S.C. § 1331. <u>Id.</u>

In <u>Action Alliance</u>, the D.C. Circuit dealt with "an effort on behalf of some 230,000 participants in the Medicare Part D prescription drug program to resist—indeed to reverse—the government's efforts to recover payments mistakenly made to those participants." 483 F.3d 852, 853–54 (D.C. Cir. 2007). The case arose when the Social Security Administration paid a total of $47 million, to thousands of Medicare Part D participants, "in error," and then sought to claw back the money roughly a month later. <u>Id.</u> at 854. The plaintiff, an advocacy group, filed suit, alleging that the Medicare statute required the government to provide written notice of a right to seek waiver of repayment. <u>Id.</u> at 855. In discussing whether the district court had jurisdiction to entertain the claims, the court observed that "no statute appear[ed] to make any affirmative grant of (channeled) jurisdiction over Medicare Part D claims of the type pressed by the [plaintiff]." <u>Id.</u> at 859. Because "the Medicare statute appear[ed] to provide no avenue for judicial review of

the [plaintiff]'s . . . waiver claim," the court "appl[ied] the rule of . . . <u>Illinois Council</u> and h[e]ld

that the district court had jurisdiction over that claim under 28 U.S.C. § 1331." <u>Id.</u> at 860.

In <u>Southwest Pharmacy Solutions</u>, the plaintiff, a coalition of independent pharmacies,

alleged that the government had issued a rule that allowed prescription drug plans to exclude

independent pharmacies from participating in preferred pharmacy networks.  718 F.3d 436,

439–40 (5th Cir. 2013).  The government argued that § 405(h) barred the plaintiff's claim.  <u>See</u>

<u>id.</u> at 440.  The Fifth Circuit agreed, relying on the fact that the plaintiff's member pharmacies

could serve as appointed representatives pursuing claims on behalf of customers.  <u>Id.</u> at 444.  In

that situation, "[t]he enrollees would not have to navigate the process of bringing an

administrative claim or shoulder any of the expenses associated with that process." <u>Id.</u>  The

court also noted that both the plaintiff and "the enrollees could receive a financial benefit from

overturning the [rule at issue]—albeit of different magnitudes—and have similar incentives to

initiate a regulatory challenge." <u>Id.</u> at 445.  Thus, "[b]ecause [plaintiff] could shoulder the

administrative and financial burdens of bringing an administrative claim and its enrollees stand

to gain some financial or other benefit from overturning the [rule]," the court found that "the

<u>Illinois Council</u> exception d[id] not apply." <u>Id.</u> at 446.

In <u>Physician Hospitals</u>, a trade group and a physician-owned hospital sued the

government, alleging that a statute limiting Medicare reimbursement for services provided to

patients referred by physician-owners was unconstitutional.  691 F.3d 649, 652 (5th Cir. 2012).

The parties agreed that to file an administrative claim, the hospital plaintiff, which was in the

midst of a $30 million expansion of its physical facilities, "would have to complete its new

building and treat a patient in that building, thereby risking millions of dollars in investment and

creating a potential of having a large, empty building." <u>Id.</u>  Nevertheless, the government argued

that under § 405(h), the court lacked subject matter jurisdiction.  Id.  The Court agreed, finding

that the plaintiffs had failed to adequately demonstrate why another hospital in the trade group,

in a less precarious financial situation, could not challenge the allegedly unconstitutional rule

administratively.  Id. at 659.

In American Chiropractic Ass'n, an association of chiropractors sued the Secretary of

HHS, asserting that (1) manual spinal manipulation should be a covered service only if

performed by a chiropractor and (2) organizations should not be permitted to require referrals

from non-chiropractors before obtaining coverage for chiropractic services.  431 F.3d 812,

814–15 (D.C. Cir. 2005).  The government challenged the district court's jurisdiction, citing

§ 405(h) and § 1395ii.  See id. at 816.  In assessing whether the Illinois Council "no review"

exception applied, the court described the test as follows:

> Although § 1395ii, which incorporates § 405(h), would appear to preclude all
> Medicare suits founded on general federal question jurisdiction, the Supreme Court
> has recognized an exception: if the claimant can obtain judicial review only in a
> federal question suit, § 1395ii will not bar the suit.  The exception applies not only
> when administrative regulations foreclose judicial review, but also when
> roadblocks practically cut off any avenue to federal court.  As to the latter, it is not
> enough that claimants would encounter potentially isolated instances of the
> inconveniences sometimes associated with the postponement of judicial review, or
> that their claims might not receive adequate administrative attention.  The
> difficulties must be severe enough to render judicial review unavailable as a
> practical matter.

Id. (citations and internal quotation marks omitted).  With respect to the association's second

assertion, the court found that the association could have its claim heard in an administrative

proceeding in two ways: either an enrollee (i.e., a patient) could obtain chiropractic services

without a referral and then file a grievance if coverage were denied on that basis or a

chiropractor who provided the services could become his or her patient's assignee and mount an

administrative challenge.[12]  Id. at 816–17.  As to the association's first assertion, the court found

that, although a "more difficult" call, the association could also obtain judicial review of the

issues presented in that claim.[13]  Id. at 817.  Accordingly, because the association could have its

claims administratively reviewed, the district court lacked jurisdiction.  Id. at 818.

As a general rule, in the cases where the court found a lack of jurisdiction, there was

some way in which the plaintiff could facilitate administrative review.  See Puerto Rican Ass'n,

521 F.3d at 49 (noting that individual doctors and therapists, who were members of the

plaintiff-association, could, and were incentivized to, administratively challenge the regulation at

issue); Sensory Neurostimulation, 977 F.3d at 981–84 (finding that § 405(h) barred federal suit

because medical device supplier could become a beneficiary's assignee and/or recruit a proxy to

challenge the denial of an NCD); Sw. Pharmacy Sols., 718 F.3d at 444–45 (concluding that

because one of the plaintiff-association's member pharmacies could act as an enrollee's

appointed representative and challenge the rule through administrative channels, the Illinois

Council exception was inapplicable); Physician Hosps., 691 F.3d at 658 (declining to apply the

Illinois Council exclusion where the plaintiff failed to explain why another hospital in the

---

[12] The Court rejected the association's argument that because it could not, itself, be a party to the administrative proceedings, § 405(h) did not apply.  See Am. Chiropractic Ass'n, 431 F.3d at 817 ("The Association's objection that it could not itself become a party to the administrative proceedings is an objection the Supreme Court rejected in Illinois Council.  An association speaks only on behalf of its member[s], and thus has standing only because of the injury those members allegedly suffer." (alteration in original) (citation and internal quotation marks omitted)).

[13] Specifically, the court found that an enrollee in a health maintenance organization ("HMO") with a rule that only medical doctors and osteopaths (not chiropractors) are permitted to provide spinal manipulation services could obtain the services from a chiropractor, assign his claim for coverage to his chiropractor, and then the chiropractor could administratively contest the denial by arguing the HMO had misinterpreted the relevant statute.  See Am. Chiropractic Ass'n, 431 F.3d at 817.

association could not administratively challenge the relevant regulation); Am. Chiropractic

Ass'n, 431 F.3d at 816–17 (finding that an individual chiropractor could "mount an

administrative challenge" as an enrollee's assignee).[14]  Here, Akebia is not an association whose

members could challenge CMS's decision administratively (nor is it a member of an association

where other, better-positioned members could do so).  Rather, it is in a category of entities,

pharmaceutical companies, that are seemingly wholly excluded from the Part D administrative

review process.  Additionally, there is nothing in the record suggesting that Akebia could act as a

Part D participant's assignee or appointed representative.[15]  Thus, unlike the plaintiffs in these

cases, apart from standing idly by and hoping that Part D participants manage to run the gauntlet

---

[14] Council for Urological Interests could plausibly be read to suggest that the only reason the plaintiff was permitted to bring its claim in court was because the third-party hospitals who could have administratively challenged the relevant regulation had not challenged it and had no incentive to do so.  See 668 F.3d at 713–14.  That is, the fact that the plaintiff could not, itself, do anything to facilitate administrative review was immaterial to the analysis so long as another party, even if completely unaffiliated, was likely to bring an administrative challenge.  In contrast, the Part D participants here have an incentive to challenge (and have in fact already challenged) non-coverage of Auryxia.  Thus, under the logic of Council for Urological Interests, the fact that Akebia cannot bring about administrative review could be considered unimportant because Part D participants are incentivized to do so (and have).  Nevertheless, the Court is not bound by a D.C. Circuit case.  Further, it views Council for Urological Interests as an outlier and generally at odds with the trend in the case law that the applicability of the "no review" exception depends on whether there is something the plaintiff can do to facilitate administrative review.

[15] As Akebia points out, the Government could view an attempt by Akebia to serve as an assignee or representative for a participant as a violation of the federal anti-kickback statute. [ECF No. 59 at 17; ECF No. 108 at 4].  The Government has not responded to this argument, nor has it anywhere suggested that Akebia could act as a representative or assignee.  Further, even if Akebia could legally do so, as discussed above, at least one court has suggested that drug companies like Akebia need not recruit a proxy to obtain judicial review.  See Baxter, 643 F. Supp. 2d at 116.

necessary to successfully challenge a denial of coverage for Auryxia administratively, Akebia can do nothing to bring about review of the Government's position on Auryxia.[16]

Moreover, as Akebia points out and the Government concedes, an individual Part D participant can challenge only an individual coverage determination by a sponsor, not a generally-applicable decision by the Government that a drug is not covered under Part D.[17] Regardless of whether a Part D participant prevailed or failed through the administrative process or even a subsequent judicial proceeding, the resulting decision would apply only to that individual's claim for coverage, meaning that it would have no bearing on any other participant or give Akebia a more global resolution regarding coverage. See supra note 7; [ECF No. 59 at 14 n.5 (Akebia noting that a judicial decision in favor of single patient would not bind the Government in subsequent cases); ECF No. 71 at 4–5 (Government failing to address Akebia's argument)]. In sum, Akebia cannot obtain judicial review of its claim (that, because Auryxia is approved by the FDA for treating IDA and is not a "mineral product," it should be a covered drug for all Part D participants, not on dialysis, seeking to use it to treat IDA), unless it is

---

[16] Given the complex and potentially expensive administrative review process, a plaintiff's ability to contribute to its proxy's financial and administrative burden has been found to be relevant to the "no review" analysis. See Sw. Pharmacy Sols., 718 F.3d at 444 (discussing the fact that as an appointed representative, a pharmacy would relieve the enrollee's administrative and financial burden). Here, the Court finds it material that there is no indication that Akebia could help Part D participants seeking coverage for Auryxia navigate the complex and potentially costly administrative review process.

[17] The Government seemingly concedes this point. See [ECF No. 71 at 4 ("It does not matter that a beneficiary could not file an appeal formally seeking to overturn the CMS Email, and it is irrelevant that 'the agency adjudicator [in a challenge to an individual plan sponsor coverage determination] would not be permitted to overrule the CMS Decision.'" (alteration in original) (footnote omitted)].

allowed to challenge CMS's decision in court pursuant to 28 U.S.C. § 1331.[18]  Given these

circumstances, Akebia has adequately demonstrated that the <u>Illinois Council</u> "no review"

exception is applicable.[19]

Finally, even if the <u>Illinois Council</u> exception were inapplicable, § 405(h) would not

necessitate dismissal because Akebia presented its claim to the Government and exhausted it as

best it could.  <u>See</u> <u>Am. Hospital Ass'n v. Azar</u>, 895 F.3d 822, 825–26 (D.C. Cir. 2018) (noting

that the "presentment" and "exhaustion" requirements are separate and that the latter is

waivable).  As noted above, after the CMS decision, Akebia repeatedly lobbied the Government,

outside of litigation, to change its decision.  <u>See</u> [Compl. ¶¶ 38–46].

> Exhaustion is generally required as a matter of preventing premature interference
> with agency processes, so that the agency may function efficiently and so that it
> may have an opportunity to correct its own errors, to afford the parties and the
> courts the benefit of its experience and expertise, and to compile a record which is
> adequate for judicial review.

<u>Weinberger v. Salfi</u>, 422 U.S. 749, 765 (1975); <u>see also</u> <u>Illinois Council</u>, 529 U.S. at 11–12

(relying on <u>Salfi</u> in a Medicare case even though it is a Social Security case).  Here, during

pre-litigation engagement with the Government, Akebia met the goals of exhaustion by allowing

the Government a chance to change its decision, share its experience and expertise, and develop

---

[18] This distinguishes Akebia from the plaintiff in <u>Sensory Neurostimulation</u> because a proxy
acting on behalf of the plaintiff in that case could potentially obtain the same exact relief the
plaintiff was seeking: a binding nation-wide proclamation that the device was covered.  <u>See</u> 977
F.3d at 981.

[19] The Government appears to argue that because each and every Part D participant, not on
dialysis, seeking to use Auryxia to treat IDA can ultimately obtain judicial review of an
individual coverage denial, Akebia's claim is subject to judicial review.  As a practical matter,
however, given the number of Part D participants, the prevalence of CKD, and the burdensome,
complex, and expensive administrative review process, this piecemeal, participant-by-participant
review process would not, in fact, result in a meaningful judicial review of Akebia's claim.  <u>See</u>
<u>Am. Chiropractic Ass'n</u>, 431 F.3d at 816 (noting that substantial practical roadblocks to judicial
review can trigger the <u>Illinois Council</u> exception).

an administrative record. Thus, further administrative review does not seem necessary or productive as the Government's position on Auryxia as a Part D drug is clear.[20]

In sum, Akebia has met its burden of showing that the Court has subject matter jurisdiction.

### B. Final Agency Action

Pursuant to the APA, Akebia may seek review only of "final agency action." 5 U.S.C. § 704.

> As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted). The parties dispute whether the CMS decision here (i.e., that Auryxia is not covered under Part D when used to treat IDA in non-dialysis patients) constitutes final agency action. The Government argues that it was "not the consummation of CMS's decision-making process because it leaves room for further administrative decision-making and provides discretion to plan sponsors" and "did not determine any rights or obligations, and no legal obligations flow from it." [ECF No. 47 at 12–16]. Akebia responds that CMS's decision satisfies both prongs of the

---

[20] The Government represents that individual Part D participants have pursued administrative appeals of non-coverage for Auryxia for IDA, see [ECF No. 71 at 3 n.2; ECF No. 107-1 at 5–8], but these administrative actions have not resulted in changes to the Government's position on the relevant issues. This supports the Court's determination that further development of an administrative record to satisfy the exhaustion requirement is not warranted.

Bennett test.  [ECF No. 59 at 20–26].  For the reasons below, the Court finds that CMS's decision qualifies as final agency action for purposes of the APA.

With regard to the first prong of the Bennett construct, CMS's decision was the consummation of the decision-making process and was neither tentative nor interlocutory.  First, the initial email alerting sponsors of the change in position is unequivocal: Auryxia is excluded from Part D for one use (treating IDA in patients not on dialysis), but not excluded for another use (controlling serum phosphorus levels in patients on dialysis).  See [ECF No. 1-1 at 2].  Second, since the email was sent in September 2018, Part D sponsors have adhered to the Government's stance and not covered Auryxia for treating IDA in patients not on dialysis.  [Compl. ¶ 37].  Third, after Akebia lobbied for reconsideration, [id. ¶¶ 37–45], the Government told Akebia, in no uncertain terms, that it would not change its position, [id. ¶ 46].  Although the Government maintains that the decision leaves room for further administrative decision-making and provides discretion to plan sponsors, the record belies these contentions.  At no point, either before or during this litigation, has the Government indicated that it may change its position on Auryxia.[21]  Nor is there anything in the record suggesting that any Part D sponsors have been exercising any discretion by continuing to cover Auryxia for treating IDA despite the Government's position.  To the contrary, sponsors have consistently denied coverage in accordance with the Government's email.  See [Compl. ¶ 37; ECF No. 107-1 at 5 (showing that

---

[21] The Court notes that it has been nearly three years since the initial email to plan sponsors, [ECF No. 1-1 at 2], and nearly two years since the Government told Akebia that it would not revisit its decision, [Compl. ¶ 46].  Given the passage of time, there is no reason to think that the Government will change course and no evidence that it is considering it.

participant's request for Part D coverage for Auryxia was denied by sponsor)]. In sum, all signs point to the Government's decision being final.[22]

CMS's decision also satisfies the second half of the <u>Bennett</u> test. Before the decision, non-dialysis Part D participants could obtain Auryxia to treat IDA through their sponsors, sponsors covered Auryxia for that use, and the Government reimbursed sponsors for covering Auryxia for that use. <u>See</u> [Compl. ¶ 34]. After the decision, non-dialysis Part D participants cannot obtain Auryxia to treat IDA through their sponsors, sponsors do not cover Auryxia for that use, and the Government does not reimburse sponsors for covering Auryxia for that use. <u>See</u> [<u>id.</u> ¶ 36]. The decision therefore altered the rights and obligations of participants, sponsors, and the Government.[23]

_____

[22] The cases cited by the Government, <u>Holistic Candlers & Consumers Ass'n v. FDA</u>, 664 F.3d 940 (D.C. Cir. 2012) and <u>AT&T & Co. v. EEOC</u>, 270 F.3d 973 (D.C. Cir. 2001), are inapposite. In <u>Holistic Candlers</u>, the FDA invited the plaintiffs to engage further with the agency to determine whether the product at issue, ear candles, could be legally sold. 664 F.3d at 942–44. Here, the Government has told Akebia that it will not revisit its decision. [Comp. ¶ 46]. Additionally, the letters sent by the FDA in that case were more equivocal than the email here. <u>Holistic Candlers</u>, 664 F.3d at 942–44. In <u>AT&T</u>, the EEOC simply expressed its view of the law, which had "force only to the extent the agency c[ould] persuade a court to the same conclusion." 270 F.3d at 976. Here, the Government's decision regarding Auryxia has force; since 2018, Part D sponsors have not covered Auryxia for treating IDA in patients not on dialysis. [Compl. ¶ 37]. Further, whereas the court in <u>AT&T</u> would "disrupt the administrative process" by interfering with the agency's "discretion to allocate its resources," 270 F.3d at 976, here, there is nothing for the Court to disrupt because the Government is not reconsidering its decision.

[23] Again, the cases relied upon by the Government, [ECF No. 47 at 16], are distinguishable and do not compel a different conclusion. In <u>Independent Equipment Dealers Ass'n v. EPA</u>, the agency letter at issue had no "concrete impact" on the plaintiff and merely "restated in an abstract setting – for the umteenth [sic] time – EPA's longstanding interpretation" of its regulations. 372 F.3d 420, 427 (D.C. Cir. 2004). Here, on the other hand, CMS's decision had a concrete impact on many, including Akebia and Part D sponsors and participants. Further, the CMS decision, unlike the EPA's decision in <u>Independent Equipment</u>, was a departure from the Government's prior interpretation of the relevant regulation. In <u>Center for Auto Safety v. National Highway Traffic Safety Administration</u>, the language in the document at issue was far more equivocal than the language in CMS's email. 452 F.3d 798, 809 (D.C. Cir. 2006). Further,

Where, as here, the Government changes its stance on the meaning of a particular regulation vis-à-vis a particular drug and shows no signs of changing its mind, and that decision has a concrete impact on Part D participants and sponsors, the decision qualifies as final agency action for APA purposes.  Cf. Baxter, 643 F. Supp. 2d at 116 (finding that letter from CMS to pharmaceutical company was final agency action because "CMS stated its legal position firmly and finally").

III.     **CONCLUSION**

For the reasons stated above, the Court has subject matter over Akebia's claims and finds that Akebia has plausibly alleged final agency action subject to APA review.  Accordingly, the Government's motion to dismiss, [ECF No. 46], is DENIED.

**SO ORDERED.**

July 9, 2021                                                              /s/ Allison D. Burroughs
                                                                         ALLISON D. BURROUGHS
                                                                         U.S. DISTRICT JUDGE

---

the car manufacturers in that case did not seem to change their behavior because of the agency's policy guidelines, id. at 811, whereas here, the sponsors did change their behavior following CMS's decision.  Finally, the language in the protocols at issue in National Ass'n of Home Builders v. Norton was ambiguous and did not represent a definitive stance on a particular issue. 415 F.3d 8, 14 (D.C. Cir. 2005).